C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-----------------------------------------------------------

In the Matter of the Application of the
United States of America for Authorization
to Intercept Wire and Electronic
Communications Occurring over the
Cellular Telephone Currently Assigned
Telephone Number 901-229-6346, ESN
A000004778A3BE ("**Target Phone 4**")

No. 1:17-mc-52-4

Hon. Robert J. Jonker
Chief United States District Judge

**SEALED**

-----------------------------------------------------------

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR ORDER AUTHORIZING
THE INTERCEPTION OF WIRE AND ELECTRONIC COMMUNICATIONS
AND FOR OTHER RELIEF CONCERNING TARGET PHONE 4**

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ...............................................................................3

II.     **NEWLY IDENTIFIED TARGET SUBJECTS**..............................................11

III.    **PROBABLE CAUSE IN SUPPORT OF INTERCEPTION**.......................12

        **A. Summary**......................................................................................12

        **B. Identification of PHILLIPS's use of Target Phone 4 in furtherance
        of drug trafficking**................................................................................17

        **C. Analysis of Toll Records**........................................................................20

IV.     **NECESSITY** .....................................................................................22

        **A. Electronic Surveillance**.........................................................................24

        **B. Physical Surveillance** ...........................................................................29

        **C. Cooperating Sources of Information and Undercover
        Agents/Officers** .........................................................................................34

        **D. Subject/Witness Interviews and Grand Jury Subpoenas** ................37

1

E. Search Warrants and Consent Searches ............................................40

F. Pen Register, Trap and Trace, and Telephone Analyses..................42

G. Trash Pulls ...............................................................................43

H. Mobile Tracking Devices..........................................................46

I. Video Surveillance Cameras ....................................................48

J. Mail Cover Requests ................................................................49

K. Other Investigations ...............................................................50

V. PRIOR APPLICATIONS...............................................................51

VI. MINIMIZATION ...........................................................................53

VII. OTHER REQUESTS .....................................................................56

VIII. CONCLUSION ..............................................................................59

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-----------------------------------------------------------

In the Matter of the Application of the
United States of America for Authorization
to Intercept Wire and Electronic
Communications Occurring over the
Cellular Telephone Currently Assigned
Telephone Number 901-229-6346, ESN
A000004778A3BE ("**Target Phone 4**")

No. 17-mc-52-4

Hon. Robert J. Jonker
Chief United States District Judge

**SEALED**

-----------------------------------------------------------

## Affidavit in Support of Application for Order Authorizing the Interception of Wire and Electronic Communications over Target Phone 4

Alexis Giudice, being duly sworn, states as follows:

### I.    Introduction

1.    I am a Special Agent with the United States Drug Enforcement Administration, United States Department of Justice. I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am currently assigned to the Grand Rapids Office in the DEA's Detroit Field Division. During my time as a Special Agent, I have participated in investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have been the affiant in investigations that included the interception of wire and

3

electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b).

2.      This Affidavit is submitted in support of an Application for an Order under Title 18, United States Code, Section 2518, authorizing: the initial interception of wire and electronic communications of: the **Interceptees of Target Phone 4** (defined *infra*) and others as yet unknown, occurring to and from a cellular telephone currently assigned telephone number (901) 229-6346 with ESN A000004778A3BE, a phone showing a billing party of "Update Info" with an address of 295 Parkshore Drive, Folsom, CA, 95630 used by YUSEF LATEEF PHILLIPS, with service provided by Cellco Partnership DBA Verizon Wireless (hereinafter referred to as "**Target Phone 4**" or the "**Target Phone**").

4

3. Evidence developed in this investigation indicates that the user of **Target Phone 4** is utilizing it to commit the following criminal offenses:

a. conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846;

b. possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1);

c. use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and

d. offenses involving money laundering, conspiracy to do the same, and attempts to do the same, in violation of 18 U.S.C. §§ 1956 and 1957 (hereinafter, the "TARGET OFFENSES").

4. The authorization sought is intended to apply not only to the telephone numbers assigned to **Target Phone 4**, but also to:

a. any background conversations intercepted in the vicinity of **Target Phone 4** while the telephone is off the hook or otherwise in use;

b. any wire and electronic communications that are intended for **Target Phone 4** but are redirected due to the activation of the service provider's call-forwarding feature for **Target Phone 4**;

c. any real time interception of messages that are left in or retrieved from the voice mail system of **Target Phone 4**; and

5

    d.  any other phone number subsequently assigned to or used by the instrument bearing the same electronic serial number used by **Target Phone 4**, within the thirty-day period. The authorization is also intended to apply to the numbers of **Target Phone 4** referenced above regardless of service provider.

   5.  I am personally involved in the investigation of the offenses referred to below. In addition to my personal knowledge, the statements contained in this Affidavit are based in part on:

    a.  information provided by DEA Agents, Grand Rapids Police Department officers, and other law enforcement officials, including oral and written reports that I have received directly or indirectly from DEA and other law enforcement officials;

    b.  interviews with confidential sources;

    c.  results of physical surveillance conducted by DEA Agents and other law enforcement officials, which have been reported to me either directly or indirectly;

    d.  a review by other law enforcement officers and law enforcement analysts of telephone toll records, pen register, trap and trace, and subscriber information, which has been communicated to me;

    e.  consensually recorded telephone calls and text messages in the course of this investigation, the contents of which have been reported to me;

6

        f.      records from the National Law Enforcement Telecommunications System;

        g.      my training and experience as a Special Agent;

        h.      the training and experience of DEA agents and investigators, Grand Rapids Police Department officers, and other law enforcement officials with whom I have spoken regarding this investigation, or whose reports I have reviewed; and

        i.      wire and electronic communications intercepted from **Target Phone 1**, used by CAZEMBIE SOKONI BASKIN, aka "Doe-Boy," pursuant to this Court's June 5, 2017 Order.

        j.      wire and electronic communications intercepted from **Target Phone 2**, used by RETISHA MAE PEGRAM, aka "Blackie," pursuant to this Court's June 21, 2017 Order.

        k.      wire and electronic communications intercepted from **Target Phone 3**, used by RAY ANTHONY LEE, aka "Rudy Ray," pursuant to this Court's July 20, 2017 Order.

      6.      On the basis of the information contained in this Affidavit, my experience and training, and on the basis of other information which I have reviewed and determined to be reliable, I allege that the facts show that:

        a.      There is probable cause to believe that YUSEF LATEEF PHILLIPS, aka "Sef"; RAY ANTHONY LEE, aka "Rudy Ray"; DEMETRIUS

7

DEWAYNE GAINES; CAZEMBIE SOKONI BASKIN, aka "Doe-Boy"; ANDREA KAY THOMPSON; ERNESTINE HUBBARD; PAUL TIMOTHY WILLIAMS, aka "Fish boy"; JESSE MARTELL PHILLIPS; RETISHA MAE PEGRAM, aka "Blackie"; KIMBERLY ANN FOSTER; KEONA NICOLE WILLIAMS; EDDIE CLIFTON POWELL, Jr.; PHILLIP NELSON; BRANDON KENYEN PARKS; CHARITY MAE VANDERWAL; TRISHA NELSON; DENATE QUINN; LATOYA JOWERS; LEON WILLIAMS, aka "Nuke;" MICHAEL YADELL NELSON; MICHAEL STERLING; MICHAEL GOULD; KAYODE MOYO-JOMOKE MARSHALL,ERIKA ATKINSON, SOLON TATUM, JENNIFER JOY THOMAS (collectively, the "TARGET SUBJECTS"), and others as yet unknown have committed, are committing, and will continue to commit the TARGET OFFENSES.

b. This probable cause determination is based upon PHILLIPS's ongoing use of wire and electronic communications to and from **Target Phone 4** in furtherance of drug trafficking, as set forth below, with certain TARGET SUBJECTS, including: YUSEF LATEEF PHILLIPS, aka "Sef"; RAY ANTHONY LEE, aka "Rudy Ray"; MICHAEL GOULD; JENNIFER JOY THOMAS; and others yet unknown (collectively, the **Interceptees of Target Phone 4 or Interceptees**).

c. There is probable cause to believe that particular wire and electronic communications of the **Interceptees** and others yet unknown concerning the TARGET OFFENSES will be obtained through the interception of such communications to and from **Target Phone 4.** In particular, these wire and

8

electronic communications are expected to concern the specifics of the TARGET OFFENSES, including:

    i.    the nature, extent, and methods of the distribution of controlled substances by the **Interceptees** and others;

    ii.    the nature, extent, and methods of operation of the illegal enterprise being conducted by the **Interceptees**;

    iii.    the identities and roles of accomplices, aiders and abettors, co-conspirators, and other participants in these illegal activities;

    iv.    the distribution and transfer of controlled substances and money involved in the illegal activities;

    v.    the existence and location of records related to the illegal activities;

    vi.    the location and source of supply for the controlled substances and for the resources used to finance the illegal activities;

    vii.    the location and disposition of the proceeds from the illegal activities; and

    viii.    the locations and items used in furtherance of the illegal activities.

    d.    In addition, these wire and electronic communications are expected to constitute admissible evidence of the commission of the TARGET OFFENSES.

9

7. Since this Affidavit is being submitted for the limited purpose of securing authorization for the interception of wire and electronic communications over **Target Phone 4**, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that agents and officers believe necessary to establish probable cause and the foundation for an Order authorizing the interception of wire and electronic communications.

8. To the extent that I use quoted language in this Affidavit from consensually recorded and lawfully intercepted telephone conversations and text messages, these quotes are taken from careful review of the conversations as communicated to me by other law enforcement officials. These quotes are still in draft format and are not intended to be final transcripts or quotations. At various points in the Affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on the contents and context of the conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, information provided by the confidential source involved in the call, my experience and training, and the experience and training of other law enforcement agents in this investigation.

9. As is described in detail later in this Affidavit, though normal investigative procedures have been successful in initiating this investigation, these investigative procedures have been tried and have failed, or reasonably appear

10

unlikely to succeed in achieving all of the objectives of this investigation, or are too risky to employ at this time.

## II.   NEWLY IDENTIFIED TARGET SUBJECTS

10.   The following TARGET SUBJECTS have been identified since the prior application of July 20, 2017, through information from intercepted communications, confidential sources, surveillance, controlled purchases of narcotics, and telephone records:

a.   ERIKA ATKINSON. Based on wire interceptions from **Target Phone 3,** investigators identified ATKINSON is a narcotics customer of LEE. ATKINSON has a criminal history that includes State of Michigan convictions for retail fraud, larceny in a building, controlled substance-possession of marijuana, operating-license suspended, and operating-impaired.

b.   SOLON TATUM.  Based on physical surveillance during the investigation, investigators identified TATUM as a Grand Rapids-based narcotic trafficker, whose source of supply is LEE. TATUM has a criminal history that includes State of Michigan convictions for motor vehicle-unlawful, controlled substance-delivery/manufacture 50-449 grams, and domestic violence.

c.   JENNIFER JOY THOMAS. Investigators have identified THOMAS as a Grand Rapids, Michigan retail distributor for both cocaine and crack cocaine through controlled purchases of narcotics from her. THOMAS is an associate of Yusef PHILLIPS. THOMAS has a criminal history that includes State of Michigan

11

convictions for controlled substance-delivery/manufacture less than 50 grams, operating-license suspended, weapons-switchblade-possession or sale, and habitual offender.

## III.  PROBABLE CAUSE IN SUPPORT OF INTERCEPTION

### A.  Summary

11.  Since spring of 2016, agents and officers from the DEA Grand Rapids Resident Office, and the Grand Rapids Police Department have been conducting this joint investigation into the drug trafficking activities of the Drug Trafficking Organization ("DTO").  According to proffer interviews and Confidential Source interviews, the DTO has been operating out of the Grand Rapids, Benton Harbor, and Kalamazoo, Michigan area since 2014. The investigation has revealed that the DTO is distributing heroin and cocaine in kilogram level quantities throughout Western Michigan.

12.  Sources indicate that the DTO is utilizing an unknown Mexican source of supply that delivers drugs into Michigan.  As detailed in the prior affidavits, surveillance has observed both LEE and PHILLIPS at two separate stash house locations moving packages into and out of them.  Investigators have conducted regular trash pulls from these locations on March 27, 2017, May 8, 2017, July 10, 2017, and July 24, 2017, and on each occasion discovered kilogram wrappers, packaging made of clear tape in the size of kilogram packages, cellophane wrappings,

12

heat sealed bags, numerous pairs of latex gloves, two respiratory masks, an empty box of sandwich bags, three gallon zip lock bags, and bottles of GNC Inositol (a cutting agent for narcotics). During the May 8, 2017 trash pull, investigators discovered a GNC paper receipt for GNC Inositol powder to RAY LEE.

13.     On June 29, 2017, investigators applied for and obtained a federal GPS car tracker for RAY LEE's Audi A6, which was signed by the Honorable Judge Ellen Carmody.On July 17, 2017, at approximately 4:00 a.m., investigators were alerted by electronic surveillance to the movement of RAY LEE's Audi A6. Investigators traveled to the parking lot of the Meijer Grocery located at 5531 28th Street, Grand Rapids Michigan and observed LEE's vehicle in the parking lot at the south end of the Country Inn and Suites located at 5399 28th Street SE, Grand Rapids, Michigan.

14.     A few minutes later, investigators observed a semi-truck with a trailer arrive and park on the west side of the hotel. Investigators then observed a male exit the passenger side of the truck and walk to rear of the trailer. Investigators then observed LEE's vehicle leave its parking spot and pull next to the rear doors of the truck. Investigators then observed a second Audi, driven by YUSEF PHILLIPS, arrive and park next to LEE's vehicle. After approximately a few minutes, both LEE and PHILLIPS vehicles l parking lot. Approximately a few minutes after the departure of both LEE and PHILLIPS, the truck drove out of the parking lot.

15.     At approximately 4:55 a.m., investigators observed LEE and PHILLIPS arrive at their narcotics stash location located at 3841 Whispering Way Drive SE,

Grand Rapids, MI monitoring the GPS car tracker information and a pole camera.,. Investigators then observed PHILLIPS carrying a large duffle bag into the narcotics stash location. At approximately 5:09 a.m., LEE and PHILLIPS left the narcotics stash apartment. Based on the observations early that morning, the brief exchange between LEE and PHILLIPS and the truck occupant, and the return to the stash location tied through the investigation to a multitude of kilogram wrappers over the last several months, Investigators believe that the meet with the semi-truck was for the purposes of LEE and PHILLIPS obtaining a shipment of narcotics from their source of supply.

16.    The investigation has also revealed that LEE and PHILLIPS utilize members of the DTO to transport/distribute narcotics for them. Based on my training and experience, most DTO leaders like PHILLIPS and LEE do not handle their own narcotics while in public places or outside of their stash locations. The leaders instead direct workers to possess, sell, transport and/or hold heroin and cocaine to prevent an arrest in the event they encounter law enforcement.

17.    For example, on July 18, 2017, investigators observed LEE arrive at a narcotics stash location located 3818 Camelot Drive SE, Grand Rapids, Michigan. At approximately 9:50 a.m., investigators observed LEE exit the narcotics stash location carrying a box. Investigators then observed LEE travel to the Woodland Mall parking lot located at 3195 28th Street SE, Grand Rapids, Michigan and arrive at approximately 10:22 a.m.

18. Investigators then observed LEE park two parking spaces away from SOLON TATUM, the driver of a black Range Rover, Michigan plate: DLL-5421, registered to SOLON TATUM. After a few minutes, investigators observed LEE exit his vehicle carrying the box and enter TATUM's vehicle. Investigators then observed LEE hand the box of suspected narcotics to TATUM and TATUM hand LEE a plastic bag that appeared to be full. Investigators then observed LEE and TATUM talk to one another for approximately a few minutes before LEE left the vehicle and return to his own vehicle. Due to the timing of the shipment of narcotics obtained by LEE and PHILLIS the previous day and the nature and duration of his meeting with TATUM, Investigators suspect that LEE distributed a large amount of narcotics to TATUM for further distribution on behalf of the DTO.

19. Additionally, as detailed below, the investigation has determined that LEE and PHILLPS regularly switch their cell phones, approximately every 30 days. The investigation has tied LEE to the use of four separate telephones since April. In my training and experience, drug traffickers regularly use, discard, and switch cellular telephones to facilitate their drug trafficking and thwart law enforcement detection.

20. On June 5, 2017, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, authorized the interception of wire and electronic communications occurring to and from a cellular telephone currently assigned telephone number (616) 427-4523, used by CAZEMBIE

15

SOKONI BASKIN (hereinafter referred to as "**Target Phone 1**"), based on my affidavit in support of an application for an order authorizing interception. The facts recited in that affidavit are incorporated by reference herein and the affidavit for **Target Phone 1** is available for the Court's reference at the Court's request. The additional facts offered in support of probable cause as a part of this Application are set forth below.

21.     Interceptions over **Target Phone 1** indicated that PEGRAM is involved in distributing narcotics and that she transports narcotics for BASKIN from Chicago to Grand Rapids, in addition to distributing them herself.

22.     On June 21, 2017, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, authorized the interception of wire and electronic communications occurring to and from a cellular telephone currently assigned telephone number (269) 556-5645, used by RETISHA MAE PEGRAM (hereinafter referred to as "**Target Phone 2**"), based on my affidavit in support of an application for an order authorizing interception. The facts recited in that affidavit are incorporated by reference herein and the affidavit for **Target Phone 2** is available for the Court's reference at the Court's request. The additional facts offered in support of probable cause as a part of this Application are set forth below.

23.     Interceptions over **Target Phone 2** indicated that LEE is involved in distributing narcotics and supplied heroin to PEGRAM, as investigator observed him

16

make a ten gram heroin delivery to PEGRAAM in conjunction with intercepted communications involving the transaction..

24. On July 20, 2017, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, authorized the interception of wire and electronic communications occurring to and from a cellular telephone currently assigned telephone number (616) 318-4941, used by RAY LEE (hereinafter referred to as **"Target Phone 3"**), based on my affidavit in support of an application for an order authorizing interception. The facts recited in that affidavit are incorporated by reference herein and the affidavit for **Target Phone 3** is available for the Court's reference at the Court's request. The additional facts offered in support of probably cause as a part of this Application are set forth below.

25. Interceptions over **Target Phone 3** indicate that LEE is involved in distributing narcotics to KAYODE MARSHALL, and ERIKA ATKINSON. Further the interceptions confirm that LEE and PHILLIPS are working together to distribute narcotics throughout Western Michigan. Corresponding wire communications for these transactions were captured during the monitoring of **Target Phone 3**.

**B. Identification of PHILLIPS's use of Target Phone 4 in furtherance of drug trafficking.**

26. On July 21, 2017, at approximately 9:10 p.m., LEE, who was using **Target Phone 3**, had a phone conversation (Call 24) with Yusef PHILLIPS, who was

17

using 901-229-6346[1]. During the phone call, PHILLIPS asked LEE how much cocaine

was left at the narcotics stash location at 3841 Whispering Way. Specifically,

---

[1]     As detailed above and as highlighted in the June 5, 2017 Affidavit, specifically in pages 17-19, PHILLIPS is a co-leader of the DTO with RAY LEE and a kilogram level distributor of narcotics, according to source CS2 and as confirmed through surveillance and trash pulls. PHILLIPS was identified as the user of **Target Phone 4** in the following manner:

On July 4, 2017, investigators conducted physical and electronic (pole camera) surveillance on 3841 Whispering Way SE, Apt. 302, Grand Rapids, Michigan. At approximately 11:10 a.m. investigators observed PHILLIPS arrive in a silver Nissan rental vehicle and enter the apartment. At approximately 11:34 a.m., investigators observed PHILLIPS leave the apartment and drive directly to a mall parking lot located at 3525 28th Street SE, Grand Rapids, Michigan. At approximately 11:46 a.m., investigators observed PHILLIPS conduct a hand-to-hand suspected narcotics transaction with MICHAEL GOULD. Investigators observed GOULD enter and exit a yellow Dodge Neon. At approximately 11:49 a.m. both PHILLIPS and GOULD drove away from the parking lot. Investigators conducted surveillance on GOULD until he arrived back at his registered residence of 3241 Prairie Street, Grandville, Michigan. Investigators then observed PHILLIPS arrive at 6488 Cascade Road, Grand Rapids, Michigan and place a black bag into the trunk of the rental vehicle prior to entering the residence.

Investigators then conducted a toll analysis of GOULD's phone number of (616) 990-5440 for the date of July 4, 2017. The toll analysis revealed 4 phone calls and 43 text messages between GOULD's phone number of (616) 990-5440 and **Target Phone 4**. Further, a toll analysis of GOULD's phone number of (616) 990-5440 revealed common contacts with phone numbers belonging to LEE as well as **Target Phone 4**. The toll analysis showed that GOULD would attempt to contact either LEE or **Target Phone 4** if either LEE or PHILLIPS did not answer the call.

Further, investigators have conducted electronic surveillance on two known stash locations for LEE and PHILLIPS: 3818 Camelot Drive, Grand Rapids, MI; and 3841 Whispering Way, Grand Rapids MI, for approximately 60 days via pole cameras and mobile video surveillance. During this time frame, only LEE and PHILLIPS have been observed entering and exiting these locations. During the call between LEE and PHILLIPS detailed above, acquired from the interceptions of **Target Phone 3**, the user of phone number **Target Phone 4** stated, "You said you got one left over at your spot?" Approximately 6 minutes after this phone call, investigators observed PHILLIPS enter the stash location located at 3818 Camelot Drive and then immediately conducting a narcotics transaction. Based on the narcotics transaction between GOULD and PHILLIPS, the phone call between LEE and PHILLIPS and a toll analysis of **Target Phone 4**, investigators believe this phone number belongs to YUSEF PHILLIPS.

PHILLIPS stated, "Oh okay. Tell me how many girls [kilograms of cocaine] did you get so far?" LEE stated, "One." PHILLIPS stated, "You said one?" LEE stated, "Yup. Hold on. Hold on. Hold on. I got one [kilogram of cocaine] and have the one I got from you. Did I get one from you? Yeah. Yeah. So I got one [kilogram of cocaine] over there." PHILLIPS stated, "You said you got one [kilogram of cocaine] left over at your spot [the stash house at 3841 Whispering Way]?" LEE stated, "Yup." PHILLIPS stated, "Okay, I was just making sure." LEE stated, "Everything good?" PHILLIPS stated, "Yeah."

27. On July 21, 2016, at approximately 9:16 p.m., within six minutes of call between PHILLIPS and LEE in the paragraph above, investigators observed PHILLIPS arrive at 3818 Camelot Drive SE, Grand Rapids, Michigan, the narcotics stash location for the DTO, in a silver Ford GT Mustang, using a pole camera. At approximately 9:20 p.m., investigators established surveillance at 3818 Camelot Drive SE. At approximately 9:33 p.m., investigators observed PHILLIPS exit 3818 Camelot Drive SE and drive to the Planet Fitness parking lot located at 3681 28th Street SE, Grand Rapids, Michigan.

28. At approximately 9:44 p.m., investigators observed DEMETRIUS GAINES arrive in a black Chevrolet Impala, with Michigan Plate: 3LWN04, registered to GAINES. As detailed in the June 5, 2017 affidavit in paragraphs 10(c)

19

and 24, through information from CS2, investigators previously identified GAINES as a kilogram level distributor for the DTO based on source information and the recovery of a kilogram wrapper from a location he is known to frequent. Investigators then observed PHILLIPS leave his vehicle and enter the passenger front seat of GAINES's vehicle for approximately three minutes before exiting. At approximately 9:47 p.m., investigators observed both vehicles leave the parking lot. Based on the prior intercepted communication concerning the remaining kilogram of cocaine, PHILLIPS travel to the stash location and his brief meeting with GAINES that followed, investigators believe that PHILLIPS delivered cocaine to GAINES during this meeting.

### C. Analysis of Toll Records

29.     **Target Phone 4** - Investigators obtained phone records for **Target Phone 4** for the dates of June 29, 2017, through July 25, 2017. During the analysis period, **Target Phone 4** conducted a total of 1622 phone calls and 1262 text messages.

30.     An analysis of those phone records reveals that PHILLIPS has been in contact with the following **Interceptees** over **Target Phone 4:**

31.     **MICHAEL GOULD**, (616) 990-5440[2]: from July 12, 2017, through July 10, 2017, there were approximately 9 phone calls and 39 text messages between

---

[2] Investigators identified MICHAEL GOULD as the user of (616) 990-5440 in the following manner: Subscriber information provided by T-Mobile, which lists the name of "Robert Gould," is Michael GOULD's father. Further, investigators searched phone number

**Target Phone 4** and GOULD on phone number (616) 990-5440. The most recent

phone call between (616) 990-5440 and **Target Phone 4** took place on July 4, 2017.

The most recent text message between (616) 990-5440 and **Target Phone 4** took

place on July 12, 2017.

    32.    **JENNIFER JOY THOMAS,** (616) 308-3467[3]: From July 20, 2017

through July 21, 2017, there were approximately 2 phone calls and 8 text messages

---

(616) 990-5440on Facebook where if users attach a mobile phone number to their account, investigators will find which account is tied to the number, which revealed the account of "Mike GOULD" and pictures of GOULD tied to the account. On May 2, 2011, GOULD provided phone number (616) 990-5440 to the Grand Rapids Police Department as his cell phone number related to incident report #11-027536.

    Further, investigators have observed GOULD and PHILLIPS meet for a suspected narcotics transaction. On July 4, 2017, investigators conducted both physical and electronic surveillance on 3841 Whispering Way SE, Grand Rapids, Michigan, a narcotics stash location for LEE and PHILLIPS. At approximately 11:10 a.m., investigators observed PHILLIPS arrive in a silver Nissan and enter the apartment. At approximately 11:34 a.m., investigators observed PHILLIPS leave the apartment and drive directly to a mall parking lot located at 3525 28th Street SE, Grand Rapids, Michigan. At approximately 11:46 a.m., investigators observed PHILLIPS conduct a hand-to-hand suspected narcotics transaction with GOULD. Investigators observed GOULD enter and exit a yellow Dodge Neon, registered to GOULD before and after the transaction. At 11:49 a.m., investigators observed both vehicles exit the parking lot. Toll records for (616) 990-5440 indicated numerous calls with PHILLIPS on **Target Phone 4** surrounding the observed transaction.

    [3]    THOMAS was identified as the user of (616) 308-3467 through a controlled purchase of narcotics with the use of a confidential source (CS4) on July 5, 2017. During the call, KANET (Kent Area Narcotics Enforcement Team) investigators observed the dialing of this number when CS4 contacted THOMAS to make the purchase and recovered suspected narcotics from the transaction. CS4 is cooperating with law enforcement in hopes of receiving financial gain from information provided. CS4 has a criminal history that includes convictions for criminal sexual conduct, weapons offense, and robbery. Investigators have found CS4 to be reliable. Specifically, CS4 has provided information regarding BASKIN and MOORE, drugs distributed by the BASKIN and MOORE, and vehicles driven by BASKIN. CS4's information concerning the BASKIN and associates has been corroborated by other law enforcement sources and intelligence. For example, both physical and electronic surveillance has corroborated the frequented addresses of BASKIN, BASKIN's vehicle and toll analysis has confirmed BASKIN's phone number, all of which were provided by CS4. In addition, CS4

between **Target Phone 4** and THOMAS, who was using (616) 308-3467. The most recent phone call between (616) 308-3467 and **Target Phone 4** took place on July 20, 2017. The most recent text message between (616) 308-3467 and **Target Phone 4** took place on July 21, 2017.

## IV.    NECESSITY

33.    The objective of this investigation is to obtain evidence to fully prosecute **all the members of the DTO** who are involved or have been involved in or associated with narcotics trafficking. Specifically, the goal of this investigation is to identify and develop evidence concerning head DTO members to include YUSEF PHILLIPS and RAY LEE, and the whole of the DTO operating in the area of Grand Rapids, Michigan, Benton Harbor, Michigan and Kalamazoo, Michigan.

34.    The investigation aims to identify and target the drug trafficking network of the DTO, pinpointing customers, workers, and suppliers.

35.    I believe that the interception of wire and electronic communications over **Target Phone 4** will enable the government to further the goals and objectives of this investigation. Specifically, these objectives include:

---

has corroborated information on BAKSIN and MOORE that has been provided by CS2 as well as other law enforcement intelligence sources.

22

a. Identifying other key personnel involved in the DTO and discovering the full scope of each member's activity;

b. Discovering the identities and roles of all suppliers of controlled substances to the DTO;

c. Discovering the identities and roles of all customers of controlled substances of the DTO;

d. Discovering the management and disposition of proceeds generated by the DTO; and

e. Obtaining admissible evidence that demonstrates beyond a reasonable doubt that the TARGET SUBJECTS and any later identified targets committed the alleged violations of law set forth herein.

49. Based on my training and experience, the experience of other law enforcement officers, and based on the facts set forth herein, the interception of wire and electronic communications over **Target Phone 4** is necessary in this matter because normal investigative techniques have been tried and have failed to fully achieve the goals and objectives of this investigation, or appear reasonably unlikely to succeed if tried, or are too risky to be tried. Specifically, investigators have identified YUSEF PHILLIPS, along with RAY LEE, as a head of the DTO. The interception of PHILLIPS's phone likely will enable investigators to further identify and capture interceptions with PHILLIPS's source of supply, and identify additional

23

members of the DTO to include top-tier members and their roles and activities in support of the DTO.

50. The following investigative techniques, which are usually employed in this type of criminal investigation, have been attempted and have not been fully successful, reasonably appear to be unlikely to be successful if attempted, or are too risky to employ under the circumstances surrounding this investigation.

**A. Electronic Surveillance**

51. A prior wiretap of **Target Phone 1**, which concluded on July 4, 2017, provided useful information regarding the illegal drug activities of all of the individuals being intercepted over that wiretap. Specifically, on June 12, 2017, as mentioned in the June 21, 2017 affidavit, interception of the of **Target Phone 1** led investigators to the seizure of over 2 kilograms of cocaine, a .40 caliber handgun, and over $100,000 in the middle of a Chicago delivery involving PHILLIP NELSON and BRANDON PARKS, a delivery contemplated and endorsed by BASKIN and PEGRAM.

52. However, while thus far these intercepted calls provided valuable evidence regarding the illegal narcotics trafficking activities of the TARGET SUBJECTS, there has been insufficient information derived from the calls to identify all of the members of the drug trafficking organization, the locations used by the organization to receive, store and distribute both narcotics and drug proceeds, the sources of supply for the organization, the organization's methods of distributing

24

narcotics and/or collecting proceeds, as well as the other goals of this investigation. Additionally, targets of this investigation, including LEE, PHILLIPS, BASKIN, and PARKS have shown themselves wary of law enforcement. For example, LEE and PHILLIPS use fictitious addresses or rent apartments in other people's names, regularly use vehicles registered to other persons and place services such as Comcast Home Security in other person's names. Additionally, BASKIN and PARKS utilize rental vehicles that are rented in other person's names while conducting narcotics transactions, in order to deter law enforcement from locating known vehicles of theirs or placing GPS tracking devices on vehicles utilized during narcotics transactions.

53.     Moreover, the narcotics trafficking organization currently under investigation is a multi-state, complex organization, involving numerous individuals. Intercepting the communications of individuals on **Target Phone 1,** which is primarily utilized by BASKIN, and **Target Phone 2,** used by PEGRAM, will not be sufficient to uncover the full scope and nature of this enterprise, which appears to span several different states and involves many individuals. Intercepting the communications on **Target Phones 1 and 2** has not enabled DEA to gain adequate information concerning the activities of the drug trafficking organization in other states and areas. Specifically, the evidence gathered in this investigation has shown that BASKIN's source of supply for cocaine is NELSON through PEGRAM and PARKS's delivery of drugs. While interceptions of **Target Phone 1** have confirmed this relationship, they have not revealed BASKIN's Grand Rapids-based source of

25

supply for heroin, which he states is an associate of RAY LEE but not RAY LEE himself. Specifically, on July 1, 2017, at approximately 10:07 p.m., BASKIN using **Target Phone 1**, had a telephone conversation (Call no. 4766) with PARKS, using 616-885-6725. During the call, BASKIN informed PARKS he was currently waiting for his heroin source of supply to arrive and stated that PEGRAM is attempting to get them to LEE directly instead of the middle-man, whom BASKIN is waiting on. Although **Target Phone 1** confirmed that BASKIN's source of supply is indirectly LEE, the interceptions also confirmed that **Target Phone 1** will be unable to undercover the full scope of LEE's DTO.

54.     Similarly, the interceptions over **Target Phone 2** have confirmed that LEE is a source of supply for heroin for PEGRAM, as detailed in the application for **Target Phone 3**, but they have not provided any further detail about LEE and the DTO's other customers, his partner YUSEF PHILLIPS, or the DTO's source of supply.

55.     The interceptions over **Target Phone 3**, which commenced on July 20, 2017 and are ongoing, have confirmed that LEE and PHILLIPS are working together as the heads of the DTO, as detailed above, but they have no provided any further detail about PHILLIPS's customers, like DEMETRIUS GAINES who has not been in contact with LEE's phones, or the DTO's source of supply.

56.     The interception of **Target Phone 4** would aid the DEA in identifying further unknown associates of the DTO as well as the source of supply for the heads

26

of the DTO with the combined interceptions of **Target Phone 3** and **Target Phone 4.**

57. The interception of **Target Phone 4**, in conjunction with **Target Phone 3**, would aid investigators in developing sufficient evidence to: identify and convict all associates of the DTO; identify further stash locations pertaining to PHILLIPS; and determine the DTO's source of supply to include real-time information as to the next shipment of narcotics for the DTO.

58. DEA investigators have obtained search warrants for the GPS location information associated with **Target Phone 1, 2** and **3**. Specifically, the Honorable Ellen Carmody, United States Magistrate Judge for the Western District of Michigan, issued a search warrant for such information for **Target Phone 1** on June 5, 2017, a search warrant for such information for **Target Phone 2** on June 8, 2017 and a search warrant for such information for **Target Phone 3** on June 29, 2017. The location information from **Target Phone 1, Target Phone 2** and **Target Phone 3** corroborated information obtained through the interceptions of **Target Phone 1** and **Target Phone 2**, and confirmed the locations associated with the meet locations for narcotics transactions broadcasted by BASKIN, PEGRAM and LEE during the interceptions of **Target Phone 1** and **Target Phone 2**. While this location information is useful for locating and confirming the location of BASKIN, PEGRAM and LEE during the course of narcotics distributions in conjunction with the wire interceptions of **Target Phone 1** and **Target Phone 2**, it has not revealed the scope

27

of the DTO's drug trafficking operations, other members of the DTO, or the distribution flow of the DTO, including the involvement of YUSEF PHILLIPS.

59.     Additionally, in my experience, drug traffickers often seek to compartmentalize information in order to preserve the secrecy of their operations. Accordingly, it is not possible to identify all members of the drug trafficking conspiracy by intercepting the communications of a handful of individuals, because these individuals will deliberately remain ignorant of, and avoid contact with, certain other members of the drug trafficking organization.

60.     For example, the interceptions of **Target Phone 1** and **Target Phone 2** have revealed that BASKIN, and PEGRAM obtain heroin from LEE or from other associates of the LEE DTO. However, BASKIN is not able to contact LEE and must rely on PEGRAM to utilize LEE as a source of supply, even though BASKIN obtains heroin from an associate of LEE as well. Neither BASKIN nor PEGRAM has any contact with PHILLIPS. Similarly, GAINES has no contact with LEE, meaning that PHILLIPS and LEE compartmentalize the DTO's customers while working together to obtain and disseminate the organization's drugs. Details of the DTO's full activity require interception of the communications of both LEE and PHILLIPS.

61.     I also know that, based on my experience in Title III narcotics investigations, individuals who participate in drug trafficking organizations will often utilize several cellular telephones at the same time in order to compartmentalize information and minimize the chances that their unlawful

28

activities will be revealed, particularly in the event that law enforcement acquires authority to overhear conversations on any single phone that they utilize. For instance, interceptions over **Target Phone 1** and **Target Phone 2** indicate that BASKIN, PEGRAM, PARKS, PHILLIP NELSON, LEE and PHILLIPS use multiple phones and routinely change phone numbers every thirty days.

62.　　Accordingly, interception over **Target Phone 4** would increase the likelihood of DEA agents achieving the goals of this investigation, including the complete identification, disruption, and dismantling of the drug trafficking organization, both in the Western District of Michigan and other areas.

### B. Physical Surveillance

63.　　Since January 2017, law enforcement agents have conducted physical surveillance of the DTO in the Western District of Michigan. The physical surveillance has been successful in identifying some residences, vehicles, and additional members of the DTO, but in several instances members of the DTO have effectively thwarted law enforcement attempts at surveillance. Specifically, BASKIN has "cleaned" while driving vehicles, i.e., driven in a manner clearly intended to evade detection by law enforcement. In addition, the neighborhoods in which the DTO conducts drug trafficking generally are very law enforcement conscious.

64.　　For example, on May 3, 2017, BASKIN demonstrated his surveillance consciousness while DEA agents and GRPD officers conducted surveillance. Investigators observed BASKIN driving a vehicle away from a known narcotics

29

trafficker's place of business. While driving, BASKIN unexpectedly changed lanes and made a quick left hand turn into a Meijer parking lot. Once in the parking lot, BASKIN was observed driving extremely slowly up and down two parking lanes without parking the vehicle. BASKIN then exited the parking lot and changed lanes abruptly when choosing a direction to enter back on the main road. Due to BASKIN's surveillance consciousness, the surveillance was terminated.

65.     On June 6, 2017, at approximately 5:29 p.m., (Call no. 7), BASKIN arranged to meet with an unknown female for "two more of the same shit." At approximately 5:35 p.m., (Call no. 10), the unknown female stated, "You can just pull in that little driveway there next to the building." BASKIN then responded, "No, you can come to the car wash cause' I see police right there. I know what's up." The unknown female then responded, "Oh, okay, okay, okay."

66.     On June 27, 2017, at approximately 3:17 p.m., (Call no. 1264), PEGRAM who was using **Target Phone 2**, had a telephone conversation with BASKIN, using phone number 616-329-3419. During the call, BASKIN stated, "Man, everywhere I turn there's the police. Peep around you. They gotta' be fittin' to raid something man. It's a feeling." PEGRAM stated, "You say they on every corner?" BASKIN stated, "Boo, I'm coming down Alexander, one coming. I turn down Fuller, I see another mother fucking police car. I don't know if the nigga' turned around or not." PEGRAM stated, "So you want me to bring everything to Butterworth right now?" BASKIN stated, "Meet me on Butterworth Street." PEGRAM stated, "What ima' do with this

30

toy?" BASKIN stated, "The what?" PEGRAM stated, "The toy, the gat [gun]."
BASKIN stated, "Bury it [gun] in the back. Put it [gun] in the ground. Bury that
mother fucker or throw it in that little car."

67.    Further, during the July 18, 2017 drug transaction between LEE and
TATUM as detailed above, investigators observed LEE waiting until the surrounding
vehicles became unoccupied in the parking lot prior to leaving his vehicle.
Investiators then observed LEE look around multiple times prior to obtaining the box
containing the narcotics out of his vehicle and continuously looked around while
walking to TATUM's vehicle.

68.    Further, CS2 has advised investigators that members of the DTO have
radio frequency detectors in their vehicles that are able to detect GPS car trackers
and/or wire emitters. CS2 advised that the vehicles utilized by the DTO will be
occasionally checked for law enforcement devices such as vehicle trackers.

69.    Sources link PHILLIPS and LEE to the distribution of narcotics in the
Western District of Michigan to customers that they know and trust, but the
investigation demonstrates that PHILLIPS and LEE direct others, like PAUL
WILLIAMS, as noted below, to deliver or transport narcotics. Consequently, physical
surveillance will not be an effective means of developing admissible evidence against
those, like PHILLIPS and LEE, who use surrogates to conduct their criminal activity.

70.    For example, CS2 informed investigators that during deliveries by the
DTO, PAUL WILLIAMS is responsible for driving narcotics to a bus station at the

31

Woodland Mall. CS2 stated that WILLIAMS will then distribute the narcotics to a specific narcotics user, who is responsible for sitting at the bus stop with the narcotics until a buyer approaches. The specific narcotics user will then distribute the narcotics on behalf of the DTO and return the narcotics profits to WILLIAMS and/or YUSEF PHILLIPS, who will watch the transactions from the parking lot.

71. Generally speaking, physical surveillance in and of itself is useful mainly in generating information concerning the identity of an individual, where he or she resides, locations he or she frequents, and the identities of the persons with whom he or she meets. However, it provides limited direct evidence of the significance of the meetings. When used in conjunction with wire and electronic communication interception, however, physical surveillance has proved to be a useful investigative technique. Information obtained from the interception of communications over **Target Phone 3** and **Target Phone 4** will help law enforcement to locate **Interceptees** TARGET SUBJECTS and to identify additional TARGET SUBJECTS, thereby enhancing the prospects for fruitful physical surveillance, as it did during the interception of **Target Phone 1** and **Target Phone 2**,. In addition, with the knowledge provided beforehand by wire and electronic surveillance that a meeting is to take place at a given location, or that proceeds or narcotics will travel over a certain route, it may be possible to establish physical surveillance at that location or on that route in advance, thus minimizing the risks of detection inherent in following subjects or remaining at target locations for

32

extended periods of time. Investigators surveillance of LEE's delivery of 10 grams of heroin to PEGRAM was accomplished in this fashion.

72. Most importantly, intercepting communications of **Target Phone 4** in conjunction with physical surveillance will allow the investigators to identify those who are responsible for the decisions, specifically PHILLIPS who is the primary user of **Target Phone 4,** and efforts of the DTO, not just their surrogates tasked with holding contraband. Investigators hope **Target Phone 4** will reveal evidence of phones used by DTO decision makers to include YUSEF PHILLIPS, and PHILLIPS and LEE source of supply and to seek authority to monitor their phones and further the goals of the investigation.

73. Intercepting communications to and from **Target Phone 4** will also provide additional direct evidence of communications between the **Interceptees of Target Phone 4**, TARGET SUBJECTS and other conspirators and assist in identifying TARGET SUBJECTS and additional criminal associates of the TARGET SUBJECTS, including suppliers of drugs to the DTO; locations where additional cocaine and heroin distribution operations are being conducted, and locations from which they conduct their activities and store cash and narcotics; all of which is information that physical surveillance to date has not fully revealed.

74. Physical surveillance alone of the TARGET SUBJECTS will not establish, conclusively, the elements of the TARGET OFFENSES and has not, and most likely will not, conclusively establish the identities of various co-conspirators.

33

75.    By contrast, surveillance combined with interception of wire and electronic communications to and from **Target Phone 4** would provide investigators with information and evidence about the nature and timing of meetings between PHILLIPS and other members of the DTO.

## C.    Cooperating Sources of Information and Undercover Agents/Officers

76.    As detailed in the June 5, 2017 affidavit and above, agents in the Western District of Michigan have utilized cooperating sources in this investigation, but generally have not been successful in utilizing cooperating sources to accomplish the full scope of the investigation's goals. Sources in multiple agencies have been questioned regarding their knowledge of the DTO. Sources have seen PEGRAM, PHILILPS and LEE participate in heroin and cocaine transactions. Sources know that LEE and PHILLIPS are large-scale narcotics suppliers in Grand Rapids and other locations, but other sources who have purchased narcotics from other members of the DTO have had no direct contact with LEE, PHILLIPS or PEGRAM, or even knowledge of higher-level members of the DTO. As noted above, CS4 was able to recently purchase narcotics from THOMAS in a controlled purchase but there is no indication that CS4 has any contact or ability to contact and purchase narcotics from PHILLIPS or LEE.

77.    None of the sources has full knowledge of how the DTO operates. Nor could they identify the DTO's source(s) of supply, or describe how the DTO moves drugs and/or drug proceeds. Other sources developed through the investigation and

34

case have provided information, but because the PHILLIPS and LEE drug distribution network has been operating in the area of Grand Rapids, Benton Harbor, and Kalamazoo, Michigan for years, many sources are reluctant to testify or get involved for fear of retribution by members of the DTO.

78.     Many of these same sources provided a general knowledge regarding the activities of YUSEF PHILLIPS and RAY LEE and those of their subordinates under the PHILLIPS and LEE DTO's direction and control, which in the West Michigan area has become common "street talk," but none of the Cooperating Sources have knowledge of YUSEF PHILLIPS or RAY LEE's current heroin or cocaine source.

79.     Further, investigators have attempted to locate confidential sources that could make direct narcotics purchases into YUSEF PHILLIPS, RAY LEE or top-tier customers of the DTO's heads. However, due to the large quantities that LEE, PHILLIPS and the top-tier members of the DTO sell such as half-kilogram to a full kilogram of narcotics, buying directly into these targets is not feasible. For example, on July 21, 2017, at approximately 8:26 p.m., (Call no. 19), LEE who was using **Target Phone 3**, had a telephone conversation with an UNKNOWN MALE, using phone number 616-264-4662. During the call, LEE stated, "What are you trying to do?" The UNKNOWN MALE stated, "Oh my boy, he wanted [unintelligible]." LEE stated, "What?" The UNKNOWN MALE stated, "That girl [cocaine]." LEE stated, "Oh man you know I ain't going to come outside if it's less than one [kilogram]. You know I ain't going to do that bro." The interception of **Target Phone 4** would provide

35

investigators with a better understanding of the operations of the DTO, allow real-time interception of large scale narcotics trafficking and may identify the DTO's source of supply.

80. The goal of further investigation is to identify, as broadly as possible, the DTO's co-conspirators, and the scope of their activities. I know that, in my training and experience, drug traffickers and money launderers usually are highly reticent about meeting with unknown persons, or discussing the full scope of their activities with outsiders to their conspiracy, or individuals who are newly introduced to a DTO as a potential co-conspirator. Furthermore, the fact that cooperating sources have talked in general about the DTO and provided more specifics about lower-level members of the DTO does not obviate the need to intercept communications between members of the DTO. Members of the DTO are much more likely to discuss the nature, extent, and methods of the operations of the DTO in conversations with each other than in conversations with outsiders or individuals who are newly introduced to the DTO as a potential co-conspirator.

81. At this time, investigators have been unable to successfully introduce an undercover law enforcement officer (UC) to DTO members. However, if a UC were to be able to make an introduction, even a well-placed UC is unlikely to be made aware of the full scope of DTO member activities, or of all the detailed methods by which they operate their narcotics organization. Specifically, the UC would be unable to dictate the timing of the shipments of drugs or money, or have a say in how the

36

drugs or money are moved. Criminal organizations tend to be especially suspicious of outsiders and therefore the organizations themselves tend to be difficult to penetrate. Even if we were able to introduce a UC into the top tier and able to conduct controlled buys, it is likely (much like the limitations with confidential sources) that the UC would not be given access to information such as the DTO's source of supply or the disposition of its narcotics proceeds.

82. As stated prior, I am also aware that attempting to introduce a UC into an organization inherently comes with risks for the UC, particularly if any of the TARGET SUBJECTS suspect that the UC may be a law enforcement officer. It is very possible that attempting to introduce a UC into the upper tiers of the DTO may place that person in danger.

83. Accordingly, the use of one or more UCs is not a viable alternative technique to wire and electronic surveillance of **Target Phone 4**. At this time, I do not believe that the use of a UC is likely to be successful in helping achieve all of the goals of this investigation, namely the identification of all members and associates of the enterprise and the collection of evidence sufficient to demonstrate their guilt beyond a reasonable doubt.

## D. Subject/Witness Interviews and Grand Jury Subpoenas

84. Based on my experience, I believe that interviews of the TARGET SUBJECTS or their criminal associates would provide insufficient information as to the identities of all the persons involved in the conspiracy, the identification of the

37

individuals from whom they obtain narcotics, the location or locations where
narcotics, narcotics proceeds, and weapons are stored, and other pertinent
information regarding the offenses noted earlier. Among the limitations of subject
interviews is that without evidence of criminal wrongdoing, members of criminal
organizations are more likely to honor their commitment to the organization (i.e., to
not cooperate with law enforcement) over their personal responsibility to provide
truthful information to law enforcement officers.

85.     For example, additional subject interviews may alert the TARGET
SUBJECTS to the existence of the investigation, particularly if law enforcement
officers questioned a TARGET SUBJECT regarding events that law enforcement has
learned about based on calls or text messages intercepted from **Target Phone 1, 2,
3** and **4** during the course of this investigation.

86.     For example, on June 12, 2017, following the arrest of BRANDON
PARKS and PHILLIP NELSON and the seizure of over 2 kilograms of cocaine, a .40
caliber handgun, and $100,000, PARKS agreed to speak to officers following Miranda
warnings.  PARKS gave information to investigators about NELSON, including
information about two prior deliveries of cocaine PARKS had received from NELSON
on other occasions.   Notably, PARKS did not tell investigators anything about
BASKIN or PEGRAM and their roles in the drugs PARKS attempted to receive.
Because investigators did not want to risk tipping information about the still covert
investigation, and risk losing the wire and the information about PEGRAM's **Target**

38

**Phone 2**, investigators could not confront PARKS with information known about his West Michigan activity and the PHILLIPS and LEE DTO. For that reason, PARKS was a limited resource, even when caught with cocaine. Additionally, NELSON refused to speak with investigators.

87.     Further, based on my experience, agents believe that interviews of the TARGET SUBJECTS or their criminal associates would provide insufficient information about the identities of all the persons involved in the conspiracy, the identification of the individuals from whom they obtain narcotics, the location or locations where narcotics, narcotics proceeds, and weapons are stored, and other pertinent information regarding the SUBJECT OFFENSES. Finally, if law enforcement agents were successful in interviewing individuals who were willing to provide information, it is unlikely they would know or be able to provide direct evidence of the full scope of the conspiracy without being directly involved, thereby limiting their value as a witness.

88.     Similarly, based on my experience, I believe that subpoenaing persons suspected to be involved in this conspiracy and their associates before a federal grand jury would not be completely successful in achieving the goals of this investigation. If any principals were called to testify before the grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of the most culpable members of the

39

conspiracy and could not ensure that such immunized witnesses would provide truthful testimony. Additionally, the service of grand jury subpoenas upon the principals of the conspiracy would only alert them to the existence of this investigation, causing them to become more cautious in their activities, to flee to avoid further investigation and prosecution, or otherwise compromise the investigation. Finally, subpoenas for historical call contact between the TARGET SUBJECTS would provide only limited, or, in the case of some service providers, no information about electronic text contact between the targets of the investigation. Warrants for such information would provide only historical information which would not fully detail the full nature of the subject offenses as it could not be bolstered by surveillance and other live law enforcement techniques.

### E.     Search Warrants and Consent Searches

89.    I have also considered the use of search warrants and consent searches at the residences and/or "stash" locations of top tier DTO members and have concluded that these investigative techniques would be inappropriate at this stage of the investigation. Searches, whether by warrant or consent, would not reveal the total scope of the criminal enterprise, the identities of the co-conspirators, and/or the conclusive identities of the suppliers of illegal drugs to the organization and their associates.

90.    Law enforcement has developed suspected residences tied to members of the DTO, as well as "stash locations" used by the DTO in Cascade, Grand Rapids,

and Benton Harbor, Michigan. Law enforcement intends to seek search warrants for documents and other evidence of drug trafficking at these addresses, and others linked to the TARGET SUBJECTS, at the time that charges are brought against appropriate TARGET SUBJECTS. However, the execution of search warrants at this time – well in advance of the achievement of the investigation's most critical goals – likely would lead to the detection of the investigation and the destruction of evidence, thwarting law enforcement goals.

91.     Further, based on my training and experience, I believe that additional search warrants executed at this time would likely compromise the investigation by alerting the TARGET SUBJECTS to the investigation and allowing other unidentified subjects of the conspiracy to further insulate themselves from detection.

92.     At present, law enforcement does not have information regarding all of the locations of narcotics, narcotics proceeds, or other sufficient evidence related to the SUBJECT OFFENSES.

93.     Additionally, with respect to search warrants, the limitations of physical surveillance described above prevent law enforcement from observing activity occurring at various suspected locations and/or criminal activity critical to the establishment of the probable cause necessary for a legal search. Moreover, even if probable cause for search warrants were developed, the execution of search warrants alone is generally insufficient in these types of cases to establish the full scope of the

enterprise and conspiracy, and to gather sufficient evidence regarding all of the participants in the enterprise and conspiracy.

94.     Accordingly, investigators believe that executing search warrants at this time (assuming it is possible for all identified locations) would likely compromise the investigation of the DTO and its associates by alerting the subjects to the investigation and allowing other unidentified subjects of the conspiracy to further insulate themselves from detection.

**F.     Pen Register, Trap and Trace, and Telephone Analyses**

95.     Investigators have used and will continue to use telephone toll records in this investigation. Among other things, telephone records have assisted agents in confirming that members of the DTO are in frequent contact, via mobile phone, with other members of the DTO.

96.     In general, telephone records provide only limited information; these methods will not enable law enforcement to identify with certainty the persons involved in committing the TARGET OFFENSE, nor will they reveal the extent and nature of the activities of the DTO. Among other problems, a telephone number appearing in the records may not be listed or subscribed in the name(s) or address(es) of the person(s) using the telephone. I know from my training and experience that the use of fictitious subscriber information is a common practice of drug traffickers so that law enforcement personnel cannot immediately ascertain their identity. Moreover, to date, law enforcement has not been able to fully identify all of the

members of the DTO who are in the process of arranging and participating in these drug-trafficking transactions. Further, toll records or pen-register, trap-and-trace information, unlike the interceptions requested herein, do not provide real-time evidence of the content of communications, which are an essential tool not only in providing opportunities to identify the DTO's members and interdict its activities, but also to be used as evidence of the commission of those activities. It is only through the combination of wire and electronic interception, visual surveillance, and other investigatory tools that the agents expect to identify fully the nature and scope of the DTO.

## G.    Trash Pulls

97.    Investigators have conducted numerous trash pulls during the course of this investigation on known residences and suspected stash locations of the DTO. For example, on March 27, 2017, investigators conducted a trash pull on the known residence of YUSEF PHILLIPS and RAY LEE located on Cascade Road in Grand Rapids, Michigan. During the search of the contents approximately six suspected cocaine kilogram wrappers with "T-80" written on the outside of each wrapper in permanent marker, fifteen large heat sealed plastic bags cut open, eight gallon size zip lock bags, fifty sandwich bags, numerous latex gloves, one gallon sized bag with significant amount of white powder residue that resembled the smell of cocaine and 9 empty bottles of "Fresh Fruit" (cutting agent for narcotics) were located. Following

43

this trash pull, investigators suspected that this location was a narcotics stash location for the DTO.

98. However, on May 2, 2017, investigators were conducting electronic surveillance on RAY LEE, via a State of Michigan GPS cell phone ping, a State of Michigan GPS car tracker and previously established pole cameras. At approximately 2:12 p.m., investigators observed LEE leaving an apartment complex suspected of being another narcotics stash location. Investigators observed LEE holding a white trash bag with red handles and placing that trash bag into the back seat of LEE's vehicle. On May 3, 2017, at approximately 7:38 p.m., investigators observed LEE open the garage door of the residence on Cascade Road (the same location as the March 27, 2017 trash pull), and retrieve a white plastic garbage back with red handles from the same vehicle. Investigators then observed LEE carrying this trash bag and placing it in the trash bin inside of the garage.

99. On May 8, 2017, investigators conducted another trash pull at the known residence for PHILLIPS and LEE located on Cascade Road. During the search of the contents investigators located only one trash bag that was white in color with red handles. The contents of this trash bag included numerous tan taped suspected kilogram wrappers, packaging made of clear tape in the size of kilogram packages, cellophane wrappings, heat sealed bags, numerous pairs of latex gloves, two respiratory masks, an empty box of sandwich bags, three gallon zip lock bags, a 16

44

ounce bottle of GNC Inositol (cutting agent for narcotics) powder with latex gloves inside and a GNC paper receipt for GNC Inositol powder to RAY LEE.

100. On June 19, 2017, investigators conducted another trash pull at the known residence for PHILLIPS and LEE located on Cascade Road. During the search of the contents investigators located numerous latex gloves and two face masks, vacuum sealed bags, a white trash bag with a red draw strap, empty boxes for face masks, empty boxes for gallon size zip lock bags, empty boxes for latex gloves, six empty containers for Fruit Fresh Protector (cutting agent for narcotics), 3 kilogram wrappers, 1 kilogram wrapper containing white powder, and 1 kilogram wrapper containing grease.

101. On July 10, 2017, investigators conducted another trash pull at the known residence for PHILLIPS and LEE located on Cascade Road. During the search of the contents investigators located approximately nine kilogram wrappers, 3 playing cards and 8 labels with the words "Chee" and "Duro," respirator packaging, receipt and Lowes bag, empty latex glove box, Bell Fruit Preservative bottle (cutting agent), numerous wrappers, latex gloves, corner bags, vacuum seal bags, razor blades, utility records, GNC receipt to Ray LEE for Inositol powder (cutting agent), and miscellaneous mail addressed to Ray LEE.

102. On July 24, 2017, investigators conducted another trash pull at the known residence for PHILLIPS and LEE located on Cascade Road. During the search of the contents investigators located approximately six kilogram wrappers, numerous

45

freezer bags, Fruit Fresh preservative (cutting agent), Inositol bottles (cutting agent), and razor blades which are commonly used to mix drugs while adding cutting agents.

103. Although these trash pulls have resulted in identifying stash locations and confirming that narcotics trafficking is occurring within the DTO, these trash pulls did not reveal the originating source of supply, to whom the narcotics are being distributed or any organizational functions of the DTO. The interception of **Target Phone 4**, in conjunction **with Target Phone 3** would allow investigators to intercept a shipment as well as identify the source of supply providing the shipment as it occurs. Furthermore, trash searches are not effective in fully identifying the participants and scope of a narcotics conspiracy or, as here, determining the stash locations as LEE, on May 3, June 19 and July 10, 2017, moved trash from one location to another.

104. Trash pulls performed by law enforcement also run the risk of compromising the investigation if detected. Conversely, contacting the garbage service responsible for trash pickup at target addresses risks alerting others of the need for law enforcement to seize this trash.

## H. Mobile Tracking Devices

105. Investigators have employed GPS tracking devices for the purpose of identifying various locations that members of DTO frequent. However, this tactic is effective only when members of DTO drive vehicles known to law enforcement. GPS tracking of vehicles driven by top tier members of the DTO is difficult because they

46

utilize multiple vehicles, including rental vehicles, for their drug trafficking and transportation of drug proceeds. Physical surveillance, the confidential sources listed above, and pole cameras have provided information on several vehicles used by the top tier members of the DTO, but law enforcement has had difficulty discerning any patterns of vehicle usage, i.e., which member drives which vehicle for which DTO purposes. Additionally, sources informed investigators that DTO members regularly check their automobiles for tracking devices. PHILLIPS, LEE, HUBBARD, THOMPSON, BASKIN, and GAINES allow other members of the organization to utilize some of their vehicles. Any information obtained from GPS tracking of these vehicles is of limited value, and provides little in the way of intelligence regarding the scope and extent of the DTO. GPS tracking information of **Target Phone 1, 2, 3** and **4**, while useful in some respects, will not enable agents to determine the full scope of the organization. Although use of GPS tracking may be of assistance in identifying the general locations of places that may be involved in the operations of the DTO, it is unlikely to reveal the means and methods of the DTO's narcotics trafficking business or provide adequate basis to obtain warrants to search any particular locations.

106. Also, in my experience, mobile tracking devices serve a limited purpose. Such devices are typically used as a long-range surveillance tool. As such, mobile tracking devices cannot reveal who an individual is meeting with, or the nature of that meeting or any transactions that take place. Accordingly, mobile tracking

47

devices as an investigative technique suffer from the same problems associated with physical surveillance.

**I.    Video Surveillance Cameras**

107.    In February 2017, investigators installed a pole camera in the vicinity of a suspected DTO residence located on Cascade Road and Camelot Drive SE in Grand Rapids, and a mobile surveillance camera in the vicinity of a suspected DTO stash apartment located in Grand Rapids, Michigan, with limited results.    The camera monitored the comings and goings of various vehicles, mostly belonging to members of the DTO. Investigators have already identified properties and vehicles owned by members of the DTO as well as possible stash locations. The cameras did provide information as to where the contents of the successful trash pulls were originating; however, the cameras only monitor people coming and going into a specific location and would not provide intelligence into the inner workings of the DTO.    However, the interception of **Target Phone 4,** in conjunction with video surveillance cameras, would provide investigators with a further understanding of the operational layout of the DTO.

108.    Additionally, DEA and GRPD technical teams have conducted site evaluations of a Grand Rapids, Michigan apartment complex where ANDREA THOMPSON and other DTO members rent multiple apartment units. Investigators have routinely observed DTO members, including PHILLIPS and LEE, arriving in vehicles and parking outside of the apartment complex. Based on this frequency and

48

the lack of an identified resident, investigators believe it is a stash house and a location where drugs are "cut." However, technical teams have determined that it is not possible to post a pole camera at the apartment complex due to a lack of viable mounting locations. Therefore, the use of a pole camera to target members of the DTO in this location would be of limited value.

109. By their nature, surveillance cameras suffer the same limitations as physical surveillance, in that they provide limited direct evidence of the significance of the meetings. When used in conjunction with wire and electronic communication interception, however, physical surveillance has proved to be a useful investigative technique.

## J.    Mail Cover Requests

110. "Mail covers" are a service provided to law enforcement by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target location, and then the list would be provided to a United States Postal Inspector, who would provide the list to me.

49

111. However, based on our investigation to date it is unlikely that the TARGET SUBJECTS are using the mail to conduct narcotics trafficking. Moreover, even if the TARGET SUBJECTS were using the mail to traffic narcotics, a mail cover by itself is unlikely to identify all of the members or activities of the enterprise and conspiracy, and would not allow law enforcement officers to reach the goals of the investigation.

**K.    Other Investigations**

112. DEA has coordinated with GRPD, Kent Area Narcotics Enforcement Team (KANET), and the Federal Bureau of Investigations (FBI), to obtain information relating to ongoing investigation by those offices.

113. GRPD became aware of the DTO in approximately September of 2012. GRPD has provided intelligence, reports of traffic stops, interviews, trash pulls and surveillance data concerning the DTO. However, GRPD has been unable to successfully use informants, an undercover law enforcement officer or other enforcement techniques to take enforcement actions or arrest the identified top members of the DTO, and has limited knowledge of the source of supply or real time evidence relating to the DTO.

114. KANET became aware of the DTO in approximately March of 2017. KANET has provided intelligence, controlled purchases of narcotics from BASKIN, interviews and surveillance data concerning the DTO. However, KANET has

developed limited evidence regarding real time evidence relating to the DTO other than low level DTO members.

115. FBI became aware of the DTO in February 2017. FBI has contributed to the investigation by sharing intelligence and reports related to the Benton Harbor, Michigan branch of the DTO. However, the FBI has developed limited evidence regarding real time evidence relating to the DTO, the top tier of the DTO, and the DTO's source(s) of supply.

116. Lastly, other than the three phones in the present investigation noted in Section V below, there have been no prior known wiretap investigations involving the TARGET SUBJECTS.

## V. PRIOR APPLICATIONS

117. Inquiries of the electronic surveillance indices of DEA, the Federal Bureau of Investigation, Immigration and Customs Enforcement, and ATF, for the previously identified TARGET SUBJECTS were completed on July 24, 2017. There have been no prior applications seeking court authorization to intercept the wire and electronic communications involving **Target Phone 1, 2, 3** or **4**, or for any of the TARGET SUBJECTS, beyond the prior period of interception for **Target Phone 1, Target Phone 2, Target Phone 3** and **Target Phone 4**, which are described below.

118. As described above, there has been one prior application for the interception of wire and electronic communications occurring to and from a cellular telephone currently assigned telephone number (616) 427-4523, **Target Phone 1,**

51

used by CAZEMBIE BASKIN. The interception sought by that application was authorized by the Order of the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan. The interception of **Target Phone 1** pursuant to that Order terminated on July 4, 2017.

119. As described above, there has been one prior application for the interception of wire and electronic communications occurring to and from a cellular telephone currently assigned telephone number (256) 556-5645, **Target Phone 2**, used by RETISHA PEGRAM. The interception sought by that application was authorized by the Order of the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan. The interception of **Target Phone 2** pursuant to that Order terminated on July13, 2017.

120. As described above, there has been one prior application for the interception of wire and electronic communications occurring to and from a cellular telephone currently assigned telephone number (616) 318-4941, **Target Phone 3**, used by RAY ANTHONY LEE. The interception sought by that application was authorized by the Order of the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan. The interception of **Target Phone 3** pursuant to that Order is ongoing and scheduled to continue through August 18, 2017. There have been no other applications for the interception of wire and electronic communications for any of the TARGET SUBJECTS discussed herein.

## VI.    MINIMIZATION

121.    All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's Order, or ten days after the Order is entered.    Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the **Interceptees of Target Phone 4** or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. All intercepted conversations that are minimized during the monitoring process will be spot monitored to determine if they have become criminal in nature.

122.    To avoid interception of privileged communications, the monitoring officers will be instructed to minimize all privileged communications.

123.    The officers who are to carry out the requested interception of wire and electronic communications, will be instructed concerning the steps they should take

53

to minimize the interceptions of the communications not otherwise subject to interception, in accordance with Chapter 119, Title 18, United States Code. All DEA agents, GRPD officers, and other law enforcement officers will be required to review minimization instructions prior to monitoring wire and electronic communications over **Target Phone 4**.

124. All monitoring officers will be "investigative or law enforcement officers within the meaning of Title 18, United States Code, Section 2510 (7). DEA agents, IRS agents, FBI agents, and GRPD Vice Detectives will supervise the wire interception and will inspect the wire room periodically, review transcripts, and be available at all times. During the course of the interception, once sealed, DEA will retain physical custody of the disks.

125. All monitoring of electronic communications will be conducted in accordance with Chapter 119 of Title 18, United States Code. Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If an intercepted text message is not relevant to the investigation or criminal in nature, or is privileged, the text message will be minimized by remaining in an encrypted state and will not be accessible to or be disseminated to the entire investigative team. If the text message appears to be relevant to the investigation or otherwise criminal in nature, it will be

54

marked as non-minimized and made available to the other agents and monitors involved in the investigation.

126. In addition, all intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

55

## VII.  OTHER REQUESTS

127.  Based on the foregoing, I further submit that the information likely to be obtained through the use of the pen register and trap and trace device on **Target Phone 4** is relevant and material to an ongoing criminal investigation.

128.  Based on the foregoing, I further submit that there are reasonable grounds to believe that subscriber information and historical call detail records for numbers in contact with **Target Phone 4** is relevant and material to an ongoing criminal investigation insofar as such information, in conjunction with intercepted communications, will assist investigators in identifying those persons with whom the user of **Target Phone 4** is engaging in criminal conversations.  Experience from other investigations shows that subscriber information and historical call detail records often results in investigative leads concerning:

a.  the names of individuals associated with, and businesses relevant to, the subject of the investigation;

b.  the locations of places from which the subject and his confederates conduct criminal activity;

c.  information regarding the sources of funds relating to criminal activity, as well as regarding the disposition of criminally-obtained funds; and

d.  the whereabouts of the subject, and the existence of communications between the subject and associates, at times significant to the investigation.

129. Obtaining subscriber information and historical call detail records by grand jury subpoena often takes weeks and, at times, administrative subpoenas can take months. In my experience and the experience of other law enforcement agents, including intelligence analysts who regularly discuss subpoena compliance with phone service providers, service providers generally respond to court orders compelling disclosure of subscriber information and historical call detail records within a few days. In contrast, service providers generally treat grand jury subpoenas and administrative subpoenas as less time sensitive than court orders.

130. This Affidavit seeks permission to delay notification of the execution of any warrant requested by the accompanying Application because, as discussed below, there is reasonable cause to believe that providing immediate notification of the execution of such an order may have an adverse result as defined by Title 18, United States Code, Section 2705, namely flight from prosecution, evidence tampering, or otherwise seriously jeopardizing this investigation. In this case, by serving copies of the orders issued by this Court on any of the **Interceptees**, law enforcement would be notifying the **Interceptees** of both the fact and nature of its current investigation. The disclosure of the fact and nature of the government's investigation could lead to evidence tampering and/or flight of subjects under investigation, and could therefore seriously jeopardize the investigation.

131. Agents and officers believe there is good cause to seek delay of the notification provisions applicable to any warrant issued during the course of this

57

investigation. Moreover, agents and officers believe a period of delayed notification in excess of thirty days is appropriate in this case. This investigation concerns the activities of a complex drug trafficking organization that involves the activities of multiple individuals in different states. The investigation of this organization is expected to continue on a covert basis for at least 90 days. For example, subsequent investigation conducted pursuant to the wire and electronic interception authority sought by the accompanying Application may result in the discovery of additional leads and communication facilities utilized by BASKIN, PEGRAM, LEE, and PHILLIPS and their DTO associates. If the government were required to give notice within the next thirty days, such notice would necessarily compromise the ongoing investigation and lead to the adverse results discussed above.

132. Accordingly, agents believe there is good cause at this time to seek a 90-day delay of the notification provisions applicable to any warrant issued during the course of this investigation. In addition, agents believe there is good cause to permit the execution of any warrant relating to the collection of cellular location information at any time of the day or night. Cellular telephone users may utilize a telephone at any time of the day or night, and may possess cellular telephones at any time of the day or night as they conduct illegal activity. Accordingly, in order to effectively utilize such information, including its use in conjunction with contemporaneous physical surveillance and otherwise, it is necessary for law enforcement to be able to gather such cellular location information at any time of the day or night.

## VIII. CONCLUSION

133. Based upon my training and experience, I believe that probable cause exists that the **Interceptees**, the TARGET SUBJECTS and others known and unknown are involved in a continuing criminal conspiracy involving drug trafficking and other offenses. I also believe that the evidence sought will be obtained on a continuing basis after the first interception and will reveal other co-conspirators along with the extent and nature of their participation in the described illegal activity. Therefore, I respectfully request that the interception applied for not be required to automatically terminate when the sought after communications are first intercepted, but be allowed to continue until communications are intercepted which fully reveal the manner in which the TARGET SUBJECTS and their associates participate in the TARGET OFFENSES, and the identity of their confederates, their places of operations, the nature and scope of the conspiracy involved, and the location and identity of illegal proceeds, not to exceed thirty days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's Order, or ten days after the Order is entered. As detailed above, normal investigative techniques have yielded limited success with regards to identifying all the members of the PHILLIPS and LEE narcotics trafficking organization throughout the area of Grand Rapids, Michigan, Benton Harbor, Michigan and Kalamazoo, Michigan. Therefore, interception over **Target Phone 4** is necessary and permission is hereby requested to intercept wire and

59

electronic communications of the **Interceptees** and any other co-conspirators later identified.

134. It is requested, pursuant to 18 U.S.C. § 2518(3), that in the event that **Target Telephone 4** is transferred outside the territorial jurisdiction of this Court, interceptions of the transferred facility may continue to take place in the Western District of Michigan where all communications will first be heard or read and minimized regardless of where the wire and/or electronic communications are placed to or from.

FURTHER AFFIANT SAYETH NOT.

ALEXIS J. GIUDICE
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this ⟍27⟍ day of July, 2017.

ROBERT J. JONKER
Chief Judge
United States District Court
Western District of Michigan

60