UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

                    Plaintiff,
                                        DOCKET NO. 1:17-cr-193
vs.


ALEX ALBERTO CASTRO,
MICHAEL YADELL NELSON,
SOLON TATUM, DANTE ANDRE HOWARD,
ERIKA ATKINSON, MAX AVERY,
ANDREA THOMPSON, AARON LEON COX,

                    Defendant.
_____/


VOLUME X (PAGES 2385-2625)

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

GRAND RAPIDS, MICHIGAN

October 22, 2018


Court Reporter:          Glenda Trexler
                         Official Court Reporter
                         United States District Court
                         685 Federal Building
                         110 Michigan Street, N.W.
                         Grand Rapids, Michigan 49503


Proceedings reported by stenotype, transcript produced by

computer-aided transcription.

1   A P P E A R A N C E S:

2   FOR THE GOVERNMENT:

3       MR. STEPHEN P. BAKER
      UNITED STATES ATTORNEY'S OFFICE
4       330 Ionia Avenue, NW
      P.O. Box 208
5       Grand Rapids, MI 49501-0208
      Phone: (616) 808-2056
6       Email: stephen.baker@usdoj.gov

7       MR. JOEL FAUSON
      UNITED STATES ATTORNEY'S OFFICE
8       330 Ionia Avenue, N.W.
      P.O. Box 208
9       Grand Rapids, Michigan 49503-0208
      Phone: (616) 456-2404
10       Email: joel.fauson@usdoj.gov

11   FOR THE DEFENDANT ALEX CASTRO:

12       MR. MATTHEW J. LOMBARD
      LAW OFFICES OF MATTHEW J. LOMBARD
13       11400 West Olympic Boulevard, Suite 1500
      Los Angeles, California 90064
14       Phone: (424) 371-5930
      Email: mlombard@lombardlaw.net
15

16   FOR THE DEFENDANT MICHAEL YADELL NELSON:

17       MR. LAWRENCE J. PHELAN
      HAEHNEL & PHELAN
18       200 North Division Avenue
      Grand Rapids, Michigan 49503
19       Phone: (616) 454-3834
      Email: lphelan.hp@gmail.com

20

21

22

23

24

25

1   FOR THE DEFENDANT SOLON TATUM:

2       MS. MARY CHARTIER
       CHARTIER & NYAMFUKUDZA, PLC
3       1905 Abbot Road, Suite 1
       East Lansing, Michigan 48823
4       Phone:  (517) 885-3305
       Email: mary@cndefenders.com
5

       MR. TAKURA NYAMFUKUDZA
6       CHARTIER & NYAMFUKUDZA, PLC
       1905 Abbot Road, Suite 1
7       East Lansing, Michigan 48823
       Phone:  (517) 885-3305
8       Email: takura@cndefenders.com

9   FOR THE DEFENDANT DANTE HOWARD:

10      MR. PATRICK WILLIAM O'KEEFE, II
       O'KEEFE LAW, PLLC
11      3893 Okemos Road, Suite B-1
       Okemos, Michigan 48864
12      Phone:  (517) 253-0114
       Email:  5469132420@filings.docketbird.com
13

   FOR THE DEFENDANT ERIKA ATKINSON:
14

       MS. SARAH RILEY HOWARD
15      PINSKY, SMITH, FAYETTE & KENNEDY, LLP
       146 Monroe Center Street, N.W., Suite 805
16      Grand Rapids, Michigan 49503-2824
       Phone:  (616) 451-8496
17      Email:  sarahrileyhoward@hotmail.com

18      MS. ERIN DORNBOS
       PINSKY, SMITH, FAYETTE & KENNEDY, LLP
19      146 Monroe Center Street, N.W., Suite 805
       Grand Rapids, Michigan 49503-2824
20      Phone:  (616) 451-8496
       Email:  edornbos@psfklaw.com

21

22

23

24

25

FOR THE DEFENDANT MAX AVERY:

        MR. JOHN J. FRAWLEY
        JOHN J. FRAWLEY, P.C.
        303 South Waverly Road, Suite 2
        Lansing, Michigan 48917
        Phone:  (517) 327-0200
        Email:  frawleylaw@yahoo.com

FOR THE DEFENDANT ANDREA THOMPSON:

        MR. KEITH W. TURPEL
        3018 Oakland Drive
        Kalamazoo, Michigan 49008
        Phone:  (269) 381-1911
        Email:  Keithturpel@hotmail.com

FOR THE DEFENDANT AARON LEON COX:

        MR. MICHAEL DARRAGH HILLS
        HILLS AT LAW, PC
        425 South Westnedge Avenue
        Kalamazoo, Michigan 49007
        Phone:  (269) 373-5430
        Email:  mhills@hillslawoffice.com

        MR. JAMES D. HILLS
        HILLS AT LAW, PC
        425 South Westnedge Avenue
        Kalamazoo, Michigan 49007
        Phone:  (269) 373-5430
        Email:  jhills@hillslawoffice.com

                        *   *   *   *   *

```
 1                              Grand Rapids, Michigan

 2                              October 22, 2018

 3                              8:36 a.m.

 4                    P R O C E E D I N G S

 5         (Judge, jury, counsel, and parties present in the

 6    courtroom)

 7              THE COURT:  Well, good morning everybody.  Welcome

 8    back to your second Monday in the chair.  No poem today,

 9    though.  It's a different kind of week.  We can call it,

10    though, I think, a day of illumination for several reasons.

11    139 years ago today in Menlo Park, New Jersey, Thomas Edison

12    perfected the first working lightbulb, so all of the

13    illumination we have in our court here and everywhere else we

14    can think back to Thomas Edison today.

15              But more importantly, this will be a day of

16    illumination in a different way for all of you because you're

17    going to hear something different after we finish the proofs.

18    We're first going to finish whatever proofs there are on the

19    defense side, hear if the government has any rebuttal proofs,

20    then you'll get some instructions from me -- and hopefully they

21    will be illuminating -- but more importantly, you'll start

22    hearing and maybe finish hearing from all the lawyers today in

23    closing argument.  Which is the opportunity for you to hear

24    from each of the lawyers how they put together what we've all

25    been listening to for the last couple of weeks.  There's an
```

1    awful lot of information that you've been listening to and

2    receiving, and each of the lawyers will now have that chance to

3    argue to you what it all means for their case.  And that's why

4    I think it's a good thing that our day today coincides with

5    Edison's creation of the lightbulb 139 years ago, because all

6    of those things, I hope, will illuminate your day today in a

7    different way.

8            A pretty nice weekend in other respects too.

9    Depending on how you feel about Michigan or Michigan State.  My

10   family is a house divided on that.  I'm University of Michigan,

11   both of our kids went to Michigan State, so I was happier than

12   they were over the weekend.  But that's not unusual.

13           So why don't we get back to it.  I think when we

14   broke off on Friday we were in the middle of Mr. Tatum's case,

15   so, Ms. Chartier, we'll turn it over to you for the next

16   witness on your side of the case.

17           *MS. CHARTIER:*  Thank you, Your Honor.  We call

18   Gabe Holmes.

19           *THE CLERK:*  I'll swear you in first.  Please raise

20   your right hand.

21                        GABRIEL HOLMES

22                *(The oath was administered)*

23           *THE WITNESS:*  I do.

24           *THE CLERK:*  Thank you.

25

DIRECT EXAMINATION

*BY MR. NYAMFUKUDZA:*

*Q.* Good morning. Would you please state your name and spell it for the record, please.

*A.* Gabriel, G-A-B-R-I-E-L, last name Holmes, H-O-L-M-E-S.

*Q.* Do you mind introducing yourself to the ladies and gentlemen of the jury.

*A.* Yeah, my name is Gabriel Holmes. I'm an employee with the Kent County Juvenile Detention Center. I've been there for several years now. And I have some strong ties within the community working with youth in the community as well, so . . .

*Q.* Thank you for that. I'm going to focus you very quickly on the reason that -- well, I know that you're here. We're going to talk about Mr. Tatum.

Do you know Solon Tatum?

*A.* Yes, I do.

*Q.* How so?

*A.* Um, myself and Solon, we've played basketball together over the years. We kind of built a strong tie because of that. We also participated within the same men's ministry, sort of like a Bible study that we did with the Salvation Army. And so our relationship from there just grew stronger.

*Q.* Okay. I'm not going to go into all of those things that you did together, but I want to fast forward you and we're going to focus now on the years of 2016 through 2017.

1      Has Mr. Tatum ever cut your hair?

2  A.   Yes.

3  Q.   Do you know about a location called Gifted Hands?

4  A.   Yes, I do.

5  Q.   Where was that located?

6  A.   Um, Eastern -- Bates, Eastern, and Franklin area.

7  Q.   What side of town is that in?

8  A.   Southeast side.

9  Q.   Of Grand Rapids?

10  A.   Yes.

11  Q.   Roughly how many times from the years of 2016 through 2017

12  did you go to that shop, Gifted Hands?

13  A.   At least every other week.

14  Q.   And why did you go to Gifted Hands?

15  A.   Solon is the best at cutting hair, at least in my opinion,

16  so I just went there for the haircut.

17  Q.   Generally what time of day would you go to Gifted Hands?

18  A.   Um, generally it's morning, early afternoon.

19  Q.   And I see that your facial hair is a little bit longer

20  than mine.  Did Mr. Tatum just work on your hair or your face

21  or both?

22  A.   Both.

23  Q.   Was the shop busy each time that you went?

24  A.   Yes.  For the most part absolutely.  It was extremely

25  busy, yeah.

1   *Q.*   And what does busy mean to you?

2   *A.*   Um, to the point where I would have to call sometimes

3   ahead of time to make sure that I'm not six, seven, you know,

4   possibly eight down the line before getting a haircut, so . . .

5   *Q.*   Were there other barbers in the shop when you went?

6   *A.*   Yes.

7   *Q.*   As well as customers?

8   *A.*   Yes.

9   *Q.*   I'd like to focus now on what we've heard described by

10  other witnesses as tools of the trade.

11      Have you ever trimmed your beard or lined it up on your

12  own?

13  *A.*   Yes.

14  *Q.*   What do you use for that?

15  *A.*   Um, T liners.

16  *Q.*   T liners.  We've heard about those too.  Do you have any

17  training as a barber?

18  *A.*   No.  No.

19  *Q.*   Who helped you keep your clippers in good working

20  condition?

21  *A.*   Solon.

22  *Q.*   What did he do?

23  *A.*   Um, I seen how he, you know, managed his clippers, and,

24  you know, kept his clippers clean, so I asked him if he could

25  help keep mine clean.  So he would get them, clean them, you

know, take caps off or whatever you call them, I don't know the
technical terms for them, but he would clean them out for me,
oil them for me.

Q.   Did that happen more than once?

A.   Um, I would say probably, yeah, about a couple times.  A
few times.

Q.   Did he charge you for that?

A.   No.

Q.   And would you say it was helpful?  Whatever he did,
whether it was removing caps and changing blades, we've heard
that too.

A.   Uh-huh.

Q.   It was?

A.   Yes, it was helpful.

Q.   And how long generally would it take once you gave him or
he took your clippers until you got them back, your T liners?

A.   You know, a couple days maybe.  You know, it's mainly on
me to find the time to just come back and get them.  But he'd
be done immediately just about, and I would just have to go
there and pick them up, so . . .

Q.   Thank you, Mr. Holmes.  I have no further questions.

        *THE COURT:*  Mr. Baker.

        *MR. BAKER:*  Thank you, Your Honor.

CROSS-EXAMINATION

*BY MR. BAKER:*

Q.    Good morning, Mr. Holmes.

A.    Good morning.

Q.    Is it fair to say you and Solon Tatum are friends?  Is that a good categorization, sir?

A.    Yes.

Q.    When you picked up the T liners after Mr. Tatum worked on them, would you go to his barber shop to get them?

A.    Yes.

Q.    Mr. Holmes, were you aware that Mr. Tatum never received his license to be a barber?

A.    Yes.

Q.    Were you aware that he never paid taxes on the money that he made as a barber at Gifted Hands?

A.    I can't -- I can't speak to that.

Q.    Would it surprise you that he claims that he made over $110,000 a year in cash as a barber at Gifted Hands?

A.    Again, I can't speak to that.

        *MR. BAKER:*  I don't have any further questions, Your Honor.

        *THE COURT:*  All right.  Any redirect?

        *MR. NYAMFUKUDZA:*  No, Your Honor.  Thank you.

        *THE COURT:*  All right.  Well, that was a short stay. You may be excused.

1          And we'll go to your next witness.

2          MS. CHARTIER:  Thank you, Your Honor.  We will be

3   calling Buster Laird.

4          THE CLERK:  I'll swear you in first.

5          THE COURT:  All right.  If you could just stand there

6   and Ms. Khayat Bratt will swear you in.

7                          EDDIE LAIRD

8                   (The oath was administered)

9          THE WITNESS:  I do.

10                       DIRECT EXAMINATION

11  BY MR. NYAMFUKUDZA:

12  Q.   Good morning, Mr. Laird.

13  A.   Good morning.

14  Q.   Would you state your name and spell it for the record,

15  please.

16  A.   Eddie Laird, E-D-D-I-E, Laird L-A-I-R-D.

17  Q.   Mr. Laird, where do you live?

18  A.   In Kentwood.  1116 -- do you want the address?

19  Q.   Well --

20  A.   Grand Rapids, Michigan.

21  Q.   I don't need the address.  Thank you.

22       What do you do for a living, Mr. Laird?

23  A.   I DJ and I work at Tubelite.

24  Q.   Have you ever done any parties for famous people?

25  A.   Yeah, all the time.  All the time.

```
 1   Q.   Any that we may know?

 2   A.   50 Cent, Two Chainz, Cedric the Entertainer,

 3   Floyd Mayweather.  The list goes on and on.

 4   Q.   It sounds like fun work.

 5   A.   Yes, fun work.

 6   Q.   Do you know Solon Tatum?

 7   A.   Yes.

 8   Q.   Have you ever been to his barber shop?

 9   A.   Yes.

10   Q.   Do you know what the name of that shop was?

11   A.   Um, it was Wealthy Styles.  You had Gifted Hands.  He had

12   switched the name once he moved.

13   Q.   Now I'm going to focus you just on the years of 2016

14   through 2017.  That's the relevant time frame for this

15   testimony.

16   A.   Okay.

17   Q.   When you went to Gifted Hands -- let me rephrase that.

18        How many times approximately -- I don't expect to you say

19   exactly -- but about how many times did you go to Gifted Hands?

20   A.   Like every week.  Like once every week.

21   Q.   And we know also that in barber shops people have their

22   hair worked on or their facial hair.  Which one of those did

23   Mr. Tatum do for you?

24   A.   Facial hair.  Haircut.  Clippers.

25   Q.   No eyebrows?
```

1   A.   No eyebrows.

2   Q.   Okay.  Were there other barbers in the shop when you went

3   to Gifted Hands?

4   A.   Yes.

5   Q.   Were there other customers?

6   A.   Yes.

7   Q.   Would you describe it as a busy location?

8   A.   Yes, a very busy location.

9   Q.   What time typically would you go to Gifted Hands when you

10  went?

11  A.   Um, it depends on availability, openings.  On my work

12  schedule.  Sometimes it was an afternoon.  Sometimes it was in

13  the evening.  So it varies.

14  Q.   And still every time that you went it was busy?

15  A.   Yes.

16  Q.   You mentioned clippers, and I'd like to focus on that for

17  just a brief amount of time.

18       Did you ever trim your own beard or line your hair up

19  outside of the barber shop?

20  A.   Yes.

21  Q.   What did you use to perform that task?

22  A.   Some liners.

23  Q.   Liners.  And do you have any training as a barber?

24  A.   Do I have any training as a barber?

25  Q.   Yes.

1    A.    No, I don't have any training as a barber.

2    Q.    So we've heard that those liners should be kept in good

3    working condition.  Who did that for you?

4    A.    Solon Tatum.

5    Q.    How many times did he work on your clippers for you?

6    A.    Um, I don't know approximately how many times, but I know

7    he had changed his blade on his liners frequently, so sometimes

8    when I'm there I would be like "Can you put a new blade on my

9    clippers?"  Or "Can I get, you know, a brand-new blade?"

10   Q.    Did he ever charge you for that?

11   A.    No.

12   Q.    Whatever it is that he did for your clippers each time,

13   was that helpful --

14   A.    Yes.

15   Q.    -- in terms of how the clippers operated after he

16   performed that service?

17   A.    Yes.

18   Q.    And, again, generally how long did it take for him to work

19   on your clippers?  I know sometimes you said he would do it on

20   the spot, but were there times that you left your clippers with

21   him?

22   A.    Sometimes I left them with him and finally came back and

23   picked them up at Gifted Hands.

24   Q.    On average about how much time would pass between the time

25   you dropped them off and picked them back up?

1    *A.*   It could have been a day.  It could have been the same

2    day.  It depends on how busy he is.

3    *Q.*   Okay.  Mr. Laird, I have no more questions.  Thank you for

4    your time.

5              *THE COURT:*  Mr. Baker.

6              *MR. BAKER:*  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    *BY MR. BAKER:*

9    *Q.*   Good morning, Mr. Laird.

10   *A.*   Good morning.

11   *Q.*   When you picked up the clippers that Mr. Tatum worked on

12   for you, would you do it at the barber shop?

13   *A.*   Would I do -- can you repeat that, please?

14   *Q.*   Yes.  Would you pick them up from Mr. Tatum at the barber

15   shop?

16   *A.*   Yes, usually he would do them there.  If I leave them,

17   sometimes I'll come back.

18   *Q.*   Thank you, sir.  I don't have any further questions,

19   Your Honor.

20             *THE COURT:*  All right.  That's real short.  So you

21   can be excused.  Thank you, Mr. Laird.

22             We'll go to your next witness.

23             *MS. CHARTIER:*  Our final fact witness other than

24   Agent Guidice will be a gentleman named Harry Knowling, and

25   I'll get him right now.

1    *THE CLERK:*  I'll swear you in first, please.

2                        HARRY KNOWLING

3                 *(The oath was administered)*

4          *THE WITNESS:*  Yes.

5                      DIRECT EXAMINATION

6    *BY MR. NYAMFUKUDZA:*

7    *Q.*   Good morning, Mr. Knowling.

8    *A.*   Good morning.

9    *Q.*   Would you please state your name for the record and spell

10   it.

11   *A.*   Harry Knowling, H-A-R-R-Y, Knowling, K-N-O-W-L-I-N-G.

12   *Q.*   Mr. Knowling, where do you live?  We don't need the

13   physical address, just the city.

14   *A.*   Grand Rapids, Michigan.

15   *Q.*   How long have you lived in Grand Rapids?

16   *A.*   My whole life.

17   *Q.*   What do you do for a living, Mr. Knowling?

18   *A.*   Barber.

19   *Q.*   I want to focus on the reason I'm sure you understand

20   you're here.

21   *A.*   Yes.

22   *Q.*   Talking about Mr. Tatum.  Do you know Mr. Tatum?

23   *A.*   Yes.

24   *Q.*   Did you ever work together?

25   *A.*   Yes.

1   *Q.*   Where?

2   *A.*   At Gifted Hands barber shop.

3   *Q.*   So going forward I'm going to be focusing on the years of

4   2016 through 2017.  Is that all right?

5   *A.*   Yes.

6   *Q.*   Did you pay weekly rental --

7   *A.*   Yes.

8   *Q.*   -- for your workstation?

9   *A.*   Uh-huh.

10   *Q.*   Is that a "yes"?

11   *A.*   Yes.

12   *Q.*   Who received that weekly payment, Mr. Knowling?

13   *A.*   Solon.

14   *Q.*   How many other barbers worked at Gifted Hands?

15   *A.*   Six others.  Yes.

16   *Q.*   Is that including Mr. Tatum?

17   *A.*   Including Mr. Tatum, yes.

18   *Q.*   Do you remember their names?

19   *A.*   Rick, QB, Kal, Avery, me, Solon.

20   *Q.*   Was there any sharing of chairs or booths?  We've heard

21   them described both ways.

22   *A.*   No.

23   *Q.*   Who pulled in the most customers, Mr. Knowling?

24   *A.*   Solon.

25   *Q.*   What hours did you and the others generally work at

1   Gifted Hands?

2   A.   Eleven -- like 11 or 12 to 7.  There wasn't really a set

3   time, but normally everybody was there by 12 noon.

4   Q.   And what days of the week was -- what days was

5   Gifted Hands open?

6   A.   Tuesday through Saturday.

7        MR. NYAMFUKUDZA:  Permission to approach, Your Honor?

8        THE COURT:  Sure.

9   Q.   (BY MR. NYAMFUKUDZA)  Mr. Knowling, I've just handed you

10  what's been marked as Defense's Proposed Exhibits 7A through E.

11  Were you present when those photographs were taken?

12  A.   Yes.

13  Q.   Do you remember whether it was during the week or the

14  weekend when they were taken?

15  A.   It was during the week.

16  Q.   Daytime or nighttime?

17  A.   Daytime.

18  Q.   I'm going to ask you to please flip through those

19  photographs and let me know whether that is an accurate

20  depiction of Gifted Hands as it appeared on that day.

21       MR. BAKER:  Objection, Your Honor, I'd just ask for a

22  date and time.

23       THE COURT:  Can you specify the rough date that we're

24  talking about?  If he was there when they were taken.

25  Q.   (BY MR. NYAMFUKUDZA)  Summer of 2017.  Does that ring a

bell?

A.    Yes.  End of summer.

MS. CHARTIER:  That would not -- if I may, Your Honor, I can pull the exact date if the Court would give me one moment.

THE COURT:  Well, it's not you who is testifying. Let's find out if he can put a date range in and close in on approximately when it was taken.  If he knows.

Q.    (BY MR. NYAMFUKUDZA)  Could you think back to perhaps not the specific date but month?

A.    Um, it was --

Q.    Was it after Mr. Tatum's arrest?

A.    Yes.

Q.    And do you know when he was arrested?

A.    Um, September 2017, I believe.

Q.    Okay.

A.    But it was -- it was definitely after.

Q.    Okay.  So I think that would be after the summer.

MR. NYAMFUKUDZA:  But with that, Your Honor, I would ask that it be admitted into evidence, 7A through E.

MR. BAKER:  Your Honor, I object to relevance.

THE COURT:  Well, I think you brought it up yesterday when you asked Mr. Tatum if there were any pictures of the barber shop, so I'll overrule the relevance objection, and it can be admitted.

 1          7A through E?

 2               *MR. NYAMFUKUDZA:*  Yes, Your Honor.

 3               *THE COURT:*  All right.

 4    Q.   *(BY MR. NYAMFUKUDZA)*  Let's start first with 7A.

 5               *MR. NYAMFUKUDZA:*  Would you pull that up, please,

 6    Ms. Thelen.

 7    Q.   *(BY MR. NYAMFUKUDZA)*  Would you describe what we see

 8    there.

 9    A.   Yes.  Okay, so this over here would be Solon's station.

10    Just a TV, and that's just for customers.  This station was

11    Rick.  And this was my station right here in the corner.

12    Q.   Okay.  Now, Mr. Knowling, other than the gentleman in the

13    mirror, I don't see --

14    A.   Oh, yeah.

15    Q.   Who is that gentleman?

16    A.   That's Avery.

17    Q.   And is that the barber who worked at Gifted Hands?

18    A.   Yes, correct.

19    Q.   Were there any other people there when these photographs

20    were taken?

21    A.   Yes.

22    Q.   Did you see them move before they were taken?

23    A.   Yes.

24    Q.   Why did they move?

25    A.   They didn't want to be in the photograph.

1    THE COURT:  I think you're going to have to lay

2  foundation for that.  And if you found out only because of what

3  they said, then we've got a hearsay problem.

4    MR. NYAMFUKUDZA:  Understood.

5  Q.  (BY MR. NYAMFUKUDZA)  But there were other people in the

6  shop when these photographs were taken?

7  A.  Yes.

8  Q.  Do you remember who these people were?

9  A.  Yes.

10  Q.  Customers or barbers?

11  A.  Oh, it was barbers and customers there, yeah.

12  Q.  Do you remember any names?

13  A.  Avery was there.  Another barber.  QB was there.  And I'm

14  not -- I don't remember the customers' names, but it was a

15  customer and his mother were there also.

16  Q.  Were you there?

17  A.  I was there, yep.  You were there.  Rick.  And Magic Man,

18  a guy who used to be around the barber shop all the time.

19  Q.  Thank you.  I'm going to move to the next photograph,

20  please.

21    Okay.  There we go.  Would you describe what we see in

22  this photograph, please, Mr. Knowling.

23  A.  Yeah, this one is a shot from towards the back looking out

24  to the front towards the street.  And then like you said, these

25  red chairs are for customers.  And that's another workstation.

1    That one would be too.  And then the other two, my chair and

2    Rick's chair.

3    Q.   Okay.  And would you describe this as an open layout,

4    Mr. Knowling?

5    A.   Yes.

6    Q.   So while you were working, people could see what you were

7    doing?

8    A.   Oh, yeah.  Yes.

9    Q.   Could you hear what others were saying?

10   A.   Yes.

11            MR. NYAMFUKUDZA:  Okay.  Next photograph, please.

12   Q.   (BY MR. NYAMFUKUDZA)  Would you describe what we see in

13   this photograph.

14   A.   Yep.  That's QB.  He's performing a haircut.  And then

15   that's -- that's you right there.  Great photography.

16   Q.   Thank you.

17   A.   And again this -- this is the client's mother in the

18   chair.  She was there also.  This is Avery's workstation here.

19   And this is where Phil was.

20   Q.   Now, I see a gentleman performing a haircut.  What did you

21   say his name is?

22   A.   That's QB.

23   Q.   And that's not the same gentleman that we saw in the first

24   photograph?

25   A.   No.

1  Q.   His name was Avery?

2  A.   Correct.

3  Q.   And I see a couple of red chairs.

4  A.   Yeah.  Oh, yeah, more -- that's where the customers sit,

5  yep.

6  Q.   Okay.  The next photograph, please.  Would you describe

7  what we see in this photograph, Mr. Knowling.

8  A.   Yep, that's more seating area.  That was Solon's area.

9  The price list.  This is the view when you walk into the shop

10  looking towards the price list.  And, again, QB doing the

11  haircut while the client's mother is waiting.

12  Q.   The next photograph, please.  What is this we're looking

13  at, Mr. Knowling?

14  A.   This is the front of the building of the barber shop.  The

15  outside.

16  Q.   Mr. Knowling, I do not see signage anywhere indicating

17  that this is the location you've described as Gifted Hands.

18  Could you explain why?

19  A.   Um, yeah.  The guy we pay was gonna put the awning up on

20  the building or whatever, he ended up actually having a heart

21  attack and he passed away.

22  Q.   Okay.  Thank you, Mr. Knowling.  I have no additional

23  questions.  I think Mr. Baker may have some for you.

24        THE COURT:  All right.  Mr. Baker.

25        MR. BAKER:  Thank you, Your Honor.

CROSS-EXAMINATION

*BY MR. BAKER:*

Q.   Good morning, Mr. Knowling.

A.   Good morning.

Q.   Mr. Knowling, we've heard the barber business described as a cash business.  Were you a cash barber receiving every payment in cash?

A.   Yes, and I have a -- I have the cash app also.

Q.   So you have like Foursquare on your phone so you can charge?

A.   Yes.

Q.   Mr. Knowling, it's never polite to ask people what they make, but it is relevant to our trial.  Did you make over a hundred thousand dollars a year as a barber when you were working for Solon Tatum?

A.   No.

Q.   Is it fair to say, Mr. Knowling, that you didn't come close to making a hundred thousand dollars a year?

A.   Yeah, I didn't, but he had -- his clientele was larger than everybody.  But, no, I was nowhere near a hundred thousand.

Q.   Thank you, Mr. Knowling.

        *MR. BAKER:*  I have no further questions, Your Honor.

        *THE COURT:*  All right.  Anything else?

        *MR. NYAMFUKUDZA:*  No, Your Honor.  Thank you.

1            THE COURT:  Thank you.  You may be excused.

2            MS. CHARTIER:  Thank you, Your Honor.  We would just

3    like to call Agent Giudice to the stand.

4            THE COURT:  All right.  We'll have you sworn again,

5    Agent Giudice.  I can't remember if we released you last time

6    or not.

7                        ALEXIS GUIDICE

8                   (The oath was administered)

9            THE WITNESS:  I do.

10                       DIRECT EXAMINATION

11   BY MS. CHARTIER:

12   Q.   Hi, Agent Giudice.  I think this will be the last time

13   you're on the stand.

14        So on Friday I don't know if you recall Mr. Baker asking a

15   question of Mr. Tatum about an August 12th phone call in

16   reference to the word "it."  Do you remember that?

17   A.   I don't recall "it," but I recall the testimony about a

18   phone call.

19   Q.   And I have the line reports here and a transcript of that

20   call if that would refresh your recollection.  There was a

21   phone call between Mr. Lee and Mr. Tatum on August 12th at

22   12:05 in which Mr. Tatum asks if "it" has happened.

23        Would you like to see that to refresh your recollection?

24   A.   Yes, please.

25   Q.   Did that refresh your recollection?

1   *A.*   Yes, ma'am.

2   *Q.*   And there were other calls I believe you testified to

3   earlier that were deemed nonpertinent, which means they were

4   not recorded, correct?

5   *A.*   Over the duration of the entire wire, that's correct.

6   *Q.*   On August 12th, before that call, there was a telephone

7   call between Mr. Lee and Mr. Tatum deemed nonpertinent that

8   went on for 32 seconds.  And I have the line report if you'd

9   like to look at it.

10   *A.*   Yes, please.

11   *Q.*   Did that refresh your recollection?

12   *A.*   Yes, ma'am.

13   *Q.*   Was that an accurate statement that there was a

14   nonpertinent call that day?

15   *A.*   That's correct, it's an outgoing call from Mr. Lee to

16   Solon Tatum that's marked "no audio" and "nonpertinent."

17   *Q.*   And for 32 seconds, correct?

18   *A.*   Correct.

19   *Q.*   Before -- if you look at the time before that 12:05 call,

20   correct?

21   *A.*   That's correct, this call is at 12:01, and the call after

22   is at 12:05 p.m.

23   *Q.*   Thank you.  I have no additional questions.

24           *THE COURT:*  All right.  Mr. Baker.

25

CROSS-EXAMINATION

*BY MR. BAKER:*

*Q.*   Agent Giudice, in the course of the wire what does "no audio" mean?

*A.*   It means that there was no communications that went through and no audio was captured.

MR. BAKER:   No further questions, Your Honor.

*THE COURT:*   All right.   Anything else for Agent Giudice?

REDIRECT EXAMINATION

*BY MS. CHARTIER:*

*Q.*   No communications doesn't mean the call was not answered, correct, it just means it was not recorded?

*A.*   I didn't run the wire that day, so all I can testify is there was no audio listed for the phone call.   You'd have to ask the phone company.

*Q.*   Because if a call wasn't answered, you do write down "call not answered," correct?

*A.*   We would hear the audio of the call ringing and then it not answered.   In this particular case there was no audio that transmitted at all.

*Q.*   And again my question may not have been clear.   When a call is not answered, you do write "call not answered," correct?

*A.*   Correct.   We would -- if the audio was going through, we

1　would hear it and the phone would ring and nobody would answer,

2　so it would list "call not answered."

3　*Q.*　Thank you.　I have no additional questions.

4　　　　　*THE COURT:*　Any questions?

5　　　　　*MR. BAKER:*　No, Your Honor.　Thank you.

6　　　　　*THE COURT:*　You may be excused back to your seat.

7　　　　　And, Ms. Chartier, do you have any other witnesses?

8　　　　　*MS. CHARTIER:*　No, we do not at this point.　We would

9　rest.　Thank you.

10　　　　　*THE COURT:*　What that means, Members of the Jury, is

11　we'll re-pick up the list of the defendants and find out if any

12　of the other defendants intend to put on a case or if they

13　simply intend to rest on the presumption of innocence, which

14　is, of course, their right.

15　　　　　And the next person in line is Mr. O'Keefe on behalf

16　of Mr. Howard.

17　　　　　*MR. O'KEEFE:*　Thank you, Your Honor.　We'll rest on

18　the presumption of innocence.

19　　　　　*THE COURT:*　Then Ms. Howard for Ms. Atkinson.

20　　　　　*MS. HOWARD:*　Thank you, Your Honor.　We also rest on

21　the presumption of innocence.

22　　　　　*THE COURT:*　All right.　Mr. Frawley.

23　　　　　*MR. FRAWLEY:*　We rest on the presumption of

24　innocence, Your Honor.

25　　　　　*THE COURT:*　And that's for Mr. Avery.

1          And then Mr. Turpel for Ms. Thompson.

2          *MR. TURPEL:*  Your Honor, we also rest on the

3     presumption of innocence.

4          *THE COURT:*  Mr. Hills on behalf of Mr. Cox.

5          *MR. HILLS:*  We would rest, Your Honor.

6          *THE COURT:*  Okay.  That means we've gone through all

7     the defense, and you've heard the people who are relying and

8     resting on the presumption of innocence and those who chose to

9     put on some proofs.  Either option is, of course, entirely

10    within the constitutional rights of the defendants.

11         But the government is the party with the burden of

12    proof here, so they have one last opportunity to put on

13    rebuttal evidence if they wish, so I'll go to Mr. Baker and see

14    if you intend to do that.

15         *MR. BAKER:*  We have no rebuttal, Your Honor.  We

16    rest.

17         *THE COURT:*  Okay.  So what that means, Members of the

18    Jury, is that at 9:00 on your second Monday all of the evidence

19    is in.  From the day you started to today all of the parties

20    have now presented you with the evidence upon which they are

21    going to rely to make their arguments.  In the case of the

22    government that the government has proven beyond a reasonable

23    doubt what it's charged these defendants with, and in the case

24    of the defendants that the government hasn't been able to do

25    that.

1          Before we hear the arguments of the parties, I'm

2    going to give you some instructions on the law.  And before we

3    do that, I'm going to make sure that I have a script that the

4    parties are aware of so they know what I'm going to say.

5    We've, of course, worked on this before, but I want to take

6    time to make sure that the final script is the way it ought to

7    be.

8          So we'll take a break now, come back at about 9:30.

9    We'll take a 30-minute break.  And then when you come in, I'll

10   give you some instructions, and after I'm done reading those

11   instructions, I'll turn it over to the lawyers to start the

12   arguments.  The government will start and finish the arguments,

13   and the defendants will each have an opportunity in the order

14   that you've become accustomed to.  And we'll take breaks as we

15   need to along the way.

16         So be ready when you do come back in to go at least

17   an hour and a half to two hours.  That's what my hope is, that

18   we can go that long before we have to take another break.  And

19   then we'll pick up with whatever order we're in at that time.

20   So you get an early break, and we'll come back and get you

21   about 9:30.

22       *(Jury exited the courtroom at 9:09 a.m.)*

23       *THE COURT:*  All right.  Before we go to instructions,

24   is there anything else on behalf of the parties?

25       *MS. CHARTIER:*  If I may, Your Honor, I would just

like to renew my Rule 29 motion.  I will just incorporate all
the arguments previously made, and I'm assuming the Court will
reiterate its ruling.

     *THE COURT:*  And I take it all the defendants would
want to renew their Rule 29 motion at this point?

     *MR. O'KEEFE:*  Yes, Your Honor.

     *MR. LOMBARD:*  Yes.

     *MS. HOWARD:*  That's correct, Your Honor.

     *THE COURT:*  Ms. Howard.

     *MS. HOWARD:*  Your Honor, I would also object to
excluding an instruction on buying and selling not being enough
to make a conspiracy.

     *THE COURT:*  We'll get to instructions in just a
second.

     On the Rule 29s I'm going to consider that each of
the defendants have renewed that, and I'm going to make the
same ruling I did at the end of the first case with Count 4
excepted since I did dismiss that.

     And then is there anything else before we go to
instructions?  (No response).  Okay.

     Hopefully you got some iterations over the weekend,
and then you probably haven't seen the most recent iteration
until the package this morning which incorporates some changes
to the 14.07 instruction, unanimity required, to reflect a move
from my initial plan on the verdict form, one verdict form for

1    everybody, to the plan that the parties agreed on over the

2    weekend to a separate verdict form for each defendant.  I

3    thought that made sense to me.  I think actually when I look

4    through it, although it's a bigger bulk for the jury, it's

5    probably clearer.  But I did need to make some changes in my

6    judgment to 14.07 to avoid confusing the jury, at least in my

7    mind, by going back to something like the form I had.

8         I think the other changes were pretty minor.  I did

9    add back language that I think Mr. Baker initially took out in

10   the deliberation instruction on asking for exhibits, because

11   although I do intend to put the paper and electronic exhibits

12   back in the jury room, in theory they might want to see the

13   drug exhibits or some of the others, and I'm not sending those

14   back.

15        So let me just go to each party and see if there's

16   anything else that you need to put on the record or clarify or

17   object to regarding the instructions.

18        From the government, first of all.

19        MR. BAKER:  Your Honor, the government's only other

20   statement about the proposed instruction sent out this weekend

21   was that there was the clause of 7.20, a statement by

22   defendant.  I don't believe there was any evidence of any of

23   the defendants' statements in a post-arrest scenario, which was

24   the only reason we raised it.

25        THE COURT:  All right.  And I did take that out of

1    the set you got this morning.

2            MR. BAKER:  Thank you, Your Honor.

3            THE COURT:  Mr. Lombard.

4            MR. LOMBARD:  Nothing else, Your Honor.

5            THE COURT:  Mr. Phelan.

6            MR. PHELAN:  I'd just renew on truthfulness,

7    Your Honor.

8            THE COURT:  Okay.

9            MR. PHELAN:  Even though the Plea Agreement -- no

10   Plea Agreement was admitted, it still talked about what your

11   obligation is on whether to testify and the coconspirators were

12   saying they were truthful, so I would just renew my argument

13   there.

14           The other -- may I have a moment, Your Honor?

15   Nothing else, Your Honor.  Thank you.

16           THE COURT:  All right.  So I'll make the same ruling

17   on the truthfulness instruction that I did earlier, believing

18   that it's adequately covered by the existing instruction set.

19           And go to Ms. Chartier.

20           MS. CHARTIER:  No other objections.  Thank you,

21   Your Honor.

22           THE COURT:  All right.  Mr. O'Keefe.

23           MR. O'KEEFE:  No objections, Your Honor.

24           THE COURT:  And Ms. Howard.

25           MS. HOWARD:  Thank you, Your Honor.  We object to the

1   exclusion from the conspiracy instruction a separate

2   instruction that a mere buy/sell is not enough to find a

3   conspiracy.  We think it's called for under these proofs, and

4   we would state this objection for the record, Your Honor.

5           *THE COURT:*  All right.  Just so I'm clear, you were

6   relying on the commentary to the conspiracy instruction?

7           *MS. HOWARD:*  That's correct, Your Honor.

8           *THE COURT:*  Okay.  So let me just amplify briefly why

9   I'm not going to give the instruction.  I'm not excluding

10  anything from the standard instruction on conspiracy.  I'm

11  giving the standard instruction in its entirety, so that's the

12  first thing.

13          The second question is is this an appropriate case to

14  amplify that instruction in some way, pulling in particular out

15  of the commentary the reference to the general statement that

16  ordinarily a simple buyer/seller relationship or sale wouldn't

17  be enough to establish a conspiracy.  I think I've only used

18  that once.  I mentioned it earlier.  I went back to look at

19  that over the weekend.  It was a unique situation in my

20  judgment where the government charged only -- a conspiracy

21  against only one person, did not charge the underlying

22  transactional counts that it could have because the statute of

23  limitations had expired on those.  That, among other things, I

24  think made it a unique case for the instruction, and I felt

25  like it was important to amplify for the jury the difference

1     between the substantive offense and a conspiracy offense.  And

2     here I don't think the same situation applies, and I think the

3     ordinary instruction on conspiracy is adequate, ample, and

4     allows both sides to make their arguments on that point,

5     including Ms. Howard to make her argument on behalf of

6     Ms. Atkinson.  So I'm not going to include it for those

7     reasons.

8           Ms. Howard.

9           *MS. HOWARD:*  I'll just rest on my objection for the

10    record, Your Honor.

11          *THE COURT:*  Okay.  Mr. Frawley.

12          *MR. FRAWLEY:*  Your Honor, may I see Mr. Baker for a

13    moment before?

14          *THE COURT:*  Sure.  I just found out from Mr. Schmidt

15    that you didn't get the set that I was talking about this

16    morning.  I'm sorry about that.

17          *MR. FRAWLEY:*  That was going to be my question.  I'll

18    wait to see that, Your Honor.

19          *THE COURT:*  Mr. Turpel, do you have anything?

20          *MR. TURPEL:*  No objection.

21          *THE COURT:*  And once Mr. Frawley and Mr. Hills have a

22    chance to see that.

23          All right.  Mr. Frawley, anything from your

24    perspective?

25          *MR. FRAWLEY:*  Nothing.  That clears it up.

1          *THE COURT:*  Thank you.

2          And Mr. Hills.

3              *MR. HILLS:*  No objection.

4              *THE COURT:*  Okay.  I think, then, we've covered

5    everyone, then.  The only other item I had was the exhibit list

6    which I think the parties had agreed on, and I had a couple of

7    discrepancies from my notes, but we cleared that up, so I think

8    everybody is on the same page with respect to that too.  And

9    then we'd have the addition of Defense 7A through E this

10   morning.

11             Are there any other things from the parties'

12   perspective?  Go ahead, Mr. Baker.

13             *MR. BAKER:*  Your Honor, on the issue of the exhibit

14   list, the Court discussed with the parties the importance of

15   going over the exhibits.  I handed the defense counsel an index

16   of what we have on the thumb drive we discussed with the Court.

17   And I also mentioned to them we had a hard time with a couple

18   files earlier this weekend getting them on there.  Those files

19   have been added, so the index that the defense has right now

20   should also have Exhibits 95 and 105 added to it in terms of

21   our thumb drive.

22             *THE COURT:*  All right.

23             *MR. BAKER:*  Those were admitted by the Court.  And

24   then in terms of the individual still pictures or the pictures

25   in the course of the evidence, those are all available in our

final binder which has been culled of all the information that was extraneous.

THE COURT: All right. Okay. Anything else before we take a break and then everybody can get ready for an hour and a half to two hours?

MS. CHARTIER: The only thing on the exhibits is we have Mr. -- I don't know if Mr. Castro's phone call made its way onto the government's. We have it on our thumb drive. They were having difficulty with our video. It was too big for making its way through. So we have thumb drives with that phone call and our video, and then we have copies of all the defense exhibits from Mr. Tatum. But if the other lawyers have theirs, we can put them in our little packet.

THE COURT: All right. Okay.

MR. BAKER: One other issue, Your Honor --

THE COURT: Yes.

MR. BAKER: -- Ms. Chartier was kind enough to raise. There was a placard she intends to use during closing. It has some descriptions and an escalated table on burdens of proof and whether things fall into not guilty. She raised it with me to see if I had any objection. I do object to it because the Court instructs on reasonable doubt, and I don't think it's appropriate for closing argument.

MS. CHARTIER: Ms. Thelen is holding it. I believe Ms. Howard and I both might like to use it. Ms. Thelen, who

1    I've been calling Ms. Carey all morning, is holding it for the

2    Court's review so the Court can give it a thumbs up or thumbs

3    down.

4            THE COURT:  All right.  Well, I'll think about it.

5    If you do use it, Mr. Baker can object.  And what I'll tell the

6    jury is, statements that the lawyers make, arguments the

7    lawyers make about what the law means doesn't control.  And

8    what they have to do is decide what they think reasonable doubt

9    means in the context of my instructions which will tell them

10   something they wouldn't hesitate to rely on in making the most

11   important decisions in their own lives.  So I will say that.  I

12   won't -- I definitely won't let you use it without that

13   clarifying instruction.  I'll think about whether to allow it

14   at all.

15           MS. CHARTIER:  I'll make it -- that would disrupt my

16   flow, Your Honor, so I probably will not use it.  Thank you,

17   Your Honor.

18           THE COURT:  Okay.  All right.  Very good.

19           MR. BAKER:  Thank you, Your Honor.

20           THE COURT:  We'll come back at 9:30.

21           THE CLERK:  Court is in recess.

22       (Recess taken at 9:20 a.m.)

23       (Jury entered the courtroom at 9:40 a.m.)

24           THE COURT:  Members of the Jury, this is going to be

25   a set of instructions from me to you on the law that you have

to apply in the case.  I'd rather just talk to you about it informally, but we do it in a written format so that there's a script and everybody knows what's coming and so that we can be sure to get it right.  I will give you a copy of this in the jury room so that you'll have it for your deliberations if you need to refer back to it.  But I want to read it to you here. We will project it up there so that you can see it as we're going along for those of you who like that.  And once I'm done with it, we'll go right into the argument of the lawyers.

So Members of the Jury, I will now instruct you on the law you must follow in deciding this case.  I will start by explaining your duties and the general rules that apply in every criminal case, and then I will explain the elements or parts of the crimes that the defendants are accused of committing, then I will explain some rules that you must use in evaluating particular testimony and evidence.  Finally I will explain the rules that you must follow during your deliberations and the possible verdicts that you may return. Please listen very carefully to these instructions.  I will also give you a written copy of these instructions when you retire to your jury room to deliberate, and I will be projecting a copy of these instructions on the courtroom screen for those who like to follow along as I read.

You have two main responsibilities as jurors.  The first one is to decide what the facts are based on the evidence

1    that you saw and heard.  Deciding what the facts are is your

2    job, not mine, and nothing that I have said or done during this

3    trial was meant to influence your decision about the facts in

4    any way.

5            Your second responsibility is to take the law that I

6    give you, apply it to the facts, and decide if the government

7    has proven its case beyond a reasonable doubt.  It is my role

8    to instruct you concerning the law, and you are bound by the

9    oath that you took at the beginning of the trial to follow the

10   instructions that I give you, even if you personally disagree

11   with them.  This also includes the instructions that I gave you

12   before and during the trial.  All the instructions are

13   important, and you should consider them together as a whole.

14           The lawyers may talk about the law during their

15   arguments, but if what they say is different from what I

16   indicate in these instructions, you must follow what I say.

17   You must perform these duties fairly, not letting any bias,

18   sympathy, or prejudice that you may feel toward one side or the

19   other influence your decision.

20           The defendants have pleaded not guilty to the crimes

21   charged in the Second Superseding Indictment.  The Second

22   Superseding Indictment is not any evidence of guilt.  It is the

23   formal document that the government files with this court

24   telling the defendants what crimes they are accused of

25   committing.  It does not even raise any suspicion of guilt.

1    The defendants start the trial with no evidence at

2  all against them, and the law presumes that they are innocent.

3  This presumption of innocence stays with them unless the

4  government presents evidence before you in court that overcomes

5  that presumption and convinces you beyond a reasonable doubt

6  that one or more of them are guilty.  This means that the

7  defendants have no obligation to present any evidence at all or

8  to prove to you in any way that they are innocent.  It is the

9  government's responsibility to prove a defendant guilty, and

10  this burden stays on the government from start to finish.

11  Unless the government convinces you beyond a reasonable doubt

12  that the defendants are guilty, you must find the defendants

13  not guilty.

14    The government must prove every element of each crime

15  charged beyond a reasonable doubt.  Proof beyond a reasonable

16  doubt does not mean proof beyond all possible doubt.  Possible

17  doubts or doubts based purely on speculation are not reasonable

18  doubts.  A reasonable doubt is what its name implies:  A doubt

19  based on reason and common sense.  It may arise from the

20  evidence, the lack of evidence, or the nature of the evidence.

21  Proof beyond a reasonable doubt means proof which is so

22  convincing that you would not hesitate to rely and act on it in

23  making the most important decisions in your own lives.  If you

24  are convinced that the government has proved the defendants

25  guilty beyond a reasonable doubt, say so by returning a guilty

verdict.  If you are not convinced, say so by returning a
not-guilty verdict.

You must make your decision based only on the
evidence that you saw and heard here in court.  Do not let
rumors, suspicions, or anything that you may have seen or heard
outside of court influence your decision in any way.  The
evidence in this case includes only what the witnesses said
while they were testifying under oath, the exhibits that were
admitted into evidence, and the stipulations that the lawyers
agreed to.  Nothing else is evidence.  The lawyers' statements
and arguments are not evidence.  Their questions and objections
are not evidence.  My legal rulings are not evidence.  So
during the trial if I sustain an objection and did not let you
hear the answers to some of the questions that the lawyers
asked, or if I ruled that you could not see some of the
exhibits offered by the lawyers, or if I struck something from
the record and ordered you to disregard it, then you must
completely ignore all of these things in your deliberations.
Do not speculate about what a witness might have said or what
an exhibit might have shown.  Rely only on the actual evidence
admitted in the case.

You should use your common sense in weighing the
evidence.  Consider it in light of your everyday experience
with people and events and give it whatever weight you believe
it deserves.  If your experience tells you that certain

1  evidence reasonably leads to a conclusion, you are free to

2  reach that conclusion.

3  Now, some of you may have heard the terms "direct

4  evidence" and "circumstantial evidence." Direct evidence is

5  simply evidence, like the testimony of an eyewitness, which if

6  you believe it, directly proves a fact. If a witness testified

7  that he saw it raining outside and you believed him, that would

8  be direct evidence that it was raining. Circumstantial

9  evidence is simply a chain of circumstances that indirectly

10 proves a fact. If someone walked into the courtroom wearing a

11 raincoat covered with drops of water and carrying a wet

12 umbrella, that would be circumstantial evidence from which you

13 could conclude that it was raining. It is your job to decide

14 how much weight to give the direct and circumstantial evidence.

15 The law makes no distinction between the weight that you should

16 give to either one or say that one is any better evidence than

17 the other. You should consider all the evidence, both direct

18 and circumstantial, and give it whatever weight you believe it

19 deserves.

20 Another part of your responsibility as jurors is to

21 decide how believable each witness was. It is for you alone to

22 decide if a witness's testimony was believable and how much

23 weight you think it deserves. You are free to believe

24 everything that a witness said or only part of it or none of it

25 at all. But you should act reasonably and carefully in making

these decisions.

Let me suggest some factors for you to consider in evaluating each witness's testimony.  Ask yourself if the witness was able to clearly see or hear the events.  Sometimes even an honest witness may not have been able to see or hear what was happening and may make a mistake.  Ask yourself how good the witness's memory seemed to be.  Did the witness seem able to accurately remember what happened?  Ask yourself if there was anything else that may have interfered with a witness's ability to perceive or remember the events.  Ask yourself how the witness acted while testifying.  Did the witness appear honest or did the witness appear to be lying?  Ask yourself if the witness had any relationship to the government or the defendant or anything to gain or lose from the case that might influence the witness's testimony.  Ask yourself if the witness had any bias or prejudice or reason for testifying that might cause the witness to lie or to slant the testimony in favor of one side or the other.  Ask yourself if the witness testified inconsistently while on the witness stand or if the witness said or did something or failed to say or do something at any other time that is inconsistent with what the witness said while testifying.  If you believe that the witness was inconsistent, ask yourself if this makes the witness's testimony less believable.  Sometimes it may.  Other times it may not.  Consider whether the inconsistency was about

something important or about some unimportant detail.  Ask
yourself if it seemed like an innocent mistake or if it seemed
deliberate.  And ask yourself how believable the witness's
testimony was in light of all the other evidence.  Was the
witness's testimony supported or contradicted by other evidence
that you found believable?  If you believe that a witness's
testimony was contradicted by other evidence, remember that
people sometimes forget things and that even two honest people
who witness the same event may not describe it exactly the same
way.

You may also consider the age, experience, and
maturity of a witness in evaluating their believability.  These
are only some of the ideas that you may consider in deciding
how believable each witness was.  You may also consider other
things that you think shed some light on the witness's
believability.  Use your common sense and your everyday
experience in dealing with other people and then decide what
testimony you believe and how much weight you think it
deserves.

You are not to make any decisions based only on the
number of witnesses who testified for a particular side.  What
is more important is how believable the witnesses were and how
much weight you think their testimony deserves.

The lawyers for both sides objected to some of the
things that were said or done during the trial.  They have a

duty to object whenever they think that something is not permitted by the Rules of Evidence.  Therefore, you should not concern yourselves with these objections.  Please do not interpret my rulings on the lawyers' objections as any indication of how I think the case should be decided.  My rulings were based on the Rules of Evidence, not on any opinion about the case.  Remember that your decision must be based only on the evidence that you saw and heard here in court.

Both the objections of the lawyers and my rulings on them are designed to ensure that the parties receive a fair trial under the law.  They should not influence your decision.

That concludes the part of my instructions explaining your duties and the general rules that apply in every criminal case.  In a moment I will explain the elements of the crime or crimes that each defendant is accused of committing.

The defendants are on trial here only for the particular crimes charged in the Second Superseding Indictment. Also keep in mind that whether anyone else should be prosecuted and convicted for these crimes is not a proper matter for you to consider.  The possible guilt of others is no defense to a criminal charge.  Your job is to decide if the government has proved each defendant in this case guilty.  Do not let the possible guilt of others influence your decision in any way.

The defendants have all been charged with a crime of conspiracy to distribute controlled substances including

heroin, cocaine, and marijuana.  Several defendants have also
been charged with possession with intent to distribute a
controlled substance.  The number of charges is no evidence of
guilt and this should not influence your decision in any way.
And in our system of justice, guilt or innocence is personal
and individual.  It is your duty to separately consider the
evidence that relates to each defendant on each charge and to
return a separate verdict for each one of them.  For each one
you must decide whether the government has presented proof
beyond a reasonable doubt that a particular defendant is guilty
of a particular charge.  Your decision on any one defendant or
charge, whether it is guilty or not guilty, should not
influence your decision on any of the other defendants or
charges.

     Next I want to say a word about the dates mentioned
in the Second Superseding Indictment.  The Second
Superseding Indictment charges that crimes happened on or about
a certain date.  The government does not have to prove that a
crime happened on that exact date, but the government must
prove that a crime happened reasonably close to that date.

     Next I want to explain something about proving a
defendant's state of mind.  Ordinarily there is no way that a
defendant's state of mind can be proven directly because no one
can read another person's mind and tell what that person is
thinking.  But a defendant's state of mind can be proved

1    indirectly from the surrounding circumstances.  This includes

2    things like what the defendant said, what the defendant did,

3    how the defendant acted, and any other facts or circumstances

4    in evidence that show what was in the defendant's mind.  You

5    may also consider the natural and probable results of any acts

6    that a defendant knowingly did or did not do and whether it is

7    reasonable to conclude that the defendant intended those

8    results.  This, of course, is all for you to decide.

9            Now, some of the people who may have been involved in

10   these events are not on trial.  This does not matter.  There is

11   no requirement that all members of a conspiracy be charged and

12   prosecuted or tried together in one proceeding.  Nor is there

13   any requirement that the names of the other conspirators be

14   known.  An indictment can charge a defendant with a conspiracy

15   involving people whose names are not known as long as the

16   government can prove that the defendant conspired with one or

17   more of them.  Whether they are named or not does not matter.

18           Count 1 of the Second Superseding Indictment charges

19   each one of the defendants with conspiracy to distribute and

20   possess with the intent to distribute controlled substances,

21   including heroin, cocaine, and marijuana, from in or about 2013

22   through and including September 3, 2017.  It is a crime for two

23   or more persons to conspire or agree to commit a drug crime

24   even if they never actually achieve their goal.

25           A conspiracy is a kind of criminal partnership.  For

you to find any one of the defendants guilty of the conspiracy
charge, the government must prove each and every one of the
following elements beyond a reasonable doubt:  First, that two
or more people or persons conspired or agreed to distribute or
possess with the intent to distribute controlled substances.
Second, that the defendants knowingly and voluntarily joined
the conspiracy.

Now I will give you more detailed instructions on
some of these terms.  With regard to the first element of
criminal agreement, the government must prove that two or more
persons conspired or agreed to cooperate with each other to
distribute or possess with the intent to distribute controlled
substances.  This does not require proof of any formal
agreement, written or spoken, nor does this require proof that
everyone involved agreed on all the details.  But proof that
people simply met together from time to time and talked about
common interests or engaged in similar conduct is not enough to
establish a criminal agreement.  These are things that you may
consider in deciding whether the government has proved an
agreement, but without more, they are not enough.

What the government must prove is that there was a
mutual understanding, either spoken or unspoken, between two or
more people to cooperate with each other to distribute or
possess with the intent to distribute controlled substances.
This is essential.

1          An agreement can be proved indirectly by facts and

2     circumstances which lead to a conclusion that an agreement

3     existed, but it is up to the government to convince you that

4     such facts and circumstances existed in this particular case.

5          One more point about the agreement.  The Second

6     Superseding Indictment accuses the defendants of conspiring to

7     distribute and possess with the intent to distribute several

8     different controlled substances.  The government does not have

9     to prove that the defendants each agreed to distribute or

10    possess with the intent to distribute all of the different

11    controlled substances.  But the government must prove an

12    agreement to distribute or possess with the intent to

13    distribute at least one of the controlled substances for you to

14    return a guilty verdict on the conspiracy charge.

15         With regard to the second element, the defendants'

16    connection to the conspiracy, the government must prove that

17    the defendants knowingly and voluntarily joined that agreement.

18    The government must prove that the defendants knew the

19    conspiracy's main purpose and voluntarily joined the conspiracy

20    intending to help advance or achieve its goals.  You must

21    consider each defendant separately in this regard.

22         This does not require proof that a defendant knew

23    everything about the conspiracy or everyone else involved or

24    that the defendant was a member of it from the very beginning.

25    Nor does it require proof that a defendant played a major role

1   in the conspiracy or that the defendant's connection to it was

2   substantial.  A slight role or connection may be enough.

3            Further, this does not require proof that a defendant

4   knew the drug involved was marijuana, cocaine, or heroin.  It

5   is enough that the defendant knew it was some kind of

6   controlled substance.  Nor does this require proof that a

7   defendant knew how much marijuana, cocaine, or heroin was

8   involved.  It is enough that the defendant knew that some

9   quantity was involved.

10           But proof that a defendant simply knew about a

11  conspiracy or was present at times or associated with members

12  of the group is not enough, even if the defendant approved of

13  what was happening or did not object to it.

14           Similarly, just because a defendant may have done

15  something that happened to help a conspiracy does not

16  necessarily make the defendant a conspirator.  These are all

17  things that you may consider in deciding whether the government

18  has proved that a defendant joined a conspiracy, but without

19  more, they are not enough.

20           A defendant's knowledge can be proved indirectly by

21  facts and circumstances which lead to a conclusion that the

22  defendant knew the conspiracy's main purpose, but it is up to

23  the government to convince you that such facts and

24  circumstances existed in this particular case.

25           You must be convinced that the government has proved

all of these elements beyond a reasonable doubt in order for
you to find any one of these defendants guilty of the
conspiracy charge.

Several of the defendants are charged with the crime
of possession of heroin or cocaine with the intent to
distribute. I have summarized the charges against these
defendants in the table below. And you can see Counts 2, 3, 5,
10, 11, 12, and 14 each pertain to a particular defendant on or
about a particular date involving a particular controlled
substance. I won't read the whole table to you because you'll
have it with you.

Heroin and cocaine are controlled substances. For
you to find the defendants guilty of these crimes as charged,
you must find that the government has proved each and every one
of the following elements beyond a reasonable doubt: First,
the defendant knowingly or intentionally possessed heroin,
cocaine, or both as charged. Second, the defendant intended to
distribute heroin, cocaine, or both as charged.

Now I will give you more detailed instructions on
some of these terms. To prove that a defendant knowingly
possessed a controlled substance, the defendant did not have to
know that the substance was heroin or cocaine. It is enough
that the defendant knew or had reason to believe that it was
some kind of controlled substance. Further, the defendant did
not have to know how much heroin or cocaine he or she

1    possessed.  It is enough that the defendant knew that he or she

2    possessed some quantity of the heroin or cocaine.

3         The phrase "intended to distribute" means the

4    defendant intended to deliver or transfer a controlled

5    substance sometime in the future.  To distribute a controlled

6    substance there need not be an exchange of money.

7         In determining whether a defendant had the intent to

8    distribute, you may consider all the facts and circumstances

9    shown by the evidence, including the defendant's words and

10   actions.  Intent to distribute can be inferred from the

11   possession of a large quantity of drugs, too large for personal

12   use alone.  You may also consider the estimated street value of

13   the drugs, the purity of the drugs, the manner in which the

14   drugs were packaged, the presence or absence of a large amount

15   of cash, the presence or absence of weapons, and the presence

16   or absence of equipment used for the sale of drugs.  The law

17   does not require you to draw such an inference, but you may

18   draw it.

19        If you are convinced that the government has proved

20   all of these elements for an individual defendant so charged,

21   say so by returning a guilty verdict on the charge.  If you

22   have a reasonable doubt about any one of these elements for a

23   defendant on a charge, then you must find that defendant not

24   guilty of that charge.

25        Next I want to explain something about possession.

The government does not necessarily have to prove that a defendant physically possessed a controlled substance for you to find the defendant guilty of the crime of possession with the intent to distribute a controlled substance. The law recognizes two kinds of possession: Actual possession and constructive possession. Either one of these, if proved by the government, is enough to convict.

To establish actual possession the government must prove that a defendant had direct physical control over the controlled substance and knew that he or she had control of it. To establish constructive possession the government must prove that a defendant had the right to exercise physical control over the controlled substance and knew that he or she had this right and that the defendant intended to exercise physical control over the controlled substance at some time, either directly or through other persons.

For example, if you left something with a friend intending to come back later and pick it up, you would have constructive possession of it while it was in the actual possession of your friend. But understand that just being present where something is located does not equal possession. The government must prove that a defendant had actual or constructive possession of the controlled substance and knew that he or she did for you to find a defendant guilty of this crime. This, of course, is all for you to decide.

One more thing about possession. The government does not have to prove that each defendant was the only one who had possession of a controlled substance. Two or more people can together share actual or constructive possession over property, and if they do, both are considered to have possession as far as the law is concerned. But remember that just being present with others who had possession is not enough to convict. The government must prove that each defendant had either actual or constructive possession of the controlled substance and knew that he or she did for you to find the defendant guilty of this crime. This, again, is all for you to decide.

For some defendants and charges you may also be asked to determine the type and quantity of the controlled substance or substances involved in the offense. The verdict forms I have prepared for you will include special questions for you to answer in these situations.

If you find by unanimous agreement that the government has proved beyond a reasonable doubt that a defendant is guilty of one or more of the counts with special questions, you will also need to answer the questions about the type and quantities that you find were involved in the offense or offenses. In each instance you will have ranges of quantities to consider for any controlled substance you find beyond a reasonable doubt was involved. In each instance the verdict form will specify a drug type or types and a quantity

range or ranges.  For each type of drug you find beyond a reasonable doubt was involved in the offense, select the quantity that you find the government has proved beyond a reasonable doubt.

In determining the quantity of the controlled substance involved in the offense, you need not find that the defendant knew the quantity involved in the offense.  However, in determining the quantity for each defendant, you must include only the quantity you find involved from that defendant's own conduct and the conduct of other coconspirators that was reasonably foreseeable to that defendant.  That quantity could be less than the quantity involved in the conspiracy as a whole.

I will provide you with special verdict forms to help you focus on the decisions you will need to make.

That concludes the part of my instructions explaining the elements of the crimes.  Next I will explain some rules that you must use in considering some of the testimony and evidence.

You've heard that search warrants were executed at various locations which are alleged to have been associated with this conspiracy, that arrest warrants were executed against a number of people alleged to have been associated with this conspiracy, and that wire intercepts were authorized for phone numbers associated with some persons alleged to have been

1   involved in this conspiracy.  Search warrants, arrest warrants,

2   and wire intercepts are proper investigative and law

3   enforcement tools used by the government, but the fact that

4   these tools were used does not indicate one way or the other

5   whether a defendant is guilty or not guilty of the charges

6   contained within this Second Superseding Indictment.  You

7   should not consider it in your deliberations.

8           You've heard that defendants Castro, Nelson, Howard,

9   Atkinson, Avery, Thompson, and Cox have chosen not to testify

10  and that defendants Nelson, Howard, Atkinson, Avery, Thompson,

11  and Cox have also chosen not to present any evidence.  A

12  defendant has an absolute right not to testify or present

13  evidence.  The fact that a defendant did not testify or present

14  evidence cannot be considered by you in any way.  Do not even

15  discuss it in your deliberations.  Remember that it is up to

16  the government to prove each defendant guilty beyond a

17  reasonable doubt.  It is not up to any of the defendants to

18  prove that he or she is innocent.

19          You have heard Defendant Tatum testify.  Earlier I

20  talked to you about the credibility or the believability of the

21  witnesses, and I suggested some factors for you to consider in

22  evaluating each witness's testimony.  You should consider those

23  same factors in evaluating Defendant Tatum's testimony.

24          You have heard the testimony of Thomas Burns and

25  Luke Augustine who testified as opinion witnesses.  You do not

1    have to accept Mr. Burns' or Mr. Augustine's opinions.  In

2    deciding how much weight to give these opinions, you should

3    consider the witness's qualifications and how they reached

4    their conclusions.  Also consider the other factors discussed

5    in these instructions for weighing the credibility of

6    witnesses.  Remember that you alone decide how much of a

7    witness's testimony to believe and how much weight it deserves.

8            You have heard the testimony of some witnesses who

9    may have made statements before this trial that differ from

10   their testimony here in court.  Any such earlier statements

11   were brought to your attention only to help you decide how

12   believable the witness's testimony in court was.  You cannot

13   use it as proof of anything else.  You can only use it as one

14   way of evaluating the testimony here in court.

15           You have heard the testimony of witnesses who were

16   convicted of a crime before this trial.  The earlier conviction

17   or convictions were brought to your attention only as one way

18   of helping you decide how believable the testimony was.  Do not

19   use the evidence for any other purpose.  It is not evidence of

20   anything else.

21           You have heard the testimony of one or more witnesses

22   who said they were also using illegal drugs or abusing alcohol

23   during the time that the witnesses testified about.  You should

24   consider such a witness's testimony with more caution than the

25   testimony of other witnesses.  An addict may have a constant

1  need for drugs and for money to buy drugs.  He may also have a
2  greater fear of imprisonment because the supply of drugs may be
3  cut off.  Do not convict a defendant based on the unsupported
4  testimony of such a witness standing alone unless you believe
5  the testimony beyond a reasonable doubt.

6           You have heard the testimony of Yusef Phillips,
7  Toranita Meridy, Etrevion Murphy, Ray Lee, Tony Kirkland,
8  Derrick Swain, and Salvador Cervantes.  You have also heard
9  that these witnesses received or the government has promised
10 them that they may receive a benefit in the form of a lessened
11 sentence in exchange for their cooperation.  It is permissible
12 for the government to make such a promise, but you should
13 consider these witnesses' testimony with more caution than the
14 testimony of other witnesses.  Consider whether the testimony
15 may have been influenced by the government's promise.  Do not
16 convict a defendant based on the unsupported testimony of such
17 witnesses standing alone unless you believe their testimony
18 beyond a reasonable doubt.

19          You've heard the testimony of several witnesses who
20 say they were involved in the same crime that the defendants
21 are charged with committing.  You should consider the testimony
22 of these witnesses with more caution than the testimony of
23 other witnesses.  Do not convict the defendants based on the
24 unsupported testimony of such witnesses standing alone unless
25 you believe their testimony beyond a reasonable doubt.  The

1   fact that many of these witnesses have pleaded guilty to a

2   crime is not evidence that any of these defendants are guilty,

3   and you cannot consider this against the defendants here in any

4   way.

5           During the trial you have seen counsel use summaries,

6   charts, or similar materials which were offered to assist in

7   the presentation and understanding of the evidence.  These

8   materials are not themselves evidence and must not be

9   considered as proof of any facts.

10          You have heard the testimony that one or more of the

11  defendants committed crimes, acts, or wrongs other than the

12  ones charged in the Second Superseding Indictment.  If you find

13  a defendant did those crimes, acts, or wrongs, you can consider

14  the evidence only as it relates to the government's claim on

15  the defendant's intent or plan or on the credibility of a

16  testifying defendant.  You must not consider it for any other

17  purpose.

18          Remember that each defendant is on trial here only

19  for the crimes charged in the Second Superseding Indictment and

20  not for the other acts.  Do not return a guilty verdict unless

21  the government proves the crimes charged in the Second

22  Superseding Indictment beyond a reasonable doubt.

23          You have heard some tape recordings that were

24  received in evidence and you were given some written

25  transcripts of these tapes on the screens.  Keep in mind that

1    the transcripts are not evidence.  They were given to you only

2    as a guide to help you follow what was being said.  The tapes

3    themselves are the evidence.  If you noticed any differences

4    between what you heard on the tapes and what you read in the

5    transcripts, you must rely on what you heard, not what you

6    read.  And if you could not hear or understand certain parts of

7    the tapes, you must ignore the transcripts as far as those

8    parts are concerned.

9         That takes us to a point where I'm going to stop the

10   instructions and turn it over to the lawyers for their

11   argument.  And when they are all done, I'll have a few more

12   instructions for you about deliberations, and I'll show you the

13   verdict forms, or at least samples of the verdict forms, so you

14   know what to expect when you get in the jury room.  But for now

15   I want to turn it over to the lawyers.

16        And as you know, the government has the burden of

17   proof, and so they have the privilege of opening this argument

18   and closing it at the end of all the arguments.

19        So Mr. Fauson, Mr. Baker, whoever is arguing, we'll

20   turn it over to you.

21        MR. FAUSON:  Thank you, Your Honor.

22        Members of the Jury, you can see from this case that

23   drug dealing is always about the money.  People don't get

24   involved in dealing drugs because it's fun.

25        As you saw from the testimony and evidence in this

1    case, drug dealers frequently speak in code because they are
2    worried about getting caught.
3            The law prohibits the use, the possession, and the
4    possession with intent to distribute cocaine, heroin, and
5    marijuana under federal law.  These are deemed controlled
6    substances, and because they are controlled substances and
7    because they are substances of abuse and have potential for
8    addiction, they make a lot of money when they are illegally
9    sold, and that's why we're here.
10           THE COURT:  Can you make sure that microphone is
11   pointed to you as close as possible.  Thank you.
12           MR. FAUSON:  Thank you, Your Honor.
13           This was a chain conspiracy, ladies and gentlemen.
14   It started -- do we not have -- I think we need --
15           THE COURT:  Do you have it on lectern or through
16   your -- you have to have it on the lectern.
17           MR. FAUSON:  Yeah, we have it through the lectern,
18   Your Honor.  Sorry.
19           THE COURT:  All right.
20           MR. FAUSON:  All right.  This was a chain conspiracy,
21   ladies and gentlemen.  It began with the supplier,
22   Mr. Alex Castro, seated here at defense table.  I submit to you
23   in this case you saw the spectrum of drug dealing.  You saw
24   from the California-based supplier all the way down to retail
25   dealers here in Grand Rapids.  And I'm giving you a quick

overview of that.

The regional distributors were Yusef Phillips and Ray Lee. And from there Yusef Phillips delivered to Dante Howard and supplied him, Max Avery, and Andrea Thompson.

Ray Lee in turn, his brother, supplied Michael Yadell Nelson, Solon Tatum, Erika Atkinson, and Aaron Cox who is seated at the end of defense table over there.

As you heard the judge just instruct you, a conspiracy is a criminal partnership. It's an agreement to commit a crime. And in this case it's the crime of drug trafficking. All defendants here are charged with conspiracy, and as you heard the judge just instruct you, that takes two things: (1) that two persons -- two or more persons conspired or agreed to distribute or possessed with intent to distribute controlled substances and that each defendant knowingly and voluntarily joined the conspiracy.

You heard the testimony of a number of convicted coconspirators in this case. And I submit that the government doesn't always choose the witnesses in these cases. Drug dealers deal with other drug dealers, and so we're dealing with imperfect human beings as witnesses.

First was Yusef Phillips, a regional distributor. Ray Lee, his brother. You heard from Toranita Meridy, also known as Sis, who was a woman who helped out Yusef Phillips down in Benton Harbor and helped supply and middle marijuana to

the defendant Dante Howard sitting behind me.

You heard from Tony Kirkland, who was a long-time friend of Ray Lee, and as you heard him say had problems of his own with alcohol and drugs, who was a retail supplier of heroin in the Grand Rapids area as well as some cocaine. And you heard Mr. Kirkland testify that he received a drug phone from Erika Atkinson and his sales literally shot through the roof. You further heard Mr. Kirkland testify that when Ms. Atkinson returned from Texas back in 2016, Mr. Phillips asked Ms. Atkinson -- or asked Mr. Kirkland to help Ms. Atkinson out and give her back some clients.

You also heard from Derrick Swain who was supplied by Solon Tatum. Not only did you have Mr. Lee testifying here against Mr. Tatum, you also have Mr. Swain coming from underneath Mr. Tatum, if you will, who is being supplied by Tatum.

And finally, you heard the semi truck driver, Salvador Cervantes. Phillips, Lee, and Cervantes all testified against Alex Castro that he was the California-based distributor here. And you have to take into account all of these coconspirators' testimony. That's very natural in a drug case. It's your job to determine how believable they are. And as imperfect as any human being may be, including a convicted felon, the one theme running through this case, ladies and gentlemen, that I urge you to consider is that telephone

interceptions and electronic and video surveillance do not lie.
Those are the things here that you want to weigh against the
backdrop of everybody who sat in that witness chair and
determine who is telling the truth.  That is your job as
jurors.  And I submit based on the wire interceptions and the
electronic and physical surveillance presented in this case,
these six cooperating coconspirators were being truthful.  But,
again, that's for you to decide.

I'm going to go now each -- since there are eight
defendants here in this trial -- and touch upon each, if you
will, in almost their own chapter of this closing.  And I'm
going to start off with the lead defendant, Alex Castro.

Broadly, the evidence against Alex Castro with
Mr. Phillips' testimony, Mr. Lee's testimony, and
Mr. Cervantes' testimony.  There were also 46 intercepted phone
and text conversations, surveillance of semi truck deliveries,
and photographs received from Mr. Phillips' phone that
Mr. Castro had sent to him.

As you heard Mr. Phillips and Mr. Lee testify, they
developed a close bond, almost a friendship, if you will, with
Mr. Castro.  He invited them out to California.  They shot
paintball together.  You recall the movie trailer that was sent
and admitted into evidence here.  Which may have been one of
the more colorful exhibits in this case.  You know, they are
out there because right here you have Ray Lee sitting in that

movie trailer video.

And then you have Mr. Castro sending Mr. Phillips and Mr. Lee photographs of him socializing and living a life. These alone, of course, don't prove that Mr. Castro is guilty of the conspiracy charged in the Indictment, but what they do show is the close relationship between Mr. Lee, Mr. Phillips, and Mr. Castro.

I'm going to turn to some telephone calls now. And as you recall the judge's instruction here, the transcripts that rolled with these calls are not evidence. You have to recall what you heard. All right? But the transcripts are an aid, and so they are a part of this closing.

Call 8.4.59 on July 28th of 2017, taken from target phone 4. This is Mr. Castro reaching out to Mr. Phillips. Recall the code that drug dealers speak in. Mr. Phillips testified that "an original" meant a kilogram of heroin. And here Mr. Castro is reaching out to Mr. Phillips asking him if it's okay that that heroin -- whoops -- if it's not bricked up, because it's in powder. Consider whether they are talking about anything else here other than cocaine and heroin, ladies and gentlemen. And I'd submit to you that they are not and that this is very conclusive evidence that Mr. Phillips and Mr. Castro conspired to traffic in drugs.

On July 30th of 2017, this is a text message from Mr. Castro to Mr. Phillips letting him know that a semi truck

1    driver is going to be soon arriving in Grand Rapids.  You'll

2    recall Special Agent Guidice testifying, I think for the first

3    time on the stand here when she was on direct examination by my

4    colleague, Mr. Baker, the physical surveillance was conducted

5    on July 17th, 2017, of the first semi truck delivery.  GPS

6    trackers have gone off on Mr. Phillips' and Mr. Lee's vehicle.

7    Agents followed them to a meet location which happened to be

8    the Country Inn and Suites hotel off of 28th Street and saw the

9    two meeting with a semi truck driver.  And it was through that

10   that law enforcement learned that the drugs in July and August

11   of 2017 were likely coming out on a semi truck.  But what

12   happens here then is the wiretap corroborates that.  Castro is

13   telling Mr. Phillips that he's going to be there tonight.  And

14   then he asks what the count is going to be.  How much money

15   should he be expecting in return for these load -- this load of

16   controlled substances.

17          Phillips responds, 230.5 is the count.  $230,000,

18   ladies and gentlemen.  That is high-level drug trafficking I

19   submit to you.

20          Mr. Castro responds, "Cool.  I'm dropping 15 chicas

21   and one original."  You'll recall again the code.  "Chicas"

22   means cocaine.  "Original" means heroin.

23          Later, actually very early the next morning on

24   July 31st of 2017, after law enforcement surveilled and saw the

25   semi truck make the connection with Ray Lee and Yusef Phillips,

1    we have electronic surveillance of Ray Lee and Yusef Phillips

2    entering their stash house on Whispering Way.

3                We fast forward to August 2nd of 2017.  And here is

4    an interception of Mr. Castro asking about the quality of the

5    heroin.  Whether Mr. Phillips and his clientele are satisfied

6    with it.  "Did you get a read on that original?"  And you'll

7    recall Mr. Phillips testifying extensively how he used heroin

8    addicts as testers and that if anything was an 8 or above, he

9    was going to be good with it because he could sell that heroin

10   and make a profit off of it.  And we have that corroborated,

11   ladies and gentlemen, right here in this phone call.

12                Further in the phone call Castro asks, "How is

13   everything with the chica?"  Meaning cocaine.  Phillips

14   responds, "No complaints."  And then Castro asks, "What's going

15   on with the smoke?"  And you heard Mr. Phillips testify that

16   Mr. Castro was also supplying Ray Lee and Yusef Phillips with

17   marijuana.  "Smoke" is code for marijuana.

18                Further on in the call they are discussing how to get

19   money to Castro.  And he's talking about getting with my driver

20   or sister.  And you recall, ladies and gentlemen, that

21   Yusef Phillips referred to Toranita Meridy as his sister.

22   Life-long friends with her.  I believe Ms. Meridy testified

23   that she knew Yusef Phillips since the third grade, that they

24   grew up together.  She testified that she traveled to Chicago

25   on three occasions to drop off money for Yusef Phillips.  She

testified that on a trip in August of 2017 she felt she was being followed by law enforcement and that she actually hired an Uber driver to take her to Chicago.  You'll recall she was added to the lease to the stash house on Camelot.  She testified that she delivered marijuana to Dante Howard for Yusef Phillips, approximately 40 pounds of marijuana.  And she also testified that she frequently picked up Etrevion Murphy on Yusef Phillips' behalf from the Benton Harbor bus station.  And we'll get to Etrevion Murphy a little bit later.

On August 8th of 2017 -- you'll recall that Ms. Meridy said she traveled to Chicago on or about August 9th of 2017.  And here we have Phillips asking if Castro has that serial number.  And you'll recall Ms. Meridy's testimony as well as Mr. Phillips' testimony, it's identical almost, that in order to confirm that she was meeting with the right person and delivering Yusef Phillips' money to the right person, a complete stranger in Chicago who she didn't know his first name, Castro would send a picture of a serial number off a dollar bill and that person on the other end in Chicago, when Ms. Meridy went to Chicago, would have that same serial number, and that way she could verify that she was giving hundreds of thousands of dollars in drug proceeds to the correct person.

How do we know this?  In addition to the wiretap we know this because a picture of a dollar-bill serial number sent from Mr. Castro was found on Yusef Phillips' phone.  All of

this was admitted into evidence, ladies and gentlemen, here in
this trial and is here for your consideration.

On the right, Ms. Meridy testified and
identified him as the individual that she dropped hundreds of
thousands of dollars in drug proceeds off to in Chicago three
separate times.

On August 15th of 2017 we have further evidence that
Yusef Phillips, Toranita Meridy, and Alex Castro were in a
conspiracy together, as well as a lot of other individuals.
Phillips tells Castro that he has an issue. Castro asks, "What
happened?" And then Phillips describes that Meridy had told
them that she was worried that she had a tail on herself when
she was going to Chicago this last time.

Fast forward to September 2nd of 2017. You'll recall
that the takedown occurred the following day on
September 3rd of 2017. And here again Castro is talking about
money. 228,000 and 294,000 dollars. He's again talking about
15 chicas and one original. 15 kilos of cocaine and one
kilogram of heroin. And he's talking about Yusef Phillips
paying him sufficient funds so that he can also credit him
towards the marijuana, the smoke that he is supplying him with.

On September 3rd of 2017, 1:34 a.m., Castro texts
Phillips and says "20 minutes away. No room, playa."

Do you recall that Phillips interpreted that to mean
that the semi truck driver would not be getting a room that

night, but he was just 20 minutes away from Grand Rapids.  And

Phillips responds, "Okay.  Call you in 15 minutes."  Castro

responds back, "He's there, brother.  All looks good."

Confirming that Salvador Cervantes had arrived in Grand Rapids.

       And we all recall what happens next, ladies and

gentlemen.  Law enforcement was conducting aerial surveillance,

as well as physical surveillance on the ground, and you heard

the testimony of Officer Beracy from the Grand Rapids Police

Department telling you what he saw in that helicopter that

night through the high-powered lens.  He saw Yusef Phillips and

Ray Lee meet with the semi truck driver at the

Country Inn and Suites, as they had done on prior occasions, as

was their MO, pick up the load, and head towards their stash

house.

       Law enforcement triggered into action on this.

Mr. Cervantes was stopped at the rest area off of I-96

eastbound in Saranac.  And you heard MSP Trooper Sinke testify

that he searched the cab of the semi, he found a trap, and he

located this load of cocaine and heroin as well as $400,000 in

the trap.  I submit to you this is conclusive, significant

evidence of Mr. Castro's guilt on Count 1 of the conspiracy.

       Your verdict form will look like this.  Based on this

evidence that I have just summarized to you, we believe he is

guilty of this charge and ask you to return a guilty verdict.

And we ask that you make a finding of more than 1,000 grams of

1   heroin.  Because when you think about it, he was sending out
2   one kilo each and every load.  There were multiple loads.
3   Easily, based on the simple math, quickly gets beyond the
4   one-kilogram threshold.

5           You're also going to have to consider how much
6   cocaine Mr. Castro is sending out if you find him guilty of
7   this conspiracy charge.  We request that you return a finding
8   of over 5,000 grams of cocaine.  Again, based on one load, he's
9   sending out 15 chicas each load.  That alone is 15 kilos of
10  cocaine, which gets him over this level.

11          And then as to the marijuana, you have to decide
12  between 50,000 grams or more or less than 50,000 grams.  And
13  based on the evidence and the testimony in this case, there
14  were a hundred pounds of marijuana that was seized from the
15  Cascade Road house of Ray Lee and Yusef Phillips.  This was
16  marijuana that they testified was sourced by Mr. Castro.  We
17  believe the evidence showed that he was dealing in more than
18  50,000 grams of marijuana.

19          Next I want to move to Michael Nelson.  Mr. Lee
20  identified Michael Nelson who he knew as Poppy or Tiny.  He
21  testified that he knew Poppy since he was 16 years old.
22  Mr. Nelson is sitting right here at the table.  He testified
23  that Poppy began purchasing drugs from him starting in 2015.
24  He testified that Michael Nelson only wanted to purchase
25  cocaine and he only dealt cocaine to Mr. Nelson.  He testified

that Nelson began by purchasing approximately one ounce of cocaine from him and that these quantities then grew, and they grew to approximately three to four ounces every couple of weeks.

In addition to Mr. Lee's testimony on this matter, we know that Mr. Nelson is guilty of these charges again based on the corroborating video surveillance and wiretap telephone interceptions. And I want to go through some highlights of those for you right now.

This text message here -- or call, excuse me -- again illustrates the code that drug traffickers talk in. Lee asked, "What's going on?" Nelson, all he had to do was say "Three." And you heard Mr. Lee testify that he knew that meant three ounces of cocaine based on their drug-trafficking relationship.

In addition to Mr. Lee saying that, you heard testimony of virtually every other coconspirator who testified in this case saying that they too talked in code. And you also heard the testimony of the government's opinion witness, Special Agent Burns, who has been a DEA agent for 28 years, testify that indeed drug traffickers usually talk in code because they don't want to get caught. They will frequently use numbers with no nouns attached to describe what it is they want. And I submit that you're seeing that here in the wire interceptions, ladies and gentlemen.

What happened to further corroborate matters after

Ray Lee and Michael Nelson had that interaction?  Electronic
surveillance finds Ray Lee entering the stash house at Camelot
20 minutes after his call with Nelson.  That's
Government Exhibit 81.  And then Government Exhibit 82 is him
leaving shortly thereafter.

And then GPS surveillance tracked Ray Lee's vehicle
to his home at 113 Temple, Southwest, here in Grand Rapids.
Based on this evidence, ladies and gentlemen, I submit to you
that you can find Mr. Nelson guilty of possession with intent
to distribute cocaine on July 25th of 2017.

Now, again, Mr. Nelson is also charged in the
conspiracy.  They are not mutually exclusive charges.  And what
I mean by that is, if you see an ongoing relationship of drug
trafficking between two individuals to achieve a common
objective, that's a conspiracy, and you can consider possession
with intent to distribute charges as possible evidence of that
conspiracy as well.  Just keep in mind conspiracy is merely an
agreement.  Possession with intent to distribute you have to
actually or constructively possess drugs.  And we know that
Mr. Nelson possessed these drugs because Mr. Lee drove directly
to his house and met with him after going to the stash house,
after the call where he ordered up three ounces of cocaine.

Now, real quickly, the elements for possession with
intent to distribute, as the judge just instructed you, are
that the defendant knowingly or intentionally possessed a

controlled substance and he intended to distribute it.

You have not heard any testimony in this case that Ray Lee was distributing three ounces of cocaine to Michael Nelson so he could use it. In fact, you've heard testimony that suggested quite the opposite. From Special Agent Burns that a user quantity of cocaine is roughly a tenth to a half a gram. Three ounces, ladies and gentlemen, is a distribution quantity of cocaine.

You will see this on your verdict form with regard to the possession with intent to distribute charge, and we ask that you find Mr. Nelson guilty.

I'm going to move on now to Count 10. And again, Count 1 is highlighted up here as well because you can consider that evidence when you're considering whether he actually conspired with Ray Lee and others to distribute and traffic drugs.

On August 11th of 2017 there's a call from Ray Lee to Michael Nelson, and he's telling Michael Nelson at that point that he better load up because people are going to be taking a break for a month. He's telling Mr. Nelson here "Get your cocaine now because there's going to be a dry spell because my supplier is going to be taking a break from supplying cocaine." You've not heard any other testimony or evidence in this case, ladies and gentlemen, that suggests that Ray Lee was supplying Mr. Nelson with anything other than cocaine.

1    You'll recall that Ray Lee then departed and went to

2    the Camelot stash house.  That's Government Exhibit 100.  And a

3    little over two hours later he says that he's on his way

4    towards him.  Are you ready?  Mr. Nelson responds that he's not

5    at home.  He's actually getting his tire plugged at

6    Discount Tire.

7    The call further on, approximately an hour later,

8    Nelson confirms that he's at his crib.  He's at his home.

9    You'll recall from this call that Mr. Lee was actually at the

10    barber shop at that point and offered for Mr. Nelson to come to

11    the barber shop to pick up the cocaine.  Mr. Nelson said no, he

12    would prefer to have the cocaine delivered to him at his house.

13    So Lee proceeded there.

14    And you heard the testimony of Detective

15    Lindsey Moorhead who physically surveilled Mr. Lee from the

16    location of the barber shop, I believe she testified on Eastern

17    and Bates, to Mr. Nelson's house at 113 Temple, Southwest.

18    Based on this evidence, ladies and gentlemen -- this is going

19    to be your verdict form again -- I submit you can find

20    Michael Nelson guilty of possession with intent to distribute

21    cocaine on August 11th of 2017.

22    And as to Count 1, you heard the judge instruct you

23    that the conspiracy charge does not require proof that the

24    defendant knew everything about the conspiracy or everyone else

25    involved.

1           The government is not trying to make Mr. Nelson a

2    bigger drug trafficker than he may be in relation to the other

3    defendants here, but as I noted to you in the beginning of this

4    opening, this is a chain conspiracy that spans the spectrum of

5    levels of drug trafficking.  Going from as high as Mr. Castro,

6    the California place -- California-based supplier, dealing in

7    the hundreds of thousands of dollars in drug transactions, to

8    Mr. Lee and Mr. Phillips at the regional level who are

9    significant Grand Rapids-based distributors, to their retail

10   distributors all the way down to a Derrick Swain who is getting

11   dealt with by Solon Tatum here in the back row.

12          Based on this, ladies and gentlemen, I submit that

13   Mr. Nelson is guilty of the conspiracy.  And when you consider

14   or not the quantities that he was involved with and that were

15   reasonably foreseeable to him -- this is where a little math

16   comes in -- if you're getting three ounces of cocaine every

17   couple of weeks, it takes you approximately 10 1/2 weeks to get

18   to the 5-kilogram threshold.  So I would submit, ladies and

19   gentlemen, that you can find Mr. Nelson guilty and responsible

20   for 5,000 grams or more -- or excuse me -- 500 grams but less

21   than 5,000 grams of cocaine.

22          I'm going to move now to Solon Tatum.  As you've

23   heard through a lot of testimony, Mr. Tatum is Mr. Lee's --

24   Ray Lee's unlicensed barber who worked in a shop near Eastern

25   and Bates.  Ray Lee testified that he knew Solon Tatum as Solo.

1    He testified that Solo knew that Ray Lee had a reputation for
2    being a drug trafficker and that Solo approached Mr. Lee about
3    purchasing a kilogram of cocaine.  Ray Lee testified that he
4    sold two kilograms of cocaine to Solo in the summer of 2017.
5    The first occurring on July 14th of 2017 and the second
6    occurring on July 18th of 2017.  And so you have two possession
7    with intent to distribute charges to consider as to Mr. Solo as
8    well as the conspiracy charge.
9            And as to the first charge, you heard testimony from
10   Mr. Lee that on July 14th he went to the stash house to pick up
11   a kilogram of cocaine for Mr. Solo.  He emerged about five
12   minutes later, 9:23 in the morning.  And then after that you
13   heard Officer Michael Mesman, who is a retired Grand Rapids
14   Police Department officer, testify that he physically
15   surveilled Ray Lee to a hotel parking lot in back of a
16   Panera Bread off of 29th Street in Grand Rapids.  He saw
17   Ray Lee make contact with a driver of a black Range Rover.  He
18   followed up and found out that that Range Rover, from the
19   registration records, was registered to Solon Tatum.  So you
20   have Ray Lee saying that this happened and you have
21   Officer Mesman's corroborating physical surveillance that tells
22   the same story that Ray Lee tells because he observed it with
23   his own eyes.
24           You'll have a similar verdict form.  We submit based
25   on this evidence you can find him guilty of the possession with

intent to distribute charge on July 14th of 2017.  And we all know that one kilogram of cocaine is a thousand grams, so we ask that you find Solon Tatum guilty of between -- more than 500 grams of cocaine.

As to Count 3, the possession with intent to distribute charge on July 18th of 2017, Ray Lee was picked up on video surveillance walking out of the Camelot stash house with a Food Saver box.  Ray Lee testified that this was a kilogram of cocaine destined for Solon Tatum.

You heard Nick Allers from the Woodland Mall testify about the video surveillance system.  And after this case I don't think I'm going to be doing anything in the Woodland Mall parking lot.  That video surveillance system picked up Ray Lee picking up the Food Saver box, excuse me, putting it into the back of Solon Tatum's Range Rover, and then meeting with Solon Tatum in the vehicle.  And I submit, ladies and gentlemen, and as the officers testified that observed this, what I'm circling right there is roughly $30,000 or more in cash.  Based on the circumstances of this case, the judge will instruct you that you can use your common sense and everyday experience.  And you heard Mr. Tatum take the stand and testify that he was purchasing a used scanner from Ray Lee.  I ask you whether that bag of cash -- and it's right for you to consider in your common sense and everyday experience -- is payment for a scanner or whether it's payment for a kilogram of cocaine.

1        The judge instructed you that when you consider the

2   credibility of witnesses, you're also allowed to judge

3   Mr. Tatum's testimony on the same level and determine whether

4   it makes sense in light of all the evidence presented in this

5   case.

6        You also heard Mr. Tatum further testify about

7   running a credit business.  I don't know that we saw a lot of

8   other evidence beyond his own statements that he was running a

9   credit business.  Maybe one from another witness the defendant

10  called.  But you really have to consider here whether Ray Lee,

11  who has over $400,000 stashed in his Cascade home five miles

12  away from the Woodland Mall parking lot, is going to be going

13  to Solon Tatum for credit advice, particularly when drug

14  dealers cannot use the banking system because they have too

15  much cash and it will be detected if they start making

16  deposits, significant deposits into the bank.

17       Here is a better view of Ray Lee exiting the

18  Range Rover carrying that bag of cash.  And there's no dispute

19  in this case, ladies and gentlemen, that that was Solon Tatum

20  in the parking lot and that's his Range Rover.  The

21  registration paperwork was seized at his house on Pinebrook

22  during execution of search warrants, as was the financing

23  statement here at Government Exhibit 128J.  And in considering

24  all of the evidence and testimony in this case, it's

25  appropriate for you to consider whether Mr. Tatum is truly

making $110,000 or more in cash as a barber working on the
corner of Eastern and Bates, not paying taxes, being able to
afford a $1,500-a-month lease payment on a Range Rover as well
as an additional payment on a 2013 BMW, all the while living in
his basement with a giant shoe collection. I submit based on
common sense, ladies and gentlemen, that that can be viewed as
evidence of unexplained wealth. There's no explanation other
than Mr. Tatum's own testimony in this case how he is getting
this kind of money to drive that kind of car, have that many
shoes, have a BMW on top of it.

Based on this evidence, ladies and gentlemen, we'd
ask that you find Mr. Tatum guilty of Count 3. And again, a
kilogram is in excess of 500 grams, so we'd ask that you make a
finding that Mr. Tatum is responsible for more than 500 grams
of cocaine.

You further heard Ray Lee testify that Solon Tatum
was interested in trying out the market for heroin. You heard
Ray Lee testify that on July 26th of 2017 he visited the stash
house at Camelot to pick up some tester packets of heroin for
Mr. Tatum so he could determine whether he wanted to expand his
portfolio of drug trafficking and get into heroin in addition
to cocaine. Electronic surveillance through video picked up
Mr. Lee at the stash house on Camelot, saw him going in, saw
him going out at 1:30 and 1:38, and then later that day,
approximately three hours later, you get this call from

Mr. Tatum to Mr. Lee asking, "Which one has been touched?  The one with or without the rubber band?"  Lee responds, "Without the rubber band."  Tatum says, "It ain't been touched or has?"

You heard Mr. Lee testify that those tester packets he provided, one was highly pure or raw heroin and another he had put cut on it because Mr. Tatum wanted to test the market for both.

Now, you heard Mr. Tatum testify that this call was all about clippers.  And I'm not really sure from his testimony as I heard it what the result of this call was with regard to clippers.  But if Mr. Tatum is such an expert barber and so good souping up clippers, why is he having to ask Mr. Lee these kinds of questions three hours after Mr. Lee left the Camelot stash house and had this call?  Mr. Lee was giving Mr. Tatum heroin, not clippers.  And it's appropriate for you to consider that if Solon Tatum is as good of a barber as he is, what is he doing working on clippers for people for free?  Especially while he's receiving a bag of cash in the Woodland Mall parking lot.  It's all about drug trafficking, ladies and gentlemen.  You can use your common sense and everyday experience to weigh the credibility of these witnesses in light of the corroborating information, surveillance, and wire interceptions to make that determination.

You further heard Ray Lee testify that he spoke with Solon Tatum and that he was interested in getting more cocaine

from him.  But Ray Lee also testified that Mr. Tatum didn't pay in full for his second kilo so he wasn't interested in getting him more without getting that payment in return.  And Lee is responding that he might have more cocaine on Monday.  This is happening on August 12th of 2017.

And then we fast forward to Monday, August 14th of -- that should be 2017, not 2018 -- and again we have Tatum meeting Ray Lee, walking out to his Audi with a box.  Ray Lee testified that that box contained cash for payment for that kilo.

And again, as I noted, you're seeing the spectrum of drug trafficking in this case, ladies and gentlemen, because it's a chain conspiracy.  You heard the coconspirator Derrick Swain testify that he knew Tatum from Tatum at his barber shop and that he was supplied cocaine by Tatum between Christmas and Thanksgiving of 2016 and for a while into 2017. You heard Tatum -- or excuse me -- Swain testify that he received almost in aggregate 30 ounces of cocaine from Mr. Tatum.  And that he was paid approximately 150 -- $1,050 per ounce is what Tatum charged.  And you also heard Mr. Swain testify that he only ended up buying about 30 ounces in aggregate because the cocaine was not very good.  But again here as to Mr. Tatum, you have not only his supplier above him testifying that he was distributing to him but also one of Mr. Tatum's customers below him saying he's a drug dealer and

that this isn't about barber shop clippers and used scanners.

So, again, you have to consider whether Mr. Tatum conspired with anybody here. And I submit that he did engage in a common scheme with Mr. Lee and Mr. Tatum and that it was part of the broader chain conspiracy and that you find him guilty on Count 1 and that as to heroin that it would be less than 100 grams, because, again, he received tester packets. Mr. Tatum did not receive, based on the evidence submitted in this case, more than the tester packets of heroin. But as to the cocaine, two kilos, more than 500 grams.

The next defendant is Dante Howard. You heard Yusef Phillips testify that Dante Howard was a Benton Harbor customer of his and that he initially became acquainted with Howard in 2013 or 2014 because Yusef Phillips, being the regional distributor that he is, testified that he tried to keep track of who was drug dealers. He was keeping tabs on his market and individuals that he might be able to supply.

Mr. Phillips testified that the two met and began doing small deals which started at 20 grams and then it made it to 50 grams, and Phillips testified that by 2016 or early 2017 he was supplying Howard with one kilogram of cocaine and a hundred grams of heroin per month. And, of course, we have more phone interceptions and surveillance for you to determine whether Mr. Phillips is being truthful about this, and from the government's case and the evidence in this case we believe that

he is.

On August 2nd of 2017 Howard calls Phillips and is trying to arrange a drug transaction. And you'll see in this exchange that Phillips responds, "Let me find the dog right quick." And you heard Mr. Phillips testify that the dog was Etrevion Murphy. Even when Mr. Murphy sat in that chair, he didn't deny that he worked for Yusef Phillips. He testified that he transported drugs down to Benton Harbor for Yusef Phillips by bus, that he transported drugs on a couple occasions to Detroit and Columbus, that Phillips supplied Murphy with a customer base, and that Phillips even provided Murphy with a white Volkswagen Golf.

You have to consider the testimony of Mr. Murphy's and decide whether he's being truthful about this, the matters in this case, just like any other witness. The thing that he denied was knowing Dante Howard. And I would submit, ladies and gentlemen, based on the wire interceptions that we're about to show here, Mr. Phillips was working with Mr. Howard, and the reference to finding the dog meant that Mr. Howard knew exactly who Etrevion Murphy was and that Mr. Murphy was not being truthful on that stand when he said he did not know Dante Howard.

On August 2nd of 2017, the same day that Phillips just said to Howard "Let me find the dog," Phillips reaches out to him later that day, the call occurred at 4:16 p.m., and he

asks -- because Murphy was essentially a runner for Phillips, he paid him to do runs, pick up money, and drop off drugs -- "Do you want to make $150 right quick?"  And Murphy says, "Yeah, I want to."  And you heard the testimony not only of Etrevion Murphy about his trips to Benton Harbor but also those of Toranita Meridy who picked up Etrevion Murphy. Toranita Meridy, who knew Dante Howard, who was in fact his sister-in-law, they were Benton Harbor people.

So we have a call later that night where Phillips is trying to arrange with Howard to do a deal at the Woodland Mall parking lot near the cinema.  This call occurs at 8:04 p.m. Howard says "Let's make that happen same way."  Again, they are talking in code.  They have done this before, ladies and gentlemen, and that's all they need to say is "We're going to make this deal happen the same way as we did before" because they are worried about their phones being tapped and being surveilled by law enforcement.  And we're going to see a little more of that here in the conversations between Mr. Phillips and Mr. Howard.

How do we know that Mr. Howard is doing something illegal?  He wants everything done before his sister gets there with the kids.  He doesn't want to expose his kids to his drug trafficking.

Phillips says "Tell her to meet me at the mall."  And they are trying to get this deal done that day because it's

1  8:00. So what does Mr. Phillips do after this call with

2  Mr. Howard? He goes to the stash house at Camelot and

3  testifies that he's picking up drugs for Dante Howard.

4  Later that evening, approximately 20 to 30 minutes

5  later, Phillips is calling Howard and he's telling Howard "Tell

6  her I'm right here by the cinema." He's asking Howard to tell

7  his courier that he's waiting there right by the cinema for her

8  to do a quick drop.

9  A subsequent call, four minutes later -- and you

10  recall there was a little confusion on this phone call.

11  Mr. Howard thought his courier might be driving a white Denali

12  and was telling Mr. Phillips that. Instead she was driving a

13  black car. And once they got that squared away, you see the

14  black car come up and you see Mr. Phillips approach it as he

15  testified and drop off the drugs to Mr. Howard's courier for

16  Mr. Howard. Right after that they are texting each other to

17  make sure the deal was done and everything is good.

18  How else do we know Mr. Howard is involved in drug

19  trafficking? Because he's dropping his phone just like

20  Yusef Phillips and Ray Lee do. You heard Mr. Phillips testify

21  that when Mr. Howard here dropped his phone, he would text him

22  and say, "BH, new number." Stands for Benton Harbor, new

23  number.

24  And again, that same story that Phillips was telling

25  Castro all the way out in California he's telling Dante Howard

now.  It's now August 10th of 2017, one day after Ms. Meridy's trip to Chicago where she takes the Uber ride because she's worried law enforcement is surveilling her.  And he's reporting to Dante Howard, "Sis hit me up.  Said an MFer was following her," meaning a cop.

And we know that that is Toranita Meridy.  She testified that Phillips called her Sis, that they were life-long friends.  And we know that Toranita Meridy, who testified on the stand here, is the sister-in-law of Dante Howard.

They continue their call.  And here we have verifiable proof that they are talking about countersurveillance and countermeasures to evade the police.  Howard is talking about this person on the Southwest Enforcement Team.  Referring to police.  Talking about the FBI and DEA.  Ladies and gentlemen, this is not the mind of an innocent person.  People who aren't involved in criminal activity aren't worried about getting caught by police and engaging in countersurveillance measures.

He's going a step further here and worrying about the devices they are putting on stuff.  Meaning GPS trackers, which you have seen and heard testimony of were put on on this case by law enforcement.  This is the mind of a guilty man because he's involved in drug trafficking.  And this conversation with Yusef Phillips is proving it.

1        How else do we know?  This was a very lengthy

2  conversation.  And these are just snippets of it.  But how else

3  do we know that Dante Howard is drug trafficking?  Because he's

4  not going to sell anybody a gram for 500 because he was telling

5  Yusef Phillips in this conversation that undercover officers

6  doing controlled buys pay top dollar, and he's saying if they

7  are doing that, you have to know that that's the police.  You

8  can't let greed get the best of you in that situation.

9        This is not the mind of an innocent man, ladies and

10  gentlemen.  Dante Howard is in a conspiracy with

11  Yusef Phillips, he's in a conspiracy with Toranita Meridy, and

12  one with Etrevion Murphy and others.  And it was all drugs that

13  were supplied by Castro as part of this bigger chain conspiracy

14  that's been presented to you.

15        Go to call 8.4.1508 at 4:51 p.m. on August 11th.

16  This gets back to the Etrevion Murphy issue.  Howard is telling

17  him "My man is there already."  Phillips is telling him "Let me

18  hit him and see right quick."  So what happens?  It's

19  4:51 p.m., ladies and gentlemen.  4:52 p.m. Yusef Phillips

20  calls Etrevion and asks "Where you at, man?"  Etrevion tells

21  him he's at 44th and Breton.  And Yusef Phillips is telling him

22  he wants him to go and do a deal.  And Etrevion responds that

23  "I'm going to be on my way."  Phillips and Howard were setting

24  up a deal that day and Murphy was involved right in the middle

25  of it, ladies and gentlemen.  And you can consider these wire

1    interceptions, balance those against Murphy's testimony on
2    whether or not he knew or was involved with Dante Howard, and I
3    would submit to you that he was not telling the truth on that
4    stand.
5            So as to the Count 1, again, here is the
6    verdict form, we'd request that you find Mr. Howard guilty of
7    the overarching conspiracy. You're going to have to make a
8    decision on the weight. Yusef Phillips testified that every
9    month he was giving Howard approximately a hundred grams of
10   heroin, supplying him with that quantity. A kilo of cocaine he
11   got to and a hundred grams of heroin. And after 10 months
12   you're at a kilo of heroin. And Yusef Phillips testified that
13   he was doing this for a couple of years.
14           You're also going to have to make a decision on the
15   cocaine quantity. And, again, if you're doing a kilo of
16   cocaine a month and supplying him with that quantity, it's only
17   going to take you five months to get to that 5,000 threshold.
18           Now as to the marijuana, you heard Ms. Meridy testify
19   that Dante Howard, that she supplied him. Remember, she
20   received a hundred pounds of marijuana from Yusef Phillips?
21   Gave about half of it to an individual named Demetrius Gaines,
22   gave the other half to Mr. Howard. You'll also have to make
23   the decision on the weight of the marijuana. And I believe the
24   evidence in this case, ladies and gentlemen, is that this
25   marijuana deal was not a one-time deal.

1          Let's move to Erika Atkinson.  We have conspiracy and
2     possession with intent to distribute on Count 11.  The primary
3     coconspirator that testified against Ms. Atkinson was Mr. Lee.
4     He testified that she was a 50- to 100-gram-a-month heroin
5     customer from 2014 to 2015, that she moved to Texas, and that
6     she was a 50- to 100-gram-a-month heroin customer from 2016 to
7     the arrest.  And that she sold her customers to Tony Kirkland.
8     And you heard this from Kirkland as well.  And there were six
9     phone conversations intercepted involving Ms. Atkinson.  I'm
10    going to focus on the one that involves her
11    possession-with-intent-to-distribute count.

12         There were also two deliveries at Ray Lee's home.
13    You'll recall the video surveillance of the pole cam outside
14    the Cascade house where Ms. Atkinson pulls up, backs in, goes
15    into the house.  And you'll recall Ray Lee testifying that he
16    had a physical relationship with Ms. Atkinson at some point and
17    that this is why he had this level of trust in her and would
18    allow her into his home.

19         Going to August 12th of 2017.  Again, they are
20    speaking in code, ladies and gentlemen.  All Lee has to say,
21    "What do you want me to do?"  "I need a hundred and I need a
22    one."  Lee's understanding exactly what she's saying.  "Okay, I
23    gotcha."  And she says, "One 28."  And you heard Ray Lee
24    testify that meant 28 grams of cocaine and a hundred grams of
25    heroin.  And you know, ladies and gentlemen, that this is not a

1    user quantity of cocaine or heroin.  You heard the testimony of

2    Special Agent Burns that a user quantity of heroin is about a

3    tenth of a gram.  A tenth of a gram.  And she's ordering up a

4    hundred grams of heroin.

5         On August 13th of 2017 you see Ray Lee going in and

6    out of the stash house at Camelot immediately before

7    Erika Atkinson shows up at his door.  So not only did you hear

8    the testimony of Ray Lee on this, but you also heard the

9    testimony of Tony Kirkland.  And you get to judge his

10   credibility as well.  His story is consistent with Ray Lee's

11   story.  His story is that he was a lower-level drug dealer

12   until Ms. Atkinson was moving to Texas and Ray Lee did him a

13   favor, sold him Ms. Atkinson's phone contacts, and then his

14   sales exploded.  Not only did Mr. Kirkland testify to that, he

15   identified Erika Atkinson in court.  He said, "That is her.

16   That is the woman whose phone contacts I got."

17        Based on the telephone surveillance, the video

18   surveillance, ladies and gentlemen, I submit you should find

19   Ms. Atkinson guilty of the conspiracy, because, again, this was

20   an ongoing scheme, as Ray Lee testified.  It wasn't a one-time

21   deal.  And that he was regularly supplying her on a monthly

22   basis.  And after you decide that, again, he did this and

23   supplied her, was his testimony, for approximately four years

24   in two phases.  One before she went to Texas, one after she

25   went to Texas.  And even if you're supplying 50 grams of heroin

1    per month, and we saw her just order up a hundred on the phone,

2    it's going to take you just 20 months to get to a thousand

3    kilograms -- or excuse me -- a thousand grams of heroin.

4            As to the cocaine, we'd submit the evidence presented

5    shows that she was involved in less than 500 grams of cocaine

6    based on the weights that she was ordering because she was

7    primarily ordering and distributing heroin.  And then based on

8    this surveillance, which dealt specifically with August 13th of

9    2017, we ask that you find Ms. Atkinson guilty of Count 11,

10   which is the possession-with-intent-to-distribute charge, which

11   you can consider in relation to the overall conspiracy.  And

12   that based on that deal alone where she ordered up a hundred,

13   that she was involved in more than a hundred grams of heroin.

14           Let's move to Mr. Avery.  He's been indicted not only

15   in the conspiracy, but he also has a substantive

16   possession-with-intent-to-distribute charge.  Mr. Phillips

17   testified against Max Avery.  He testified that he was a 100-

18   to 150-gram heroin customer.  That it was every month.  That

19   Mr. Avery was from Indianapolis.  That he knew Mr. Avery from

20   his childhood.  And you saw evidence of five phone and text

21   conversations.  And I want to focus on one from August 5th of

22   2017 where Max Avery is calling Yusef Phillips.  You heard

23   Yusef Phillips testify that he wasn't sure he wanted to

24   continue dealing with Max Avery because Mr. Avery is asking him

25   to put a ticket on it.  What Yusef Phillips meant -- said that

1    meant was, "Well, if you charge me more for heroin, am I going

2    to get better quality of heroin?"  And that's what Mr. Avery is

3    saying by "What could be if you're charging me a hundred

4    dollars?"  And you heard Yusef Phillips on that stand say "I

5    mix my heroin, I do it consistently, I've got a consistent

6    supply, I maintained quality at a level 8 or higher based on

7    the testers that I use."  And you heard Mr. Phillips testify on

8    that stand that Mr. Avery was going to want to get special

9    heroin for himself and he didn't really want to continue

10   dealing with him.  But we know that Mr. Avery and Mr. Phillips

11   dealt together and did a deal together because there's a

12   delivery on September 1st of 2017.  This is a call from target

13   phone 7 where Mr. Avery says "I'm on my way" and Mr. Phillips

14   responds "Here."

15          And how do we know where they are at?  We know where

16   they are at because they are in the J.C. Penney area of the

17   Woodland Mall parking lot on the Beltline.  And the camera is

18   picking up Max Avery right there.  Indisputable proof that they

19   are meeting together based on Yusef Phillips' testimony and

20   this surveillance to deal and traffic drugs together, to engage

21   in a conspiracy together.

22          Max Avery gets into the vehicle and then afterwards

23   he returns to his vehicle, which the cameras picked up as

24   having Indiana plates.  And this was some of the surveillance

25   where you saw Max Avery climbing into the back of that white

1    Suburban.  And he was in there for a while right after he had

2    emerged from Yusef Phillips' vehicle.  And you have to ask

3    yourself "Why is Max Avery climbing into the back of that

4    vehicle for a while?"  He's doing it to conceal the heroin that

5    Yusef Phillips just supplied him with.  Based on all the

6    circumstances of the case, your common sense tells you, ladies

7    and gentlemen, that that was a drug deal and that Mr. Avery was

8    concealing drugs in the back of his Chevy Tahoe.

9          You're going to see the verdict form for conspiracy,

10   and based on these interactions with Mr. Phillips and his

11   testimony and the wire and video surveillance, we ask that you

12   find him guilty of the conspiracy.  And that with regard to

13   heroin you find him responsible for 1,000 grams or more of

14   heroin.  Because, again, he's getting 100 to 150 grams every

15   month.  Yusef Phillips testified based on my recollection that

16   he was supplying Avery at least three years.  And if you do the

17   math again, it's very simple math, you're getting in excess of

18   one kilogram of heroin.

19         Based on this surveillance, which again was a

20   substantive charge, which can also be considered about whether

21   Yusef Phillips and Max Avery conspired, we ask that you find

22   him guilty of Count 12, which is possession with intent to

23   distribute heroin, and that he was responsible for 100 grams or

24   more on that particular date because he ordered a hundred grams

25   again from Yusef Phillips.

1          Let's move to Andrea Thompson who is sitting here in

2     the back row.  Yusef Phillips testified that he had somewhat of

3     a special relationship with Ms. Thompson.  I think it's pretty

4     undisputed in this case that they had a physical relationship,

5     and maybe more than just a little bit of that.  And we know

6     that as well based on the level of trust that Yusef Phillips

7     placed in Ms. Thompson.

8          Ms. Thompson also then got into Yusef Phillips' drug

9     trafficking.  And perhaps it began with helping him lease the

10    stash house at Camelot.  But my memory serves actually

11    Yusef Phillips testified that even before she began leasing the

12    Camelot stash house, which happened in or about 2015, that on a

13    couple of occasions Phillips said that she actually drove

14    controlled substances back from Chicago when he was getting

15    supplied out of Chicago.  I believe the testimony from

16    Mr. Phillips was that he met Ms. Thompson in around 2011.  So

17    he had known her for a while and he trusted her.  And I think

18    he cared about her.  But he also got her into drug trafficking.

19    And this is indisputable proof that Ms. Thompson leased the

20    stash house.

21         And we also know that Toranita Meridy was added to

22    the stash house.  Ms. Meridy's signature here, which she

23    verified on the stand, is indisputable proof that she also knew

24    what was going on in this conspiracy.  She was added right next

25    to Thompson.  They helped conceal the true use and ownership of

1  this stash location, because drug dealers don't want their name

2  on things.

3       Ms. Thompson's special relationship with Mr. Phillips

4  is also indicative by the fact that she wired money to

5  Mr. Castro.  This is at Government's Exhibit 142.  Her name is

6  right there at the top.  It may be a little difficult to see

7  here, but if you look at the exhibit book at 142, it says

8  "Funds in the benefit for Alex Castro."  And then there's

9  Ms. Thompson's signature.  It's identical to the signature that

10  you saw on the lease agreement for Camelot.

11       But we also know that Ms. Thompson became a

12  retail-level dealer for Mr. Phillips and began middling deals.

13  He asks her, "What's up with your homeboy?"  Do you recall that

14  Phillips testified that Ms. Thompson's homeboy, as he calls him

15  there, was receiving drugs from Ms. Thompson on front and not

16  paying her back very quickly and that Ms. Thompson was in some

17  financial straits.  And you're going to see that in these

18  intercepted calls.

19       You further recall Mr. Phillips' testimony relaying

20  to Ms. Thompson that you should -- tell her homeboy that if

21  he's having a slow week here, it's a problem, because the first

22  week of the month is when the people who were receiving state

23  assistance get their checks.  And Mr. Phillips testified that

24  that first week of the month is frequently some of the most

25  profitable weeks in the career of a drug trafficker.  Because

1   people who are addicted and they are on state benefits are

2   getting money in their hands and they are coming to buy drugs.

3           The call continues.  And how do we know that this is

4   about drug trafficking, ladies and gentlemen?  Because

5   Ms. Thompson's customer here is being so slow, Yusef Phillips

6   is imploring her not to give him more than 20 grams if he can

7   only move 20 grams.  Mr. Phillips is a smart businessman I

8   would submit.  You heard him testify that he never just fronted

9   drugs for absolutely free.  He might front -- get paid

10  three-quarters of the way and maybe have someone owe him a

11  couple hundred dollars or something like that.  And he's

12  actually providing business advice to Ms. Thompson.  And we

13  know that this is about drug trafficking.  He's actually not

14  using very coded language here.  He's talking about grams.

15  These are grams of drugs.

16          We further know that this is about drug trafficking

17  because Ms. Thompson is now on this call on August 3rd of 2017

18  telling Mr. Phillips that her customer is complaining about the

19  consistency of the heroin.  She's saying he's reporting it's

20  like clay.  And he's asking about how to dry them out.  And

21  she's having problems with this customer because she's not

22  getting paid and he's complaining to her about the consistency

23  of heroin that Yusef Phillips is supplying.

24          Further on in the call Phillips is giving her further

25  advice.  Sort of indicative of the closer relationship that the

1    two had.  He's telling him to just let them sit out.  Maybe put

2    them on top of the cabinets where the high heat rises.  He's

3    instructing her to give instructions to her customer on how to

4    get the heroin from a clay consistency to something that's

5    dryer and more in a brick form.  And that was Mr. Phillips'

6    testimony about this call, and it's corroborated by what's

7    happening in the call itself.

8         Ms. Thompson cannot refute, based on the plain

9    language of that call, that they were talking about grams of

10   controlled substances.

11        On August 6th of 2017 Ms. Thompson is actually

12   reporting about going over to her customer's house, and it

13   appears to be, based on the texts and what we heard on the

14   wire, she just put the drugs in the cabinet and told her

15   sister.  Told her sister that the drugs were in the cabinet.

16   You can use your common sense here, ladies and gentlemen, to

17   question, rightfully so, whether Ms. Thompson is supplying her

18   sister's boyfriend or husband.  Someone that is related to

19   Ms. Thompson's sister is Ms. Thompson's customer.

20        We go one step further here because on August 7th of

21   2017 Ms. Thompson has another call with Mr. Phillips, and on

22   this point in time again we're back to the subject of drying

23   the heroin.  And her customer, right here, the unknown male,

24   comes on and says "Yo."  And Phillips then engages him in a

25   discussion about the clay-like consistency of the heroin.  And

1     we further know that this is about drugs because Phillips is

2     asking him "What do you put on them?"  The unknown male right

3     here is saying essentially "I cut my heroin with lactose."  And

4     you heard Phillips testify, I believe, in this case that

5     lactose -- while he used Fruit Fresh to cut the heroin and cut

6     the drugs, lactose is also a common cutting agent used by

7     drug traffickers.  He responds, "That's not so bad."  He's

8     trying to figure out why this heroin that he supplied to

9     Ms. Thompson who then gave to her customer is like clay.

10         We also know this is about illegal activity because

11    Thompson's customer further on in this conversation is talking

12    about how he's trying to keep things tight.  He's trying to

13    keep his existing client base.  He doesn't want to get too

14    risky with things.  And Phillips here is saying "If you take on

15    anybody new, then you're probably going on your way to prison."

16    If they were talking about legal activity, ladies and

17    gentlemen, he wouldn't be talking about the risk of going to

18    prison.  There wouldn't be talk about grams.  There wouldn't be

19    talk about lactose as a cutting agent.  Andrea Thompson was

20    part of this call and was involved in Yusef Phillips'

21    drug-trafficking activities.  It's virtually indisputable based

22    on these intercepted calls and Yusef Phillips' testimony.

23         The call returns to just Ms. Thompson and

24    Mr. Phillips.  It appeared she was at her customer's house.

25    And Phillips is complaining that he needs to generate something

1    because the drugs are moving so slow and it's putting

2    Ms. Thompson behind worse and worse.  And she acknowledges that

3    that's happening.

4           And in another call, again complaining about

5    Ms. Thompson's customer, he's saying "You can't be too cautious

6    to where you're not gonna make no money."  In the first part of

7    my opening statement, ladies and gentlemen, I told you that

8    drug trafficking is all about the money.  It's not inherently

9    fun.  People do it to make money.  And we're seeing that right

10   here through Yusef Phillips' conversations with Thompson trying

11   to instruct her how to make a buck trafficking drugs, through

12   his conversations with Alex Castro that were intercepted,

13   through his conversations with Dante Howard.  It's always about

14   the money.

15          One of the reasons Phillips says "It's not worth it

16   if you're not making money," because when you get into a car

17   and you're traveling from A to B with drugs, you're taking a

18   chance.  Salvador Cervantes learned that.  And you heard him

19   testify about the prison sentence he earned for doing that.

20   It's an inherently risky endeavor.  It's why they talk in code.

21   But even on Mrs. Thompson's calls they are slipping.  You heard

22   about grams.  You heard about lactose.  You heard about prison.

23   It's not as coded as many of the other calls you see.

24          Here is further evidence that we know that

25   Ms. Thompson and Mr. Phillips had a relationship and that she

was aware of what was happening.

She was given access to the Camelot stash house.
Mr. Phillips testified she had a key to it.  On May 3rd of 2017
video surveillance picks her up going into the stash house.  It
shows Yusef Phillips going into the stash house 10 minutes
later.  She was welcome at the brothers' home on Cascade Road.
She entered Camelot again as picked up on surveillance on
August 14th of 2017.

You're going to get a verdict form for Ms. Thompson.
We request based on this evidence that you find her guilty of
Count 1.  If you do that, then you have to determine what drugs
she was responsible for.  Based on the calls about clay, the
cutting agent of lactose, and the fact that she's supplying her
customer with heroin, we request that you find her guilty of
Count 1 because that's what the evidence shows and that she was
involved with heroin.

And then you have to decide about cocaine.  And you
heard Mr. Phillips testify that back in 2013 she transported
cocaine -- or transported drugs from Chicago into Grand Rapids.
And you also heard the testimony that she was on the lease for
the stash house.  The stash house contained both heroin and
cocaine.  There's no evidence in this case to suggest that
Ms. Thompson did not know what was going on, ladies and
gentlemen.  And while she may not have been a mastermind at the
regional level ala Yusef Phillips, she supported him, she aided

him, she became involved in drug trafficking herself. We believe the evidence shows that she was involved with cocaine as well.

Finally this brings us to Mr. Cox who is sitting right here at the end of the defense table. He's indicted in the conspiracy in Count 1, possession with intent to distribute in Count 14. Which I believe if memory serves relates to September 1st of 2017.

Again, you heard Ray Lee testify about his relationship with Cox. It was an extended family relationship. And that he had been supplying Mr. Cox with a half kilo to one kilo of cocaine every month from 2014 until his arrest. There were 10 conversations that were picked up on the wire interception. Perhaps I was wrong and the day was September 2nd of 2017. But we saw that there was one delivery of cocaine in the Woodland Mall parking lot.

And you remember Mr. Lee on the phone listening to the phone call going, "No, I'm at K2. K2. K2." Trying to direct Mr. Cox to where he was at. We see that conversation right here. "Go to where it says J1 at." It's at the mall. It's the side of the mall where the Game Stop is at. Finally J1 or J2. Okay. Lee says, "I mean K." It's a little Keystone cop-ish almost listening to that conversation wondering if they were ever going to connect, but it was clear that they wanted to connect because they didn't give up on it.

1          And you finally saw Mr. Cox drive up in his white SUV

2     on that Woodland Mall surveillance video, park, meet with

3     Ray Lee.  And Ray Lee testified that he supplied Mr. Cox with

4     cocaine on that date in that car.

5          So again, that's going to bring you to the

6     verdict form based on Ray Lee's testimony and the video

7     surveillance from September of 2017 capturing the deal in the

8     Woodland Mall parking lot.  I submit that Mr. Cox is guilty of

9     the conspiracy, because as Ray Lee testified, that was not a

10    one-time event.  What Ray Lee was testifying about was

11    corroborated by the wire interceptions and the video

12    surveillance.

13         And then if you find Mr. Cox guilty of Count 1, you

14    also have to consider again drug quantity that's reasonably

15    foreseeable and attributable to him.  And, again, if Mr. Lee is

16    supplying Mr. Cox a half kilogram as a conservative amount

17    every month, we get to 5,000 grams in 10 months.  And Mr. Lee

18    testified that he was supplying Mr. Cox consistently from 2014

19    all the way up until the takedown in 2017.

20         You then have to consider Count 14, which again is

21    the substantive charge which we just showed you through the

22    wire interceptions and the video surveillance.  And based on

23    the quantity again that Mr. Lee testified to for that

24    particular date, he testified that he supplied Mr. Cox with

25    more than 500 grams of cocaine, so we would ask that you return

a finding that he was responsible for 500 more -- or more grams on September 2nd of 2017 alone.

Ladies and gentlemen, as I began my closing here, I mentioned that this was a chain conspiracy, that this involved the spectrum of drug trafficking.  I submit to you that the fact that one defendant may have 46 interceptions, one defendant may have 10 isn't necessarily dispositive of whether the defendant that only has 10 interceptions is guilty or not. You have to consider the substance of the evidence that was presented to you in light of your common sense and understanding and consider whether any of these deals with all of these defendants had anything whatsoever to do with anything other than drugs.

Based on the testimony that you've heard from the six coconspirators and the wire interceptions and the electronic surveillance which corroborate that very testimony, I ask that you return verdicts against all defendants in this case that are consistent with that evidence which is guilty as charged. Thank you.

*THE COURT:*  All right.  Thank you, Mr. Fauson.  So we've been going about two hours and we'll take a break.  Let's try to keep this one to about 15 minutes, and then we'll pick up with the defense closings at 11:45, and then the break after that will be a little longer.

*(Jury exited the courtroom at 11:38 a.m.)*

1          THE COURT:  All right.  15 minutes.

2      (Recess taken at 11:39 a.m.)

3      (Jury entered the courtroom at 11:55 a.m.)

4          THE COURT:  We'll go over to the defense closing

5  starting with Mr. Lombard.  And do you plan to use anything on

6  the screen?

7          MR. LOMBARD:  No, Your Honor.

8          THE COURT:  Okay.  Whenever you're ready.

9          MR. LOMBARD:  Thank you.

10         THE COURT:  If you would prefer to move the podium,

11  it should orient however you want.

12         MR. LOMBARD:  That's a little better.  Thank you.

13  And may it please the Court.  Ladies and gentlemen of the jury,

14  there's one thing that we do not agree with, Mr. Castro does

15  not agree with about what government counsel just said, and

16  that is that telephone interceptions do not lie.  Mr. Castro

17  agrees with that.  What we disagree is who has -- who is on the

18  other line of the telephone interception.  And the only person

19  or persons who can identify the source of supply are

20  Mr. Cervantes, if you believe him, and Mr. Phillips, if you

21  believe him.  There's no documentary evidence that supports

22  them.  They corroborate one another.

23         If you remember, when I first came up here I said the

24  truth does not change and lies never stay the same.  And in

25  this case Yusef Phillips, Salvador Cervantes, and Ray Lee are

1  not believable, they are not trustworthy, they are not

2  credible.

3       Now, before I get into the evidence, I want to talk

4  briefly about the standard.  We talked about it.  The judge

5  read it to you this morning.  But the government has the

6  burden, not Mr. Castro.  The government.  And it's their

7  burden.  It's not ours.  We can sit here and not say a word.  I

8  don't have to ask a single question.  It's their burden.  And

9  it's a serious burden.  It's so serious that it's the Drug

10 Enforcement Agency, the United States of America, there's

11 helicopters, GPS, there's a lot of people, fifteen law

12 enforcement agencies on this side in the Western District of

13 Michigan that participated in this investigation.  That's their

14 burden.  Not Mr. Castro's.  So if you have one question

15 whatsoever, any question about the evidence you have received,

16 you don't look to us, you look to the government, because

17 that's their burden.  That's their job to explain the evidence.

18      If you have a question about why someone didn't

19 testify or you wanted to hear more from a certain witness, if

20 you wanted to see a piece of information or evidence, if you

21 have questions about why one transcript says this and another

22 number says this, if you want see toll analysis records, if you

23 want to see Mr. Castro's name on a single piece of paper, you

24 look at them, not Mr. Castro.

25      And what is that burden?  Beyond a reasonable doubt.

1   It's the highest standard we have.  It's not clear and

2   convincing.  It's not it's likely, it's probable Mr. Castro is

3   the source of supply.  No, it's beyond a reasonable doubt.  So

4   if you have any question in this trial about what took place or

5   what you heard, you look to them, and they have to convince you

6   that Mr. Castro is that source of supply beyond reasonable

7   doubt.

8           And I'm going to tell you why he is not the source of

9   supply.  The most basic fact that Yusef Phillips,

10  Salvador Cervantes, and Ray Lee have to tell you is how the

11  drugs came, if they came from California, to Grand Rapids.  And

12  I crossed them, and I hope you paid attention, I tried to let

13  you know when I was going to get into something serious, but

14  the first question is:  When did these drugs start coming?  I

15  asked that each three, and we got different answers from each

16  of them.

17          From Mr. Cervantes the drugs started coming in 2014.

18  Mr. Lee, the drugs started coming in -- began 2014.

19  Yusef Phillips, they began September of 2013.  Remember me

20  going into 2013, September or October, and then Mr. Lee says,

21  "Oh, they started in September of 2013 and then a month later

22  came again."  That's the first discrepancy.  And it gets

23  bigger.  I'm going to get you there.

24          Mr. Cervantes says "The first load I ever delivered

25  was 10 kilos of cocaine and a hundred pounds of marijuana."

1   That's not what Mr. Phillips says.  That's not what Mr. Lee

2   says.  Remember, if you believe Mr. Lee and Mr. Phillips, they

3   were delivering -- getting drugs in Chicago, heroin, and they

4   wanted a better price for heroin.  Not cocaine and marijuana.

5       Mr. Phillips testifies that the first deal was for

6   two kilos of heroin.  Mr. Lee testifies he was receiving 12 to

7   15 kilos of heroin.  That's why those questions were asked.  I

8   tried to ask the same questions to each of them.  Because

9   that's the way we can see when people are being truthful.  You

10   tell your version of events, we'll ask someone else.  Because

11   supposedly Mr. Cervantes, Mr. Lee, and Mr. Phillips never spoke

12   and they shouldn't know what one another is saying in court.

13   That's why those questions were asked that way.

14       So then Mr. Cervantes:  "Did you ever drive a car

15   hauler?  Did you ever drive your personal car?  Did you ever

16   drive a rental car?  No, I always drove a semi truck."  So

17   Mr. Cervantes started delivering drugs in a semi truck in 2014

18   if you believe him.

19       Let's go to Mr. Phillips.  Rental cars and personal

20   cars is how the drugs came from 2013 to 2015.  That's his

21   testimony.  I asked him:  "So things came" -- I asked him a

22   question -- and your memory will serve correctly, but this is

23   how I remember the evidence, or how Mr. Castro remembers the

24   evidence -- I questioned him:  "Mr. Phillips, you began

25   delivering drugs, right?  And they came in car haulers?  No.

1    They came in rental cars?  Yes.  You weren't sure if they were

2    personal cars?  Correct.  And that stayed the same, that

3    method, from 2013 to 2015?  Yes."

4         Okay.  Well, that's not consistent with what

5    Mr. Cervantes says.  We don't hear any other testimony about a

6    secondary or another source of supply from California.

7    Mr. Cervantes doesn't say he's the source and there's another

8    person from the source of supply.  Mr. Phillips doesn't say

9    there's another source of supply from California.

10        So then we ask Mr. Lee, what's his version of how the

11    drugs got here.  He says they came in a car hauler beginning in

12    2014.  So even if you tried to discredit one of them and say

13    let's go with Mr. Cervantes, Mr. Cervantes says "I began in

14    2014.  Only drove a semi truck.  And I drove, my first delivery

15    was cocaine and marijuana."  Mr. Lee says, "Oh, we began in

16    2014.  It was a car hauler."  There's a big difference, ladies

17    and gentlemen, between a car hauler and a semi truck.

18        Mr. Cervantes says "I always drove a legitimate load.

19    Frozen produce, daily produce, stuff like that."  A car hauler

20    hauls cars.  We've seen them on the freeway that are stacked

21    with cars.  Mr. Cervantes says "I've never driven a car hauler.

22    Never driven a rental car."

23        And then in 2016 Yusef Phillips says the cars

24    started coming -- the drugs started coming on a car hauler.

25    Mr. Cervantes says he didn't deliver any drugs in 2016.

Mr. Cervantes says "From January 2016 to December of 2016 I did not drive any drugs into Grand Rapids." That's 12 months. How does that work when Mr. Phillips is telling you "My source of supply is delivering through 2016 on a car hauler"? And then Mr. Lee says that the car hauler was in 2014, not 2016. And Mr. Phillips -- I mean -- excuse me -- Mr. Lee goes -- if you remember when I started questioning him -- well, mid-October 2015 through 2017 the drugs were coming on a semi truck. Something is wrong. You all were here, we're all here, you're the triers, you're the jury. You get to look and see how these individuals testified. You get to see how they -- their mannerisms were. And they don't know what the other person said supposedly. But we caught them in this. These are lies, ladies and gentlemen, and you can't trust them.

Salvador Cervantes says "I stopped delivering in 2015 because there was a seizure of money, so I wasn't able to deliver any more drugs from mid 2015 to October 2015" he testified "all the way through 2016."

Phillips and Lee said, "Oh, no, the drugs were coming." Phillips says on a semi -- on a car hauler in 2016 and Lee says they were coming on a semi truck from 2015 -- mid 2015 to 2017.

Then Cervantes says "I started back in March of 2017." We know from the Betty Ford records that Mr. Castro was checked into Betty Ford. How does that work? You're in rehab

1 and you're still conducting your supposed drug transactions?

2 Where are the calls for that?

3 Phillips says "I only saw Mr. Cervantes on two

4 occasions." Remember when I questioned him about it? He said,

5 "Oh, I don't know. I saw him more than that." I said, "Well,

6 sir, do you remember testifying from the grand jury when you

7 raised your right hand and you swore to tell the truth, the

8 whole truth, and nothing but the truth so help you God, and you

9 gave a testimony that was much closer in time of the events

10 than today?" And he read it and he goes, "Oh, yeah, I did, I

11 said I saw Mr. Cervantes on two occasions." Two times.

12 Mr. Cervantes says "I was there five times in 2017."

13 Mr. Lee says "It's always been the same driver. I only saw

14 Mr. Raya, his passenger, one time." But Mr. Cervantes says "I

15 had a copilot, my copartner, my cotransporter of narcotics

16 across the country, that was Mr. Raya. He came with me every

17 time." So Mr. Cervantes has at least five times him and

18 Mr. Raya have been in Grand Rapids, and Mr. Lee says "I only

19 saw Mr. Raya one time."

20 I told you from the very beginning that this evidence

21 that we were going to present to you would show you these three

22 could not be trusted, they are not reliable, and they are not

23 credible. That is this case.

24 And I'm going to get to you -- I'm going to get in a

25 moment to Alexis Guidice, the special agent in this case, and

1    how she tries to support their testimony.  But let's talk

2    briefly -- and, ladies and gentlemen, like I said, telephone

3    interceptions don't lie.  There's narcotic traffic talk it

4    appears on those interceptions between the source of supply and

5    Yusef Phillips.  But without any proof, you're left to rely on

6    Yusef Phillips.  And without -- and all Yusef Phillips does is

7    corroborate Salvador Cervantes, until they actually get into

8    the details and I start questioning about the weeds of this

9    story they have concocted.

10           This is Government's Exhibit 7A.  I've put tape on

11   here because I didn't want you to rush to judgment like the

12   government has done.  What you have is Yusef Phillips who has

13   admitted to a crime, calling numbers.  The government wants you

14   to believe that these numbers are Mr. Castro's.  The only

15   evidence that shows these numbers belong to Mr. Castro are

16   Yusef Phillips and Cervantes, Salvador Cervantes, and Ray Lee.

17   The only evidence.

18           Where is the subscription notice?  Where is the

19   surveillance?  Where is the documentary evidence so we can say

20   "Okay, look, I don't really like the way you testified.  I

21   think you're lying.  I think you're not telling the truth.

22   You're actually contradicting the other person's story.  Let

23   me -- let me find something that I can hold onto and say I feel

24   confident that this person is the source of supply beyond a

25   reasonable doubt.  Where is that evidence?

1          So let's talk about Yusef Phillips.  Why you can't

2     trust Yusef Phillips.  Yusef Phillips has been playing the

3     criminal justice system since 1998.  He was looking at a

4     27-year sentence and he worked it down to a little over

5     11 years I believe it was.  Now he's looking at life in prison.

6     Mandatory life in prison.  And what does he get?  He gets a

7     25-year sentence with the option of the government making a

8     recommendation to lower his sentence.  That's why you have to

9     look at him and think "Something is not right here.  This guy

10     knows too much."  He knows more about the criminal justice

11     system than you.  He knows how this system works.  "The more

12     people I can give up, the more names that get thrown in the

13     hat, the less time I'm going to do.  And I don't want to spend

14     the rest of my life in prison."  Who does?  But he had it

15     planned out.

16          Not only that, ladies and gentlemen, it wasn't until

17     when I started cross-examining about who he was and what he

18     stood for and the principles he lived by, it was when we played

19     the video, the recording.  And you'll have that back there,

20     Defense Exhibit 2, where he's talking to Demetrius Gaines about

21     how he had all this planned out.  About how he's going to

22     cooperate, put some names in there, and then go to the Muslims

23     and hide and protect himself.  That was his plan.  He knew,

24     because he knew enough about the system, that if he ever got

25     caught -- let me just tell you -- excuse me, let me get some

water.  He knows how the system works.  When he got out of
prison, he went right back to drug dealing.  Within a year.

He knew, based on his experience, that he was facing
life in prison when he was receiving drugs from the source of
supply.  He knew the exposure he had.  He had a get-out-of-jail
card.  He knew how to play that.

Listen, Mr. Tyson, Joe Tyson, there's a conversation
where he's playing -- remember I asked him a question about
"Didn't you have Mr. Tyson working as a confidential informant
and you were using Mr. Tyson to set up someone else?"  This is
a guy who plays both sides.  You cannot trust Yusef Phillips.
Certainly not beyond reasonable doubt.

Remember when he talked about the guns?  He said,
"Oh, I don't use violence.  I'm not a violent person.  I sell
drugs, large quantities of drugs" he admitted to "with just a
shake of a hand.  People pay me back because I'm a nice guy."
Stuff like that is just not credible.  We don't ask you to
check your common sense when you walk in here.  Drug dealers
have to have respect.  If you don't pay your drug dealers, then
how are you going to be a drug dealer?  Oh, he's just a nice
guy.  Don't worry about paying him back.  We can just use his
drugs.  It doesn't work like that.  That's why we have extra
penalties for people who plead guilty using firearms.  Because
we know it comes -- drug dealing comes with that.

Mr. Cervantes.  Again, your common sense, ladies and

1  gentlemen.  I just -- "Mr. Castro walked up to me in a Hooter's

2  and asked me if I wanted to transport drugs"?  Did it really go

3  down like that?  Someone just walked up to you that you have

4  never met before and said, Hey, would you like to sacrifice

5  your life and freedom and never see your family again and get

6  paid a thousand dollars a kilo?  That's the story that was

7  presented.  I didn't testify to that.  I didn't bring that out.

8          If you have questions about that kind of testimony

9  just not ringing true, look to the government counsel.  Don't

10  look to Mr. Castro.  That's not our job.  But I submit to you

11  that's not credible.  I submit to you that's a reason to doubt

12  Mr. Castro's case -- or the government's case against

13  Mr. Castro.  There's no corroboration for Mr. Cervantes'

14  testimony.  There's no corroboration for that.

15          I submit to you that Yusef Phillips and Cervantes met

16  several times, probably at least 20 times.  They met, they

17  started -- depending on who you believe -- 2013 or 2014 up

18  through 2017 they met multiple times.  No one was there when

19  they met.  No one knows what was said between the two of them.

20  There's no recording of it.  I submit to you that's where

21  Mr. Phillips put the name Alex Castro in Mr. Cervantes' head.

22  That's my inference.  You can choose your own.  And Mr. Castro

23  doesn't have to present an inference of what this is.  It's the

24  government's job.  But that to me, that's what this sounds

25  like.  When I look at all the evidence, when I look at these

1    not believable, not credible cooperators on how this story

2    unfolds.

3            But here is the real truth, I submit to you, when it

4    comes to Mr. Cervantes.  You're going to have Defense Exhibit 6

5    back there with you.  This is the flip phone that he said was

6    his phone.  This phone here -- and you can look -- go to

7    pages 3 -- there's only -- there's 85 pages, but most of it is

8    irrelevant.  This is the Cellebrite analysis of this phone.

9    And if you look, pages 3 through 10 basically starts off with

10   the calls and it goes to the text messages.  And, ladies and

11   gentlemen, this tells you that Mr. Cervantes -- and he stepped

12   away from it and said, "I don't know the phone number.  Maybe

13   it's my partner's phone that's in the cab."  But either way

14   it's not credible.  You both are driving drugs across the

15   country.  You don't know what's going on?  You don't know

16   you're going to Ohio?  It says right here and here.  It gives

17   the address in Ohio, hey, from the same number, "Tell me I can

18   come see you and pick up the bags."  Remember I asked him to

19   read that Spanish to us and tell us what it said.  This is what

20   we call proof, this is what we call documentary evidence, this

21   is what we call corroborating evidence, and it doesn't

22   corroborate the government's version.  And they didn't present

23   this to you.  I presented this to you.  Mr. Castro presented

24   this to you.  I submit to you the reason they didn't present it

25   to you is because it gives you reason to doubt Mr. Cervantes.

It talks about -- if you look -- I'm not sure if I did it when I was asking him questions about it -- the text messages and phone calls are on the date of the delivery or the day before the delivery in Grand Rapids on September 3rd. And we know that the numbers that are being called on here are from Mexico. And we know when they were stopped there was about a million dollars worth of drugs in that truck. These guys are up to something else, and they are not telling us the whole truth. They are not credible. Why aren't they telling us the truth? We know Mr. Raya, his partner, his uncle was kidnapped. There's a lot more to this story, ladies and gentlemen, and you're not being told the whole story, and that's a reason to doubt right there.

But take this back and look at these numbers, look at the times, and you will see what I'm telling you. It's not my word. It's the document's word.

Remember I asked him, "Sir, Mr. Cervantes, have you ever traveled to Mexico with your truck?" "No."

"Mr. Cervantes, are you sure you have never traveled with your truck in Mexico?" "No. No. No." "Okay. I have no further questions for you, then, on that."

But I called then Special Agent Guidice who talked about a meeting where Mr. Cervantes was there, in his job of cooperating, and he talked about driving his truck in Mexico. Why did he lie about that? Why the inconsistent statement?

1    Another reason to doubt, ladies and gentlemen.

2         Mr. Lee.  I didn't spend a lot of time with Mr. Lee.

3    He's an admitted gang member.  He learned from his brother the

4    way things go.  Remember when he was arrested, he didn't want

5    to say anything.  "Nope, I've got nothin' to say.  I've got to

6    check back with my bro, see what he wants to do, and then I'll

7    do what he says."  That's what he is.  He waited to hear from

8    his brother to see what he had to say.  Everything flows from

9    Yusef Phillips, ladies and gentlemen.  The government's case

10   against Mr. Castro flows from Yusef Phillips.  You have to

11   believe Yusef Phillips if you want to bring a verdict beyond a

12   reasonable doubt against Mr. Castro.

13        Mr. Lee had a picture of Mr. Castro and him on his

14   phone.  Ladies and gentlemen, remember I asked him "Do you have

15   a work phone and a personal phone?"  "Yes."  "That picture of

16   Mr. Castro and you, that's on your personal phone, right?"

17   "Yes, it is, it's on my personal phone."  "You have a separate

18   phone for drug dealing, right?"  "Right."

19        Just like I asked Mr. Phillips, "You went to

20   California, right?"  "Yep."  "And did you talk drug dealing in

21   California?"  "No, purely social."  That was both of them.

22   Purely social.  No drug dealing.  That doesn't -- okay.  So you

23   have a picture of someone that's on your personal phone and you

24   went to California for social reasons and the government wants

25   you to draw that inference.  And I'm telling you that's not

1    beyond reasonable doubt, ladies and gentlemen.  It's questions.

2          What did Mr. Lee -- what did Mr. Lee say when they

3    asked about "What did you talk to your brother about when you

4    went back to Newaygo jail?"  Mr. Lee said, "I did what I was

5    supposed to do and everything is fine."

6          If you're testifying in a criminal case as a

7    cooperating witness and someone says "How did it go?"  "I told

8    the truth."  That's what you're supposed to do.  You don't say

9    "I did what I was supposed to do."  What you were supposed to

10    do was what you and your brother set up.  I submit to you,

11    ladies and gentlemen, they are telling their story back and

12    forth through family members.  And I'm going to get to the

13    Newaygo jail in a second.  But they are communicating with each

14    other.  How do you think Mr. Lee and Mr. Phillips pled guilty

15    and cooperated?  They did it knowing one was going to do the

16    other.  In fact, they were here in the same courtroom on the

17    same day to plead guilty.  So I don't submit -- I submit to you

18    that you cannot rely on their testimony.

19          So let's get to the case agent,

20    Special Agent Guidice.  She's been a DEA agent for three years.

21    I think at the time this case started she had just got on the

22    job maybe a year and a half, two years.  She was an air marshal

23    before.  She had some training which took some time.  Then she

24    lands in Grand Rapids and she gets this case.  What it sounds

25    like -- and I'm not from Grand Rapids as you obviously know --

1    it sounds like a very big case.  Fifteen law enforcement

2    agencies.  Helicopters.  GPSs.  Pole cameras.  Multiyear

3    investigation.  Sounds huge.  And here it is it lands in her

4    lap as the case agent.

5         I submit to you, ladies and gentlemen, she got used

6    and manipulated by Yusef Phillips and Cervantes.  That's what I

7    think happened here.  She went along with them.  She's an

8    investigator.  She investigates drug crimes.  These guys on the

9    other side, they are playing for keeps.  They are playing for

10   their lives.  That's what they're doing.  Yusef Phillips has

11   been playing this system since 1998, and she just came here

12   from the air marshals and just started dealing with these guys.

13   I think she got outfoxed.

14        Think back to your profession or what you do, when

15   you started something, in two, three years, and then think

16   back -- and then plus 15 years of experience how you're

17   starting to change and look at things.  How you evaluate

18   people.  I submit to you in another 15 years it won't be like

19   this.  Agent Giudice will do it a lot differently.

20        What would she do?  She wouldn't trust Yusef Phillips

21   and Salvador Cervantes and Ray Lee.  The government knew that

22   you wouldn't trust Salvador Cervantes, Ray Lee, and

23   Yusef Phillips.  What did they do?  They had Agent Giudice

24   listen to a sample call of Mr. Castro's voice.  And then said,

25   "Listen to this voice and go back and compare it to the wiretap

source of supply and tell us if that's Alex Castro." That's what she testified to. And the reason the government had her do that, because they figured you, ladies and gentlemen, are going to trust a sworn DEA agent over some lying criminals. Right? But Agent Giudice, she made a mistake. I don't know if it was too much pressure or too much ambition or what it was, but she didn't. She took their word. She didn't get an expert. She didn't use video -- or audio software.

It seems like a while ago when I first asked those questions, she was the first witness, about her experience in listening to voices and detecting voices and whether she listened to consonants or vowels, whether or not she compared the sample on the source of supply to any other voices. Big Boy, Fat Boy, Heavy, Camilla Alvarez. Did she have samples of that to compare it against the source of supply? No. They put her in a difficult position. Of course, she's going to say it's Mr. Castro. Mr. Cervantes and Mr. Phillips already told her who it was. How could she now, after the case has been indicted, after we're getting ready for trial, and then put her in that position? I tell you, ladies and gentlemen, I submit to you that that doesn't ring true. I think she got manipulated by these gentlemen.

She didn't consult with an expert. The DEA, ladies and gentlemen. They are going for, quote, the source of supply. The most important person in the case. And all she

1   has to do with all the resources they have is submit it

2   somewhere who's a professional. Or compare it to someone

3   else's voice. So you're not just confirming what your lying

4   cooperators are saying, or what your -- I won't say lying

5   because you make that determination, but I'll say certainly it

6   raises suspicion. They have everything to gain from putting

7   someone else's name out there. If you have questions about

8   that, if you have problems the way that was done, you don't

9   look to Mr. Castro, you look to the government.

10        So let's talk about the mistakes in the case. You're

11   going to have Government Exhibit 140. This is an exhibit that

12   talks about a phone number that Yusef Phillips had. 8055 is

13   the end of it. And this exhibit, there are pictures sent, a

14   movie trailer is sent from this phone and I believe the picture

15   of Ray Lee at the trailer -- at the paintball. That's this

16   phone number, okay? And the government exhibit, the exhibit

17   that they were going to give to you to rely on to try to prove

18   my client guilty beyond a reasonable doubt, this exhibit had a

19   different phone number on it. It has a number up here. You'll

20   see it. You'll have it. They tried to clear it up, but they

21   have it. It says (310) 299-6248. That number, ladies and

22   gentlemen, it's important that number, because that number is

23   the number that's talking about the September 3rd delivery. So

24   if you look at all the texts and phone calls going back and

25   forth about the September 3rd delivery in Grand Rapids, it's

1    that 310 number.  So the government had all the interests in

2    trying to put that number to the number that had Mr. Castro in

3    pictures and in video.  But that was wrong.  That was wrong,

4    ladies and gentlemen.

5          Was it ambitious?  Was there ambition clouding their

6    judgment?  Did they want to convict Mr. Castro so desperately

7    that they put the wrong evidence before you?  Or was it a

8    mistake?  Either way, ladies and gentlemen, it raises suspicion

9    into the integrity of this case.  It should give you pause when

10   you look at every piece of evidence.  What was caused?  What

11   was rushed?  What decisions were rushed?  All of these in

12   Exhibit 148 came from a 909 number.  Where's the records for

13   909?  I want to know where the records -- you say that's

14   Mr. Castro's phone.  Where are the records for it?  We don't

15   have them.  And we don't have them because he's not guilty.

16   He's not the source of supply.

17         The other number you're going to rely on -- they are

18   going to rely on.  When I get up, Mr. Baker is going to talk,

19   and he's going to be a little bit more pointed because the

20   government has the burden.  And I'm going to talk to you about

21   another number, Mr. Castro's number, (424) 303-3174.  It's the

22   text messages.  The only way you know any of this belongs to

23   Mr. Castro is because Mr. Cervantes says that's Mr. Castro's

24   number.  So you have to believe Mr. Cervantes.  You have to

25   believe when he tells you when he started delivering drugs that

he did not come in a car hauler, that he began in 2014, that he
didn't deliver any heroin to begin with.  You have to believe
him.  We have to believe Phillips who contradicts him.

And then, ladies and gentlemen, there's another
mistake here.  And I don't know if it's a mistake or if there's
another number.  But if you look at -- and you're going to have
all the text messages back here -- (424) 283-2271.  And I'm
focusing on these.  I know it seems like a lot of information.
It is a lot of information.  But remember the 909 number.
Remember that number.  And remember this number, the last two
-- the last four digits, 2271.

Remember, I asked the DEA analyst "Did you ever get
toll records for a 2217 number?"  There is a stipulation we
entered into with the government about phone records.  It's a
2217, not a 2271.  I'm not sure if there's a 2271 and a 2217
number, but it's important to know, ladies and gentlemen, when
there's other evidence out there that's not being explained to
you.  It's not our job to explain the evidence.  It's not our
job for the evidence to make sense to you.  It's their job, and
they have got two different numbers on the evidence they are
submitting to you.  I don't know if that's shoddy
investigation.  I don't know if they are just overwhelmed with
the amount of information they have.  Whatever it is, it's
their burden.  And if you have questions, you ask them about
it.  Why is it that you're giving me two different numbers?

Where is this number?  Who is it tied to?  Those are all

legitimate questions for you to ask.

You also see 1266 -- 126 -- 126A up there.  We talked

a lot about it.  If you believe these guys, $60,000 a kilo, if

you count these up, that's over a million dollars.  Just over a

million dollars of drugs.  It says, "Torres, Philadelphia."

The ones that say "Philadelphia" have "Philadelphia" written on

them.  They were going other places.  Cervantes doesn't want to

say that.  He already knows that Raya's cousin got kidnapped in

Mexico.  He's trying to skate through and just stick with the

story that Yusef Phillips told him.  Reasons to doubt.  These

are reasons I have.  You all can have different reasons, but

these are ones that I've seen, I submit to you are reasons why

Mr. Castro is not guilty.

There's no surveillance of Mr. Castro.  No photos of

him loading drugs, receiving money.  The bill of sale for the

cars and the trucks, where is that?  I mean, it's great for

someone to go say something.  It's different to have proof,

corroboration.  Where is that evidence?  Phone records with his

name in it.  Everyone has a phone number.  If you believe the

government, they all have multiple phones.  Okay, drug dealers

have multiple phones.  But certainly you also have a regular

phone.  Where is that phone?  Did you hear any testimony about,

"Oh, we did find Mr. Castro has a regular number.  This is his

number.  And we didn't find any connection to it."  Did they

1   even try to find if Mr. Castro had a regular number?  It's not

2   our job, ladies and gentlemen.  They are presenting this case.

3          No houses in his name.  No money.  No one saw him

4   with drugs.  This also puzzled me.  I think this is reason to

5   doubt.  And you're the ultimate trier of fact here, but you run

6   a drug business, you don't want to be known, you're supposed to

7   remain as anonymous as possible, everything is going well, and

8   then you go out and fly out to California to meet the person

9   and introduce yourself and bring yourself closer together when

10  there's no reason to do that?

11         We heard testimony from Mr. Lee and Mr. Phillips all

12  about how to stay anonymous and how to distance yourself.  The

13  reason they went out to California had nothing to do with

14  drugs.

15         How about the Betty Ford stuff?  Did you hear any

16  testimony that the payments for Betty Ford were for drug

17  dealing?  Yusef Phillips didn't say "I had Andrea Thompson send

18  money to Betty Ford to pay for drugs that Mr. Castro owed me."

19  You didn't hear that.  You didn't hear it because it didn't

20  happen.

21         Briefly -- I'm almost done, ladies and gentlemen --

22  the money -- there's a lot of talk about the money that

23  Cervantes, Phillips, and Lee earned in this case.  Cervantes

24  says he earned roughly $500,000 for transporting drugs.

25  Doesn't have any money.  Mr. Phillips and Mr. Lee had to have

1    made way more than that if they were doing it for three, four
2    years.  They had to make millions.  Where is that money?
3    Mr. Lee and Mr. Phillips' mother has nine homes working as a
4    patient advocate in a hospital.  The reason why that's
5    important is because it goes to show you how deceptive these
6    men are.  How their honesty and their integrity is
7    questionable.  And what they tell you on the stand you have to
8    look at carefully.  You don't accept what they say.  You should
9    not accept what they say I submit to you.
10            Newaygo jail.  We know that Yusef Phillips, Ray Lee,
11   and Mr. Cervantes are all in general population at Newaygo
12   jail.  We know that there's a way to communicate with one
13   another.  Etrevion Murphy got up here and told you that.
14   "Yeah, Yusef Phillips told me" to put Dante Howard's name in
15   his testimony.  Now, I don't know what happened over there, and
16   I don't know, but I'm telling you from our theory, we certainly
17   believe Yusef Phillips put Mr. Castro's name out there.  We
18   know how that works now.
19            The photographs that were sent from the 909 number.
20   We know, ladies and gentlemen, you all have cell phones.
21   Probably most of you have a smartphone of some sort.  We don't
22   know where that 909 number comes from.  We don't know who owns
23   that 909 number.  We know the photos that are on
24   Yusef Phillips' phone, the five people, and we know that the
25   people on the boat, there's another gentleman there, right?

1   There could be any reason we know that those numbers are sent

2   from other people.  If the government says to you, "Listen,

3   look at these photos.  These photos tell you what?  They tell

4   you that they knew each other."  We don't dispute that.  We're

5   here to talk about source of supply.

6          Ask the government, where is the subscriber

7   information for the 909 number?  Where is that?  This is my

8   inference, and you have -- you're the trier of facts as I said,

9   but this is, I submit, what the evidence shows to you:

10  Yusef Phillips and Ray Lee dealt drugs.  They dealt drugs, and

11  their source of supply was from Chicago.  They had a source of

12  supply, multiple sources of supply.  And they wanted to grow

13  bigger.  Remember, Mr. Phillips or Mr. Lee said that

14  Camilla Alvarez said, "Hey, you guys are working too hard" --

15  or maybe it was Fat Boy or Heavy -- "You guys are working too

16  hard with this marijuana business.  Step up your game and go

17  with the heroin game."  So Camilla Alvarez said, "Hey, I've got

18  people in Mexico."  That's what I've got.  And Phillips tells

19  you he's from -- the Sinaloa cartel wanted him to move to

20  Mexico.  And what happens next?  Ray Lee gets on a plane and

21  goes to Guadalajara in 2014.  And who does he take with him?

22  He called him Mikey, Michael Gould.  Remember, I asked

23  Detective -- or Special Agent Guidice about the travel records

24  she investigated.  And Michael Gould and Ray Lee traveled to

25  San Diego, and Ray Lee told you he crossed the border at

1    San Diego and he went to Guadalajara?  That was there to get

2    the source of supply.  That's where the deal was made.  That's

3    what I submit to you happened.

4         I submit to you that Salvador Cervantes works for

5    those people.  Salvador Cervantes drives his truck to Mexico to

6    pick up drugs.  He travels with the drugs here to Grand Rapids.

7    They travel to Ohio.  They travel to Indiana.  They travel to

8    Grand Rapids.  And over the course of that time Yusef Phillips

9    and Salvador Cervantes made a pact and that pact was if

10   something goes down, we need someone to be the fall guy.  And

11   that's Mr. Castro.  That's what they said.

12        Now, that's my interpretation.  You could have a

13   different interpretation.  And it's not our job to give you an

14   interpretation.  That's just the questions we were asking to

15   see really what happened here.  Our job is to sit here and test

16   the evidence.  Their job is to prove Mr. Castro is guilty

17   beyond a reasonable doubt.  And they can't do it in this case

18   because they relied on the informants, and

19   Special Agent Guidice didn't do the necessary work to

20   corroborate their story.

21        Now I'm going to sit down, and when I do, and after

22   all the other defense lawyers have spoken, Mr. Baker is going

23   to get up here.  He has that right because it's his burden, the

24   government's burden.  He's going to say a lot of things to try

25   to answer some of the things I've raised before you.  But you

1    can be my voice.  You can be Mr. Castro's voice here and in the

2    jury room.  When they are asking questions, you can ask why

3    should I trust Yusef Phillips?  What piece of paper can I rely

4    on that doesn't change over time?  Why is it that

5    Mr. Cervantes', Mr. Phillips', and Mr. Lee's story changes on

6    the delivery of the drugs?  Why isn't there any piece of

7    corroborating evidence for the sale of a car or the sale of a

8    truck?  And, ladies and gentlemen, I submit to you that there

9    isn't that type of corroborating evidence because Mr. Castro is

10    not guilty of conspiracy to distribute narcotics.  Thank you.

11            *THE COURT:*  Thank you, Mr. Lombard.

12            We'll go next to Mr. Phelan on behalf of Mr. Nelson.

13            And, Mr. Phelan, will you be using any of the

14    projection?

15            *MR. PHELAN:*  No, thank you, Your Honor.

16            *THE COURT:*  All right.  Whenever you're ready.

17            *MR. PHELAN:*  Thank you.  May it please the Court.

18            Good afternoon, ladies and gentlemen.  The first

19    thing I want to do is I want to thank you on behalf of my

20    client for sitting as jurors in this case.  You know, we ask a

21    lot of you.  We ask your time.  That's the most important, I

22    suppose.  And you've had to make difficult decisions maybe at

23    your job, home, school, whatever, and for that I thank you very

24    much on behalf of my client, his family, and myself.

25            But I hope you know when you're done -- and no matter

what your verdict is -- I hope you realize you did a good
thing.  That really what you're -- that this process that we're
going through now in this beautiful courtroom before
Judge Jonker, very few countries, if any, in this world do
exactly what we do in this case -- in this process, and for
that I thank you very much.

Now, after hearing the prosecutor's address to you,
you're probably thinking "Why are we even here?"  I mean, if
the prosecutor is correct, this is an open-and-shut case,
right?  This is an open-and-shut case.  Forget it.  But a wise
person knows there's two sides to every story.  I mean,
King Solomon would have given the baby to the wrong woman if
King Solomon had listened to the thief's story.  But
King Solomon listened to both sides of the story.

Now I want to get into, ladies and gentlemen,
reasonable doubt.  The judge has read to you what reasonable
doubt is.  And let me read that to you again.  Proof beyond a
reasonable doubt means proof which is so convincing that you
would not hesitate to rely on it in making the most important
decisions in your life.

In other words, ladies and gentlemen, reasonable
doubt is that which would cause you to hesitate in making a
most important decision in your life.  And I'll talk about that
a little bit later on.  It's that hesitation, if you hesitate
for a moment, that's reasonable doubt.

1        Now I'd like to -- and what I've done, ladies and

2   gentlemen, is I divided the case against Michael Nelson into

3   three areas.  Three areas of reasonable doubt.  Each one of

4   which I would respectfully submit to you is enough to return a

5   verdict of not guilty for Michael Nelson.

6        And the first area of reasonable doubt that I want to

7   talk to you about is the testimony of Ray Lee.  The

8   testimony -- or the evidence against Michael Nelson all is

9   funneled through Ray Lee it seems to me.  He's kind of the hub.

10  And all the evidence that the government wants you to -- that

11  the prosecutor wants you to believe all kind of funnels through

12  Ray Lee.

13       But let me -- I want to tell you a story.  I'm Irish,

14  and Irish love to tell stories, ladies and gentlemen.  I'm

15  going to tell you a story.  Back in 1945 at the end of the war,

16  after the Nazis had been defeated by the Allies and the Allies

17  had seen what the Nazis had done to the Jews, to the

18  intellectuals, the teachers, the gays, the gypsies, and seen in

19  their own eyes the final solution, the Allies decided to

20  prosecute the Nazi criminals for the final solution -- who had

21  planned out the final solution and who had implemented the

22  final solution.

23       And at that time United States Supreme Court Justice

24  Robert Jackson was asked by the Allies to head the prosecution

25  of the Nazi criminals.  And deals had been given to Nazis to

testify, accomplices.  Some had been given immunity, lesser
time in prison to testify.  And, of course, the testimony in
the trial was at Nuremberg in Northern Bavaria in Germany.  And
this is what Mr. Jackson -- or Justice Jackson said to his
prosecutors as he sat them down and talked about accomplice
testimony.  And this is what he said to the prosecutors.  He
said this:  All such people are desperate.  They all want
freedom.  They know the intricate details of everything
involved in the prosecution of these cases because they were
primary figures in these cases.  For some reason we have chosen
to let them go free because of their testimony.  The testimony,
therefore, must be examined not only with the greatest of
scrutiny but with an eye to avoiding the use of it if at all
possible.  Any alleged coconspirator can testify without
refutation about anything he desires.  About secret meetings.
Secret negotiations.  Reasons why the accused did certain acts.
By whom they were directed.  Some of it may be true, all of it
may be true, or none of it may be true.  We have no way of
knowing now or ever whether or not these people were telling
the truth.  We were not there.

That's what Justice Jackson told his prosecutors as
they got ready to try this case, ladies and gentlemen.

Now, when you decide this case, I'd like you to
consider two things about the testimony from Ray Lee, if you
would, please.  Remember what Ray Lee said at the time of

1    sentencing.  I think that is a look into his soul, into his

2    very being for whether you can trust his testimony or not.

3           Now, when he came for sentencing, you always -- you

4    tell your clients "Put your best foot forward.  Man up."  I'm

5    not trying to be sexist.  But stand up and be a human being,

6    admit what you did.  Don't minimize what you did.  Tell the

7    Court.  Be as honest as possible.

8           What did he say to the Court?  He couldn't be honest

9    with the Court.  And remember what he said.  "I would like to

10   say that I'm not this bad drug dealer that they make me out to

11   be.  I fell sick and I was unable to work and I went to drugs

12   as a means to get extra money."  That's not truthful.  That

13   he's not a bad drug dealer?  You're a good drug dealer,

14   Mr. Lee?  You spread your wealth all over the community?  You

15   gave your money to charitable organizations?  He wasn't even

16   being truthful to the judge when he came here.  He couldn't

17   even be truthful to the judge.

18          The sentencing, I think, transcript tells you

19   everything you need to know about Ray Lee, whether you want to

20   trust him or not.  Whether you wouldn't hesitate but for a

21   moment to believe what he's saying.

22          So I want to go back to the definition of reasonable

23   doubt and defining Ray Lee, ladies and gentlemen.  Remember

24   that which would cause you to hesitate in making the most

25   important decisions in your life.  Ask yourself about Ray Lee.

1    Ask yourself this:  Would you buy a home from Ray Lee?  If

2    Ray Lee came to you and said, "I've got a home for you,

3    Mr. Phelan" -- or anyone in the jury -- "I've got a home for

4    you, it's a good home, the roof doesn't leak, the furnace

5    works," would you trust him to buy that home?  If you would say

6    "Oh, man, I don't know, Mr. Lee, knowing what I know about

7    you," that's that hesitation.  That's reasonable doubt, ladies

8    and gentlemen.

9         The second area I want to talk to you about are the

10   wiretaps.  Now, the prosecution says that's Michael Nelson.

11   They say that's his voice.  Who is the only person on God's

12   green Earth that came in and said that was Michael Nelson's

13   voice?  It was Ray Lee.  Ray Lee.  The prosecution, with all

14   their power, with all their money, could have brought an expert

15   in.  We've had experts, right?  Had drug experts, had chemist

16   experts.  They could have brought an expert in to say, "I've

17   look at a controlled voice of Mr. Nelson and I've compared it

18   and it's Mr. Nelson's voice."  The only person is Ray Lee who

19   identifies that voice.

20        Remember what I said on opening, ladies and

21   gentlemen.  Those tapes, those wiretaps, are only as good as

22   Ray Lee.

23        The third area I want to talk to you about a

24   reasonable doubt, ladies and gentlemen, is the surveillance.

25   This surveillance that they say was a delivery of drugs on the

1  25th of July and on August 11th to Michael Nelson.  Again, who

2  talks about the delivery?  Ray Lee.  All the evidence goes

3  through Ray Lee.

4          After the August 11th alleged delivery there's no

5  surveillance of the Temple address, right?  That's where he's

6  supposed to be living and that's where the drugs are delivered,

7  but there's no surveillance.  I mean, we've got surveillance

8  all over the place here.  We've got pole cams.  We've got the

9  police, right?  And there's no surveillance there.  They don't

10  put a police officer there to see "Oh, yeah, okay, I saw people

11  going out and back," right?  "Going in, buying drugs, and

12  coming out.  I suspect that these were Michael's customers."

13  We don't see anything like that.  All they had to do is put a

14  police officer there, right?  They could have put a police

15  officer there July 25th for a couple of days.  They could have

16  put a pole cam up, right?  How hard is that?  And they don't do

17  that.  Again, the surveillance all through Ray Lee.

18          And that leads me to further say, ladies and

19  gentlemen, remember on September 3rd, 2017, Michael's arrest,

20  the police come over, they arrest him, they do a search

21  warrant, they look at the house top to bottom, and has any

22  evidence been presented of drug dealing from Temple to you?

23  Any evidence whatsoever been presented to you of drug dealing

24  out of the Temple residence?  There's been no drugs presented

25  to you out of the Temple residence.  No cocaine.  There's been

no drug records presented to you out of the Temple residence. There's been no multi phones or whatever presented to you out of the Temple residence. There's been no large sums of cash presented to you out of the Temple residence. There's been no guns presented to you out of the Temple residence. No money counters. We have a money counter right here. No money counters. No drug residue. They could put a chemist in there, right, and say, "Well, we think the drugs have been held right here and were put in baggies and we're going to do a field test." That's the reason I asked. No -- nothing sent to a lab. There's absolutely zero evidence to corroborate what these people are saying about Michael. And like cocounsel said, we don't have the burden of proof. I mean, that's on them. That's on them.

But I think, ladies and gentlemen, what I'd say to you, the key in the case I think is this on Michael, and I touched on it a little bit: There's not one person on God's green Earth that came in and sat on that chair and said they were a customer of Michael Nelson. Not one person. Presumably the drugs were delivered to Mike, to Michael, not to sell to himself obviously but to sell to other people. Where are the customers? There's not one person that's come in here that's said -- sat down and said, "Yeah, I went to Michael's house and I bought an 8-ball." Three and a half ounces. Three and a half grams. "I bought an 8-ball from Michael Nelson." Not one

person.

It's like that commercial, ladies and gentlemen, that we saw a number of years ago. It's a little old lady, Claire I think was her name, and she was in this hamburger shop, I think. It was supposed to be McDonalds, right? And she orders a hamburger, and she opens it up, and there's a little patty of beef, and she goes "Where's the beef?" Where's the beef in this case? Not one customer could come in here and say that this man is a drug dealer.

Now, I want to leave you, ladies and gentlemen, close -- remember this: Anybody can say anything about anyone at any time and that doesn't mean it's true.

Now I want to leave you in closing with this, ladies and gentlemen, with this final story. Again I've got to tell you another story. I'm going to leave you with a story. I was in the Army back in 1974. I went in the Army after college. I was in the Army four years. So I went in the Army from '74 to '78. And I got orders right as I was graduating to go to Germany. The alternative was to go to Vietnam. And so when I got these orders to go to Germany, I was a happy person. Nobody was going to be shooting at me. So I went -- so I went over to Germany. It was a wonderful time for me. I was 22 years old. I wasn't married. And I got a chance to see Europe and live over in Europe for almost -- over three and a half years. And it was a wonderful time. And I had an opportunity

```
 1    to go to England.  I went to England a couple times.  And one
 2    of the times I was in England I went to -- and it was kind of
 3    north central England, I forget the name of the town -- but I'd
 4    always thought about being a lawyer, and my dad was a lawyer.
 5    He was a country lawyer in Iowa, southeastern Iowa.  He was a
 6    good lawyer.  Just a country lawyer.  And I always thought
 7    about going to law school.  So I was in this town and I went by
 8    the courthouse, and I decided, "Well, I'm going to go in and
 9    see this courthouse."  And so I went in, I went into the
10    courthouse.  And they were really nice to me and they kind of
11    took me around.  The English -- and it turned out that this
12    courthouse was one of the oldest courthouses in England.  It
13    was centuries old.  And I went into the courtroom, they took me
14    into the courtroom and showed me around the courtroom.  And
15    English courtrooms are a little different than ours, but it was
16    really a majestic courtroom.  Not as big and beautiful as this
17    courtroom.  But I just thought about all the centuries of
18    people and cases that have gone through this courtroom.  And
19    they had a plaque, they had a framed picture on the wall in the
20    courtroom, and this is what it said, ladies and gentlemen --
21    and I wrote it down, and I've kept it with me all these years,
22    all these years, 40-some years -- "In this hallowed place of
23    justice, the crown never loses, because when the liberty of an
24    Englishman is preserved against false witness, the crown wins."
25            Ladies and gentlemen, I've tried many, many cases
```

1    over years and years of being a lawyer, and I can tell you that

2    the United States never loses, because when the liberty and

3    reputation of one of its citizens is preserved against false

4    witness, the United States wins.

5          I want to thank you again, ladies and gentlemen, for

6    listening to me, and I would ask you to return a verdict of not

7    guilty for Michael on all counts.  Thank you very much.  Thank

8    you, Your Honor.

9          *THE COURT:*  All right.  Thanks, Mr. Phelan.

10         We'll go to Ms. Chartier.  Will you be using the

11   screen?

12         *MS. CHARTIER:*  No, thank you, Your Honor.

13         *THE COURT:*  All right.

14         *MS. CHARTIER:*  As you've seen over the course of this

15   case, drug dealing is always about the money.  I did not plan

16   on starting my closing with a quote from the government that

17   they started their closing with, but that quote and that fact,

18   which is what you learned from that witness stand, tells you

19   that you cannot trust Ray Lee.  Because we hear the government

20   say drug dealing is about the money.  We heard their opinion

21   witness say drug dealing is about the money.  You heard Mr. Lee

22   said this is about the money.  This is a dangerous business and

23   it is all about profit.

24         But what does Mr. Lee tell you?  The one and only

25   person he makes no profit on is Mr. Tatum.  On two kilograms of

cocaine and on the supposed testers he makes no money.  And the
reason why he had to testify that way is he messed up when he
was telling his story to the government through his proffer
sessions.  He made up a story about how much he was charging
Mr. Tatum, but then he also talked about how much he was paying
for the cocaine.  And then, uh-oh, he gets on the stand and
realizes that means he makes no money off of Mr. Tatum.  That
indicates it is a lie from Mr. Lee, because no one is going to
give over two kilograms of cocaine and take that risk when they
are making absolutely no money.  You heard him.  He sets the
price.  He decides who he fronts to.  His story does not work.

Time to Mr. Lee and Mr. Swain is the only currency
that matters right now.  Money is useless to them because they
are spending years and years in prison.  And they looked at
spending a lifetime in prison.  And I ask you to think about
how you felt when you heard you might be here for three weeks
on this jury.  All of you in your head were thinking about "I'm
going to be away from my family.  I might miss a wedding.  I
have to miss work."  All of these very important aspects of
your life.

Now imagine you're Mr. Lee and Mr. Swain and you're
not just gone for three weeks with jury service, you're gone
for a lifetime in prison.  Would these men lie to spend less
years in prison?  Of course they would.  They would lie to the
government, they would lie to the Court, and they would lie to

you.

Mr. Phelan discussed the beyond a reasonable doubt standard, and he said, "Would you buy a home from Mr. Lee?" I ask that you consider the most important decisions in your life that you have either made or will make that rely on evidence and information from other people. Who handles your finances and the finances for your children's college fund or for your retirement? If you have to make a medical decision for a sick child or an elderly parent. If you were in the military, as Mr. Nyamfukudza was, for 12 years during wartime and you have to make decisions that literally will mean whether young people come home or unfortunately perish on the field. They rely on decisions and information from other people. And then think about what you were presented here. Calls and contacts that are ambiguous at best. The government says one thing; Mr. Tatum has said another. And he put up people to back up what he said those conversations and meetings were about.

The government did a search of Mr. Tatum's house where they believed that there would be indicators of drug dealing, which we'll talk about in a minute. None of them came up. Not one. No drugs, paraphernalia, anything that they were looking for.

Then you have two men who have every reason to lie. Imagine evaluating this if making a decision where you're deciding for medical treatment for your parent, an elderly

1    parent.  A doctor comes to you and says, "We have evidence that

2    it could be one thing or another.  We think if we run this

3    test, we'll find 20 markers of what we believe is occurring."

4    And they do and nothing comes back.  And then they say, "Wait,

5    we have two people who are going to try to convince you to act

6    on.  These individuals have lied and these individuals have a

7    vested interest in you believing them."  Would you act on that?

8    Because here for you it's not a matter of choices, you only

9    act, you only convict if you have no reasonable doubt

10    whatsoever.  One reasonable doubt and it has to be a not-guilty

11    verdict.

12           Calls and text messages for all of those contacts,

13    context matters.  You know that.  You heard from Agent Giudice

14    when it is a nonpertinent call, then they don't record it.

15    They don't share it with you.

16           What did you hear from Mr. Tatum?  There had been a

17    call that he had with Mr. Lee explaining one of their voice

18    messages back and forth.  One of their phone calls.  Mr. Baker

19    said, "Are you serious?  Gee whiz, there's this other call?"

20    What did we learn today?  There is another call.  A 32-second

21    call.  That explains what "it" means.  Without context you

22    cannot rely on what Mr. Lee says the conversation was about.

23    Unlike with some of the other calls and text messages that

24    you've seen, they don't have any explicit conversation about

25    drugs.  There's nothing about a quantity.  There's nothing

1    about money.  There's nothing about police surveillance.

2          Mr. Lee tried to tell you he fronted two kilograms of

3    cocaine to Mr. Tatum.  You don't think he'd be blowing up his

4    phone asking where my money is?  You think Mr. Lee is going to

5    wait patiently for it?  The context that you have not been

6    provided would support what Mr. Tatum testified to on the

7    stand.

8          Mr. Lee wants you to believe that all the sudden in

9    the middle of July 2017 Mr. Tatum asks him "Can I buy a

10    kilogram of cocaine from you?"  You heard from witnesses no one

11    starts with a kilogram of cocaine.  And then Mr. Lee decides

12    he'll front it to him.  Someone who has never purchased from

13    him ever.  It makes no sense.  But Mr. Lee has to tell you that

14    story in order to support the next time they meet, which is

15    July 18th.  Because Mr. Lee gives him a Food Saver box and

16    Mr. Tatum gives him a bag.  And so Mr. Lee has to come up with

17    this story because he knows what the government's theory is and

18    he's got to fit it in, so he's got to say "I fronted him that

19    first kilogram of cocaine and that's what that exchange was

20    about."

21          But you've seen other videos.  When has Mr. Lee

22    walked out with a big old Food Saver box or a big box of

23    anything?  A kilogram of cocaine is a brick.  Why is he

24    carrying it in a big Food Saver box?  Because it's not a

25    kilogram of cocaine inside.  It's a scanner, as Mr. Tatum told

1    you.

2         Mr. Lee at his heart is a wheeler dealer.  If he

3    could make $200 off a scanner he's not using, of course he'd

4    sell it.  And any witness up on that stand who tells you they

5    can see through that plastic bag and it's a bagful of money is

6    not being truthful.  Because you cannot see through that bag.

7    You saw the video.  You can't tell what's in it.

8         And that same witness also misidentified poor

9    Dante Howard twice when it was Mr. Tatum and another gentleman.

10   Assumptions lead individuals to get up on the stand and say

11   certain things.  And assumptions may be well-intentioned, but

12   assumptions we heard from Agent Schafer -- or Officer Schafer I

13   should say -- assumptions can be wrong.

14        In the conversations that Mr. Tatum had with Mr. Lee,

15   again you heard nothing explicit, but what do you hear from

16   Mr. Lee?  And we played it for you.  He didn't know he was

17   being recorded.  He wasn't shy about talking about his

18   drug-dealing business.  He told people how much to charge for a

19   gram.  How much to charge a fiend.  Where to hide drugs so the

20   police don't find them.  That was that testicle -- where he

21   talks about hiding it under your nuts and wearing tight

22   underwear.  He's talking about law enforcement.  He's talking

23   about hiding drugs.  Particular amounts, what to pay people.

24   None of that with Mr. Tatum.  If Mr. Lee doesn't know he's

25   being recorded, and he doesn't, why isn't he having these

1   explicit conversations with Mr. Tatum?  Because the calls are
2   not about drugs.
3          The meetings that they had at the Woodland Mall and
4   then at the hotel, think about if you know someone or if you
5   yourself have ever purchased anything off of Craig's List or
6   e-Bay, do you have that person come to your house?  Have you
7   ever bought concert tickets or ball tickets?  You don't have
8   that person come to your house.  You meet them at a public
9   place because you just don't know someone that well.
10          The lack of profit winds its way through this entire
11   case.  Think of Mr. Lee getting profit and making money off of
12   a man he believes is like his godbrother, Mr. Kirkland.  He
13   makes a profit off of a woman he's romantically involved with.
14   He makes a profit off of everyone.
15          He also cannot keep his stories straight.  He gave
16   you four different versions when I asked him about it on how
17   much Mr. Tatum supposedly owed him, ranging from $200 up to
18   $3,000 on the stand.  You heard Mr. Lombard say it, but it's
19   true, the truth doesn't change but lies do.  Try and keep track
20   of a lie in your head, especially if you're Mr. Lee and you
21   have told lies so often.  Of course you're going to get tripped
22   up on that witness stand.  Because these are falsehoods.
23          As it relates to the meeting on July 18th, think
24   about this:  Supposedly Mr. Tatum buys a kilogram of cocaine on
25   July 14th.  Four days later he burns through it but yet they

1    have no other -- because Mr. Lee says it was July 18th when he

2    gave him another kilogram of cocaine -- but then there are no

3    other purchases of cocaine after that.  At that rate he's

4    employee of the month, so why isn't he selling it more and more

5    and more?

6          Think about where Mr. Tatum parked at the mall.  You

7    saw it on the video.  If he's doing this drug deal, he's going

8    to park away from other cars.  He's there already.  There are

9    cars all the way around.  People walking in and out.

10          Mr. Lee wasn't waiting in the car to see if people

11   would go away.  You saw the picture that the government put up

12   in their closing.  Mr. Lee is standing literally in the street

13   holding a phone while he's screaming into it "K1, K1."  That

14   guy is not shy.  He's not waiting for people to leave.  He's

15   doing what Mr. Tatum said, finishing up a call and then jumping

16   into Mr. Tatum's car.

17          These supposed two tester packets of heroin.  The

18   first time Mr. Lee says this under oath is in this courtroom.

19   He never mentions that in the grand jury, and he is asked an

20   open-ended question:  How many times have you supplied drugs to

21   Solon Tatum?  Tell us about that.  He never mentions heroin

22   under oath until he takes the stand.  But he has to to try and

23   explain that July 26th call.  He says he supplied him two

24   quarter/marble-sized testers of heroin.  What is he wrapping a

25   rubber band around?  Is that more plausible than the clippers

1    that you heard witness after witness testify Mr. Tatum worked

2    on?  He liked doing it.  He was a barber.  He enjoyed doing it.

3    And he explained what the rubber band was holding, because the

4    screws in one of those clippers were loose.

5         Mr. Lee talks about the August 10th contact and says

6    that's him with Mr. Tatum talking about getting paid.  There's

7    nothing about getting paid in that.  Mr. Lee is going to sit

8    for weeks and weeks and weeks and wait for $35,000?  That's not

9    who Mr. Lee is.  You saw who he is.  And who he portrayed

10   himself to be on this stand is vastly different than the man

11   who you heard on those calls.

12        Mr. Lee says on August 12th the phrase "run into you"

13   means buying drugs, but on August 14th the phrase supposedly

14   means paying for drugs.  Without any interaction between these

15   two between August 12th and August 14th that we've heard about

16   Mr. Lee suddenly has two totally different interpretations of

17   that phrase.

18        Mr. Lee had said on August 14th he had no idea what

19   was in that T-Mobile box that Mr. Tatum walked out of the mall

20   with and then walked back into the mall with.

21        Also think of Agent Burns, who the government put on

22   the stand.  He talked about coded language.  Did he once tell

23   you that "run into you" means buying drugs or paying for money?

24   Did he once tell you that "touched" meant cut?  He told you

25   about everything else but not about that.

1          We know the government can do a thorough

2     investigation.  They did it as it relates to Yusef Phillips and

3     Ray Lee.  Helicopter surveillance.  Everything.  What didn't

4     they do for Mr. Tatum?  Never pulled him over.  Agent Giudice

5     said that would hinder their investigation.  But getting

6     evidence to clear an innocent man doesn't hinder an

7     investigation.  And if they make the choice to do that, they

8     can't ask you to fill in the gaps and guess about what the lack

9     of evidence shows.

10          They did no trash pulls on his house.  And the time

11     to do it would be after that Food Saver box goes in his car.

12     You want to know what's in that box and you don't want to pull

13     him over, you do a trash pull, which Agent Burns said was a

14     great and simple way to get evidence.  What would they have

15     found if Mr. Tatum was a drug dealer?  Residue and packaging

16     material, right?  That's what we saw in all the other trash

17     pulls.  None of that was in his house.  They don't have a

18     controlled buy with Mr. Tatum.  They don't have a confidential

19     source during the course of the investigation who said

20     Mr. Tatum was selling them drugs.  What they do have are

21     assumptions, which carried over into the Complaint, search

22     warrant, and arrest warrant, which Officer Schafer admitted

23     they made mistakes as it related to Mr. Tatum.  Wrong address.

24     Saying there was an intercepted call specifically and

25     explicitly talking about drugs.  Never happened.  Saying

1    Mr. Lee went to Mr. Tatum's home.  Never happened.  Saying

2    Mr. Lee left Mr. Tatum's home after delivering drugs.  Never

3    happened.

4            When this case started in September of 2017

5    Officer Schafer admitted under oath they did not have one

6    person to say they had ever sold drugs to Mr. Tatum.  They did

7    not have one person to say they had ever bought drugs from

8    Mr. Tatum.  But now they do.  They have one person who says

9    they sold, Mr. Lee, and one person to say they bought,

10   Mr. Swain.

11           Mr. Lee, we've discussed, has been a drug dealer

12   since 1992.  Standing in this courtroom telling this court he

13   turned to drugs for health reasons is a lie.  It's not even

14   something that's kind of true.  It's false.  It is blatantly

15   false.

16           He knew he was looking at life in prison and he

17   wanted a way out, and what better way out than to give more

18   names and more names and more names.

19           When it comes to Derrick Swain, think of the one

20   phrase that encapsulates his entire testimony:  What if I lied

21   during my proffer?  That's what he said to the government.  He

22   didn't say, What if I can't remember things?  What if I'm wrong

23   on the math?  What if I'm confused on the dates?  What if I get

24   nervous from the witness stand?  All valid things a witness

25   would say.  What does he say?  "What if I lied during my

proffer?"  You only ask that question if you lied during your proffer.  It doesn't come to you for any other reason other than you lied.

He knew what would happen if he admitted he lied, and he found out quickly.  The government let him know.  "You get more time if you admit you lied.  If you refuse to testify, we're going to get a court order, we're going to make you testify.  You have a contract with us.  That's what a Plea Agreement is.  It is a signed contract.  And your contract says you come in here and you testify if we want you to.  So if you say you lied, you get more time.  And if you don't testify, you get more time.  So you better get in line and get on that stand."  And that's what Mr. Swain did.  And we know he lied.

We know that on that witness stand he could not recall what he had told the government.  He said on the witness stand it was two or three times, but his proffer session had said five or six.  It's a vastly different story.  And we know it's a lie because the truth doesn't change.

He was not honest about his own relationship with drug dealing.  He told the Court during sentencing it was -- or excuse me, his plea -- it was a one-time kind of thing.  We know it was at least a two-time kind of thing.  He was the guy who went to Chicago.  He was the guy who got cocaine.  Sure there was another instance when that wasn't him, but on one of those instances it was him.  And he didn't say that in this

1    courtroom.  He has a criminal history dating back to the

2    nineties.  He didn't turn to drug dealing to feed his family.

3    He turned to drug dealing decades ago.  He said that in this

4    courtroom to try and get the lowest sentence he could get

5    because he knows what it takes.

6            If he wanted to feed his family, he would get a job,

7    because he had someone who had offered him a job doing snow

8    removal and lawn care.  A tough job.  A physical job.  But a

9    job that Mr. Swain didn't want.  He wanted the easy way out.

10   Just like he does right now.  He was so happy to get less time

11   in prison, he would say whatever.  He does not want to be away

12   from his family any longer than he has to.  He knows bad things

13   will happen if he does not go along with the government and

14   good things happen if he does.

15           I also would like to talk to you about the search of

16   Mr. Tatum's house.  No drugs found there whatsoever.  How is he

17   opening up a kilogram of cocaine and not one speck is anywhere?

18   You heard from Dr. Augustine what he does at a DEA lab in

19   Chicago.  He puts it under a hood.  He wears a lab coat,

20   gloves.  He uses a scalpel.  When I asked him how he does it to

21   make sure it doesn't go anywhere, he says very carefully.  So

22   how is this guy doing it and it's not getting anywhere?  Not

23   one speck anyplace.  Car, house, clothes, nothing.  They find

24   nothing.  He's a drug dealer with no drugs.  He's a drug dealer

25   who has no supplies.  The reason they don't find it is he's not

1   dealing drugs.

2        Anyone who likes to cook or bake, think about opening

3   up a container of flour.  If you're like me, I don't know how

4   it gets there, but it's right on the top of the cabinet, behind

5   the toaster.  You always have some little speck or residue of

6   what you've made.  But this guy doesn't?  Mr. Tatum doesn't?

7   When Dr. Augustine has to take all of these very careful steps

8   in a lab.

9        You heard from Special Agent Burns and

10   Officer Schafer about the types of things that you would find.

11   Cutting agents.  Not with Mr. Tatum.  Baggies, scales, kilogram

12   presses, gloves, masks, wrapping, and packaging materials.

13   None of these found at his house.

14        You've heard from Officer Albert a common place to

15   hide money or drugs is in shoe boxes.  And you saw that with

16   Mr. Lee.  When they opened up his shoe boxes, what did they

17   find?  Money and drugs.  When they opened up his shoe boxes,

18   what did they find?  Shoes.  He's been wearing the same size

19   since the ninth grade.  He likes shoes.  What's inside?  Shoes.

20   They didn't find any contraband there.

21        Agent Burns told you it is infrequent that dealers

22   will keep things in their own name.  They don't want a paper

23   trail.  We heard in the opening -- or excuse me -- closing,

24   drug dealers don't like banks.  What do we have with Mr. Tatum?

25   His car in his own name at his own address.  Both through the

Secretary of State and through the leasing agent.

He leased a car for his college-age daughter in his own name at his own address through the Secretary of State and the leasing agency.

What does he have?  A bank account.  In his own name, with the mother of his children's name and his adult daughter, and he's keeping all the receipts.  He's using a bank.  He's using credit agencies in order to get the leased vehicles.

We've heard that drug dealers have multiple phones. What did they find?  One phone for Mr. Tatum.  How much money does he have?  $2,340.  Hidden in a shoebox?  No.  In a jewelry box.  In a drawer.  Which is where people keep money when they don't mind if someone finds it.

He didn't know the police were coming.  He has no reason to hide anything.  Put it right in a drawer.  He's in a cash business.  You heard he makes a hundred -- he has six individuals who are paying him $125 a week to rent a chair at the barber shop.  That's $900.  And then he has the other money that he makes from cutting hair and trimming beards.  That accounts for the money in his house.  And it is certainly not excessive.

He doesn't have unexplained wealth.  Shoes he's had for decades.  He lives with his parents in a modest home where they have lived for years.  He sleeps in the basement.  No hidden compartments in that house.  No Tang bottles or lemonade

bottles where you can hide drugs.

When Mr. Tatum took the stand he was nervous.  Who wouldn't be.  But he wanted to tell you what those calls and contacts were about, and he did so honestly.  Because if he was trying to lie, he would have minimized his income.  He could have said like Ray Lee, "I make $60,000 a year."  For Ray Lee that is a lie beyond lies.  He couldn't even be truthful with you about that.  About how much money he was making.  And then said, "Oh, no, my brother and I have never given any money to our mother," with her nine properties in her name.  Do you have nine properties in your name?  Do you think she's getting that from her job at a hospital?

Mr. Tatum was truthful about the money that he made. He was truthful about the contacts he had with Mr. Lee.  You heard witnesses say yes he helped fix their credit.  Mr. Lee told him he might have some customers for him and he wanted to follow through with that.

You know now better than when you started what's at stake for the men who take the stand and the men who make deals with the government.  It's the difference between life in prison or decades in prison and getting out in five years, six years, seven years.  And for any of you who have young children or who have had young children, think about that.  If you're Mr. Swain, there's a big difference between getting out when your child is eight and when your child is a teenager.

1   When your child is 18.  You miss their entire life unless you

2   cut a deal.  And they will do whatever it takes.

3        Lee told you time is the only currency.  It's not

4   just about missing the big things:  Weddings, graduations,

5   birthdays.  It's all the little things that come in between.

6   When your kids are home and your spouse is home at night and

7   it's cold out like it is right now but you've got the fireplace

8   on or the heater on and everybody is safe and everybody is

9   warm, and you can hear laughter in the other room and you're

10  folding laundry or you're doing dishes and you think "I am the

11  luckiest and happiest person because everyone I care about is

12  under this roof and everybody is happy and safe."  And that's

13  what they are missing by being in prison, a cold and dark

14  place, and they will do whatever they can to get home to their

15  family.

16       The oath you took as jurors is one of the most

17  important, if not the most important, you'll ever take in your

18  life.  This process couldn't work without you.  You breathe

19  life into the Constitution.  It is mere words on paper without

20  all of you.  It is serious business being a juror.

21       If you would not rely on Ray Lee and Derrick Swain in

22  making the most important decisions in your life, you cannot

23  rely on them in making the most important decision in

24  Mr. Tatum's life.  For all the reasons I've discussed, for all

25  the reasons that you know, we ask you to return a not-guilty

verdict on all the counts for Mr. Tatum.  Thank you.

        *THE COURT:*  All right.  Thank you, Ms. Chartier.
We'll take our next break now.  And this one we'll make 45
minutes.  So plan on coming back right at 2:00.  Okay?

     *(Jury exited the courtroom at 1:23 p.m.)*

        *THE COURT:*  See you at two.

     *(Recess taken at 1:24 p.m.)*

     *(Jury entered the courtroom at 2:08 p.m.)*

        *THE COURT:*  Well, welcome back.  We're here for our
next segment.  We'll pick up right where we left off, and so
I'll turn it over to Mr. O'Keefe for closing argument on behalf
of Mr. Howard.

        *MR. O'KEEFE:*  Thank you, Your Honor.

        Thank you, ladies and gentlemen of the jury.  I'm
happy to report I'm still nervous, but I'm still excited to
talk to you about this case.  And I appreciate your time.  As
Mr. Phelan had said, we appreciate your service in this matter.
We could not do this without you.

        As I said in my opening statement, a phrase sticks
out in my mind in this case:  Oh, what a tangled web we weave
when first we practice to deceive.  And without going over
every little segment of what I think the testimony shows, I'll
just say that I agree with Mr. Fauson that it's up to you to
decide whether or not you find certain witnesses credible.
Credibility is solely within the province of the jury.

1          And I would also add that it's up to you to decide

2     what it is you think these recordings mean.  And you've heard

3     the prosecutor talk about some of the recordings that were

4     taken over the wire intercepts between Yusef Phillips and my

5     client, Dante Howard.  And I would ask you to pay close

6     attention to those.  And in particular Government's

7     Exhibit 8.4.637, which we're going to pull up for you right

8     now.

9          One of the things that Mr. Fauson did not show you in

10    his closing argument -- he certainly isn't obligated to show

11    you -- but there's a segment in this conversation, and if you

12    look down in the area of the middle of that conversation, you

13    see that Mr. Howard is having a conversation and he's telling

14    Mr. Phillips that she was gonna leave and just come over there

15    and pick up the money.

16         So if you look at this transcript and if you listen

17    to this tape, Mr. Howard is telling Mr. Phillips that this

18    woman on August 2nd is going to come over there to the

19    Woodland Mall and pick up the money.  And if I could summarize

20    this case with one metaphor, it would be "What's in the bag?"

21    Because when we watch the video from that date, that meeting at

22    the Woodland Mall, we see Yusef Phillips drive to the mall,

23    park near TGI Fridays, and we see Mr. Phillips get out of the

24    car with a small bag.  It looks like a shopping bag of some

25    sort.  It's not a duffel bag.  It's about at least two if not

three hours after he leaves the stash house earlier in that
day.  And we see him enter this car where supposedly, as he
says, he sold a kilogram of cocaine to the woman in the car.
And then we see Mr. Phillips get out of the car, and he appears
to be empty handed.  He appears to have nothing in his hands
except a set of car keys.  And Mr. Phillips would have you
believe that he is selling a kilo of cocaine for tens of
thousands of dollars, yet he steps out of the car and he steps
out of the car empty handed.

Ladies and gentlemen, I want to walk through you --
walk through a little reverse chronology in this case.
Starting with some of the testimony that we heard in this
trial.

Just a week or so ago we heard Etrevion Murphy
testify that he's never even met Dante Howard and that the only
reason he implicated Mr. Howard in his proffer interview is
because Yusef Phillips told him to do it so that he could get a
time cut.

And when we talk about these proffer interviews, what
we're talking about is we're talking about people who have
agreed to cooperate with the government, people who have not
only agreed to give them information about their drug dealings
but also people who are looking to implicate and point the
finger at other people in order to sweeten their deal.  So
without going into a great deal of detail about why

Mr. Murphy's testimony should be viewed with a great deal of skepticism, I would just point out for you that Mr. Murphy -- excuse me -- Mr. Phillips is the type of person who would tell his young apprentice, a 22-year-old man, to go to the government and to tell the government that Dante Howard was a person that was also dealing drugs around that time.

So Mr. Phillips is the kind of person who would tell another person to lie to federal agents, who would tell another person to commit perjury in order to help himself out. That's why Mr. Phillips' testimony should be viewed with a great deal of skepticism.

Mr. Phillips testifies in this trial that he hopes my client, Dante Howard, will go to trial so that Mr. Phillips himself can get a better deal, so that he himself can get a time cut. So you see the consistency there between what Mr. Phillips himself believes and what he tells Mr. Murphy to do in January of 2018 when Mr. Murphy submitted his proffer interview to the government in this case.

In December of 2017, that's when we believe Mr. Phillips told Mr. Murphy to lie to federal agents when he told him before he went into his proffer interview to implicate a person that he's never even met. And in December of last year we know that Mr. Phillips gave his third proffer interview in this case, and that is when he first disclosed that Mr. Howard was supposedly dealing not just marijuana but

1    cocaine and heroin dating all the way back to 2013 or 2014.

2           We also know that my client was charged in the

3    Indictment in November of 2017 right after Yusef Phillips

4    testified before the grand jury in this matter and told the

5    grand jury that Mr. Howard was also dealing in narcotics.

6           In October of 2017 Mr. Phillips gave his second

7    proffer interview where the only mention he made of

8    Dante Howard was that Mr. Howard was buying marijuana in the

9    past.  He doesn't mention cocaine.  He doesn't mention heroin.

10          And in September of 2017, a few weeks after the

11   takedown, a few weeks after Mr. Phillips gets shot in the

12   chest, he doesn't mention a single thing about Dante Howard.

13   Mr. Phillips does not even mention after a three-hour interview

14   with Agent Giudice Dante Howard's name.  And he's sitting down

15   for that first interview and he's giving the names of players

16   in this drug market.  He doesn't even mention Dante Howard's

17   name at that time.

18          And as we know, September 3rd of last year was the

19   date of the takedown.  This was the third shipment, according

20   to Agent Giudice, that had come into Michigan, into the

21   Western District, from out of state.  And during this third

22   shipment the agents had 20 search warrants that were prepared

23   to be executed.  They had 17 arrest warrants that were prepared

24   to be executed.  And they ended up searching Mr. Tatum's house

25   that day pursuant to one of those search warrants.  And

1     Agent -- one of the agents testified that there was a shipment

2     that went back all the way to I believe July 31st, and then

3     there was another shipment before that from July 17th.  When

4     they searched one of the stash houses on September 3rd, one of

5     the agents testified that they found remnants of what must have

6     been left over from one of the July shipments.  We saw a bunch

7     of packaging.  We saw a bunch of empty packaging, we saw a

8     bunch of residue, and so on and so forth.

9           And so my point is this:  If they assume that they

10    are not going to find any drugs over a month later after the

11    takedown or two months later after the takedown, then why are

12    they searching Mr. Tatum's house over a month after the last

13    shipment had come in?  We know that none of the drugs that were

14    delivered to Mr. Phillips and Mr. Lee on September 3rd were

15    ever going to make it into the stream of commerce.  We know

16    that they were ready, that the traps had been set, and that

17    those drugs were never going to make it out of that stash

18    house, and they never did.

19           We also know that 25 miles east of Grand Rapids on

20    that same date they arrested the gentleman, Mr. Cervantes, and

21    they found what appeared to be multiple kilos.  There was

22    heroin, there may have been cocaine, there may have been

23    fentanyl.  And look at what they did with all this stuff.  They

24    mix it all together.  We can't tell what evidence in those

25    boxes came from the stash houses versus what came out of the

1    semi truck.

2             They send the drugs to the lab.  Do they send all the

3    drugs to the lab?  No.  They send heroin, they send cocaine,

4    they send fentanyl, but they don't even test the marijuana.

5    Now, this is a case involving an alleged conspiracy to deliver

6    marijuana, and here they are, the government is not even

7    bothering to test the marijuana or to weigh the marijuana.

8             On August 11, 2017, you see and you hear evidence of

9    a discussion that took place between Mr. Murphy and Mr. Howard

10   about a police presence.  Mr. Howard is not charged with

11   talking about the police or the police's presence in the area.

12   He is charged with conspiracy to possess with intent to deliver

13   controlled substances.  And yet the government would have you

14   believe that the contents of this conversation somehow prove a

15   conspiracy.  It doesn't.  It just proves that Mr. Howard and

16   Mr. Phillips were talking about police presence around that

17   time.  That's it.  If you don't believe me, go listen to the

18   tapes themselves.  You won't hear anything about "original."

19   You won't hear anything about "boy" or "girl" or "H" or "coke"

20   or "powder" or "smoke."  Nothing.  There's absolutely zero

21   discussion about the supposed narcotics that these two

22   individuals are dealing in.  And that, ladies and gentlemen, in

23   a nutshell, that is reasonable doubt.

24             The judge has already given you a definition of

25   circumstantial evidence.  The common misconception that a lot

1   of people have is that circumstantial evidence is somehow

2   inferior to direct evidence.  I would submit that the opposite

3   is true.  Because that 33-pound bag of heroin that's sitting in

4   front of you, which I believe was destined for Philadelphia,

5   that doesn't even involve this conspiracy, that is clear

6   circumstantial evidence that the person who was in possession

7   of that was intending to deliver it.  That doesn't lie.

8          When the guy comes in from outside and is wearing the

9   raincoat with the small drops of water and he's got the

10  umbrella with the small drops of water on the umbrella, that

11  evidence, ladies and gentlemen, does not lie.  It speaks for

12  itself.

13         And so as the government said in their opening

14  statement, they were going to offer evidence that corroborates

15  the testimony of these cooperating witnesses.  Because using

16  that same example, we cannot simply accept Yusef Phillips'

17  testimony that it was raining outside that day.  We need to see

18  the beads of water on the raincoat.  We need to see the beads

19  of water on the umbrella to be able to determine if

20  Yusef Phillips is really telling the truth or if he's trying to

21  pull the wool over our eyes to get himself a better deal.  Or

22  to get his protege a better deal.  And to them Mr. Howard is

23  nothing more than collateral damage.  He is the proverbial

24  piece of garbage in operation garbage man.  He is something to

25  be used and he is something to be discarded.  He is something

1    to be thrown away because he's just a little guy, he's just a

2    pest control guy, and he's expendable in the eyes of

3    Yusef Phillips.

4         I have no quarrel with these gentlemen or with this

5    young lady here.  These are honorable men and women.  And I

6    agree they don't get to pick and choose who their witnesses are

7    going to be.  I have no quarrel with their presentation of

8    evidence.  They did an outstanding job.  These are men and

9    women of honor.  These are men and women who have integrity.

10   But ladies and gentlemen, there is no evidence that

11   corroborates Mr. Phillips' testimony that he was delivering

12   drugs to Mr. Howard, and that is the inconvenient truth that

13   they have to deal with.  That is the one inconvenient fact that

14   they must deal with.  So what they are left with is

15   Mr. Fauson's interpretation of what is on the phone calls, of

16   what he believes these two individuals are talking about on the

17   phone calls.  And as I said before, his interpretation is not

18   what counts, ladies and gentlemen.

19        I heard it said that trafficking is all about the

20   money.  It's all about following the money.  Where is the

21   money?  Where is the money that was supposedly transferred from

22   Dante Howard to Yusef Phillips?  I submit to you that what was

23   in that bag on August 2nd in the Woodland Mall very well could

24   have been money.  Based on the contents of that conversation,

25   it makes sense that Mr. Phillips was delivering money to

Mr. Howard, an individual with whom he had a bona fide business relationship. Mr. Phillips himself testified that back during this time he had hired Mr. Howard to do pest control jobs for him. He would hire Mr. Howard who owned Howard Pest Solutions, Howard and Sons Pest Solutions, to do spraying jobs at some of Mr. Phillips' rental homes. And Mr. Phillips himself testified that he would always pay Mr. Howard in cash.

I would encourage you, ladies and gentlemen, to look at Government's Exhibit 94. Look at the video from the Woodland Mall parking lot. Because that is the only video, that is the only evidence that they have that would arguably corroborate Mr. Phillips' testimony as it relates to Mr. Howard. And you make the ultimate decision as to what was in that bag.

As Mark Twain once said, I would have written a shorter letter if I had more time. And I would like to talk to you more, I have a lot more that I would like to say about this case, but I want to spare you that time, and I want to spare everybody else that time.

I would like to end my summation of the case by pointing out to you that not one piece of drugs that's seated here before you, not one single dollar was connected to my client in this case. Not one single conversation where anything about narcotics was ever discussed between my client and Mr. Phillips. Not one single search warrant was executed

1    at my client's home.  Not one single trash pull.  I know they

2    have limited resources, the government does, but they don't

3    have any problem with flying a helicopter at 27,000 feet to

4    videotape this meeting at the Countryside Inn, yet they seem

5    too busy or too indifferent to execute a simple search warrant

6    at Mr. Howard's residence.

7            They seem to not have any evidence that Mr. Howard

8    was selling drugs.  Because let's face it, they are saying that

9    he was buying drugs from Mr. Phillips or from Toranita Meridy

10   who has a rap sheet of theft convictions a mile long.  They are

11   saying that Mr. Howard was getting these drugs from these

12   individuals so that he could turn around and deliver them and

13   sell them to other people to make money.  There is zero

14   evidence that Mr. Howard made any money, that he sold any

15   drugs.  Not one confidential informant.  Not one Derrick Swain.

16   Not one single person, not one police officer to testify that

17   they saw him out in the streets dealing around these times.

18   And that, ladies and gentlemen, amounts to reasonable doubt.

19   And based on that, ladies and gentlemen, I am going to ask that

20   you find my client not guilty of conspiracy to possess with

21   intent to deliver narcotics.  Thank you.

22           *THE COURT:*  Thank you, Mr. O'Keefe.

23           And we'll go to Ms. Howard.

24           *MS. CHARTIER:*  Your Honor, I don't like to interrupt

25   someone's closing, and I don't know if Mr. O'Keefe just

1    misspoke, but he referenced Mr. Tatum and the search of his

2    home twice.  The evidence doesn't show that there were remnants

3    found in the home, so I just want to make sure that objection

4    is on the record.  Thank you.

5           THE COURT:  I'm sure the jury's heard me say in

6    instructions, and not just today, ultimately whatever decisions

7    you make have to be based on the evidence as you interpret it,

8    not the way any of these lawyers do.  So we'll just repeat that

9    for now, and we'll go to Ms. Howard for her closing on behalf

10   of Ms. Atkinson.

11          Are you using the podium?

12          MS. HOWARD:  I am, Your Honor.

13          THE COURT:  All right.

14          MS. HOWARD:  Good afternoon, ladies and gentlemen.  A

15   lot of the past two weeks have been a dazzling case about

16   Ray Lee and Yusef Phillips.  Helicopter surveillance, guns,

17   trash pulls, Fruit Fresh containers.  Who knew what that was

18   just a couple of weeks ago.  Semi trucks with hidden

19   compartments.  Big bags of drugs that were weighed by the DEA

20   lab in Chicago.  But none of that has anything to do with

21   Erika Atkinson.

22          Now, Mr. Fauson referred to the government's

23   witnesses Yusef Phillips and Ray Lee as imperfect human beings,

24   which I think might be the world's most generous description of

25   people ever.  They aren't imperfect.  They are manipulators.

1    They are demonstrated liars.  They are professional con

2    artists.  Ray Lee will lie until he gets caught.  And you saw

3    him get caught several times on the stand.  He told you how he

4    had a sort of relationship with my client, but yet he also

5    couldn't remember her actual last name.  But he told you that

6    they dated for a year, spent time at each other's residences.

7    She spent time at his then apartment behind the Wal-Mart.  Not

8    this big huge fancy house on Cascade, and not a stash house

9    apartment, but an apartment behind the Wal-Mart.

10         You'll remember he recalled the name of her teenage

11   son right away when I asked.  He spent time with her son.  They

12   went bowling together.  They did the things which would lead

13   her to believe at least that they were in a relationship.  But

14   he told you she was sort of someone he knew.  I think she was

15   just another piece of chocolate to him.  But it took her a year

16   to see through him and move on and try to start over in Texas.

17         I absolutely agree when Ms. Chartier said that

18   Ray Lee is a wheeler dealer.  He's always trying to make a deal

19   for something.  He admitted, for example, that he gave free

20   heroin to a woman he called Blackie.  He admitted that he

21   wanted to have sex with her to investigators.  However, those

22   two weren't connected he said.  Those two had nothing to do

23   with each other.

24         And you heard the phone calls.  Several of us played

25   various phone calls with Ray Lee on them.  In real life he's

1    forceful, he's bossing people around.  He sounds super healthy

2    to me.  He's not the mousy guy he tried to portray himself up

3    there as, respectful and quiet.  No, he's telling you where to

4    hide your heroin, how much to sell it for, sell it to fiends

5    for more.  He's bossing people around.  He's good at getting

6    vulnerable people to do things.  And he was dealing with his

7    brother in these huge quantities.

8         If you believe Mr. Lee, he was fronting people, all

9    kinds of people, because that's what you do in this business.

10   However, he wasn't, he says -- although he was selling to his

11   own girlfriend, he wasn't fronting her.  If you believe him,

12   there's only one reason that that would be the case, and that's

13   because he's afraid she's going to use the product before she

14   can sell it.

15        And you'll also notice that Mr. Lee does not point

16   the finger at his current girlfriend, Rebecca Johnson.  She's

17   the woman that he was dating at the time of the takedown who

18   had $360,000 in cash in her apartment.  He's overheard by

19   investigators on the jail call asking her if they found it.

20   But he sticks with his story that she knew nothing about all

21   this money that she had in her apartment.

22        Now the deal.  He's working on the ultimate deal.

23   He's trying to get a better and better deal from the

24   government.  He's already talked himself out of a mandatory

25   life sentence.  He should have gotten mandatory life in prison

1    two different ways.  Both with his record and all of the

2    quantity of drugs he was dealing in and with his record and the

3    fact that he dealt heroin to someone causing their death.

4         Now, he denies that.  He says he -- first he

5    testified he met my client through her adult son.  Then he

6    admitted he met her through Fred Adams who was a gentleman he

7    said may have died from a heroin overdose that he dealt to him.

8    Tony Kirkland said, "Yep, he died of a heroin overdose and

9    that's who was supplying him."  And he paid for the man's

10   funeral, but he has no idea what happened there.

11        But Mr. Lee has already talked himself out of his

12   mandatory life sentence.  Now he's down to only 11 years for

13   the drugs, plus five for the guns he used.  Guns, you'll

14   recall, he was prepared to use to protect his money and his

15   drugs if he needed to do it.

16        So now he's trying to make a deal again.  He needs to

17   talk his way below the mandatory minimum of 10 years on the

18   drug conspiracy charge.  He and his brother know how to get out

19   from under the heat.  They are both extremely experienced.

20   They have always got a contingency plan.  They have this nest

21   egg set up for their mother with her nine houses and piles of

22   cash all over the place, and they hoped that many of the people

23   that they have pointed the finger at would be forced to trial.

24   This is what they hoped for.  Giving them both a chance to

25   testify and deal themselves into even less time off.

1          So let's talk about the specific charges against my

2     client and what the evidence is.  Those charges are conspiracy

3     and possession with intent to distribute heroin on or about

4     August 13th of 2017.  I'm going to go backwards and start with

5     the possession with intent charge.

6          Now, what evidence is there other than Ray Lee's

7     testimony?  There's one July 2017 call referencing "28."  The

8     August 12/13 calls referencing "28" and "a hundred."  And

9     there's the meetings at Mr. Lee's home and the video of him

10    going to his alleged stash apartment.

11         Let's talk about the elements of what possession with

12    intent to distribute heroin on or about August 13, 2017,

13    requires.  It requires both possession with intent to

14    distribute beyond a reasonable doubt and it requires heroin

15    beyond a reasonable doubt.

16         Now, there is nothing but Ray Lee's word to say that

17    either the "28" or the "100" referred to in those phone calls

18    is about heroin.  We have no recovered drugs.  We have no other

19    words we can use.  We have no drug ledgers, no text messages

20    between the two of them.  And we know that Mr. Lee dealt in

21    cocaine, marijuana, and heroin.  We also know that the

22    government relied on Mr. Lee's initial story that the "28"

23    referred to in the July calls was about heroin, and the

24    government got egg on its face when Mr. Lee got up here and

25    testified, "Oh, wait, 28 means cocaine."  They relied on that

1     and they got it wrong.

2          Then they relied again when they testified at the

3     grand jury and said Mr. Lee's initial story was that in

4     August "28" and "100" both mean heroin.  And they got egg on

5     their face again when Mr. Lee got up and testified here in

6     trial, "No actually one was heroin and one was cocaine.  I was

7     wrong about that."  So you can't rely on what he has to say.

8          And we have this 10-minute meeting in August of 2017

9     at his home, where he didn't usually do deals, and we don't

10    know what happened in those 10 minutes.  And if you think it's

11    equally likely any number of scenarios, equally likely that

12    Ray Lee supplied Erika with some cocaine and some marijuana, if

13    you think it's equally likely that he supplied her with

14    128 grams of cocaine or 128 grams of marijuana, that's not

15    enough to find beyond a reasonable doubt that Erika possessed

16    heroin with the intent to distribute it in August of 2017.

17         And that's assuming that you decide she was planning

18    to use whatever it was that she got in August of 2017 herself.

19    There's no other evidence of her intent to deal or distribute

20    drugs besides the quantity and the assumptions you were asked

21    to make by Agent Burns.

22         Agent Burns admitted that a user could go through

23    28 grams in a month.  And we've got no controlled buys from

24    her.  We've got no text messages.  No other phone calls.  We've

25    got no nothing showing any dealing by her.  And no one fails to

1    leave a trail that the government can't find if they are

2    dealing those types of quantities.  And they knew about

3    Erika Atkinson as of the date they did the takedown.  So when

4    they did all of these search warrants, they knew her name.  Her

5    car is registered in her name.  They identified by the license

6    plate.  They knew who she was.  They could have searched her

7    place too.

8             And even if you find beyond a reasonable doubt that

9    Erika somehow possessed heroin in August of 2017 with the

10   intent to distribute it, you're going to be asked about the

11   quantity of heroin and what quantity was there.  And there

12   simply is not the evidence to find beyond a reasonable doubt

13   that the "100" refers to grams of heroin.  "28" could have been

14   the heroin.  Or "100" could have referred to cocaine or

15   marijuana.  And even if you think that you believe Ray Lee that

16   "a hundred" refers to a hundred grams of heroin, the government

17   is unable to prove Erika actually possessed a hundred grams of

18   heroin.  There was no recovered drugs, so there's nothing for

19   the DEA to weigh.  Any drugs that were received or weren't

20   received in August of 2017 weren't weighed.  So you heard the

21   testimony about all the kilos that they recovered from the semi

22   and when they cut the kilo packaging off and they weighed all

23   of that, many of those weighed less than a thousand grams.

24   There's no evidence of what was actually received if in fact

25   that's what she got.  So there's no way you can find guilt on

1    the charge or on the quantity question.

2            Now I want to talk to you a bit about conspiracy.

3    The judge has already instructed you that a conspiracy is a

4    type of criminal partnership and the government has to prove

5    you have two or more people agreeing to cooperate with one

6    another to distribute or possess with intent to distribute

7    controlled substances beyond a reasonable doubt.  There's no

8    evidence to support anything like Erika Atkinson was part of a

9    conspiracy with Ray Lee.  She was not his criminal partner.

10   I'd argue she wasn't even his romantic partner, even though

11   that's what he wanted her to believe.  Ray Lee was someone who

12   smelled an opportunity.  Always looking for an opportunity.

13   And he certainly smelled an opportunity when Erika Atkinson

14   moved back home from Texas.

15           When it's just Mr. Baker asking Mr. Lee the

16   questions, Ray Lee tells all of us that his sexual relationship

17   with Erika Atkinson was simply before she went to Texas.  They

18   were just friends when she moved back.  Then he admits on

19   cross-examination that he called her when she got back.  He

20   wanted to have sex with her.  Once her relationship with her

21   new partner was over, he moves in to close the deal.  He has

22   sex with her again.  Now, he denies that he ever offered her

23   money to have sex with him, but you'll have to decide if you

24   believe that denial.

25           Look at the government chart, 7E, showing contacts

1    between Erika Atkinson and Ray Lee in the time when she's back

2    from Texas.  We don't have all of the communications between

3    the two of them because the government doesn't save wiretapped

4    nonpertinent recorded phone calls.  She's never changed her

5    phone number.  Ray Lee admitted they were talking during this

6    period about things that have nothing to do with drugs, which

7    he would have to do to get into her bed again.  And now he says

8    she's buying regular quantities of heroin from him before she

9    went to Texas and when she got back, she's working her way up

10   to a hundred grams a month, or every three to four weeks

11   depending on what version.  He's thrown various numbers out

12   into the air during his proffer, during the time when he got

13   prepped by the government attorneys, and up here on the stand.

14   She's clearly not buying a hundred grams a month or every three

15   to four weeks because we have four months of wiretapped phone

16   calls and we have one reference to "100" and two references to

17   "28."  And that's if you believe that that's what they are

18   talking about.  Even if you think those refer to grams of

19   drugs, where is our every three to four weeks a hundred grams?

20        I want to talk briefly about what I've called the

21   so-called drug phone.  Remember that Erika Atkinson is

22   Tony Kirkland's only chance to try and work himself into a

23   further better deal.  He's at the 10-year mandatory minimum

24   right now, and he apparently doesn't know anybody else here.

25   He doesn't even seem to know Erika's name.  And he's Ray Lee's

1    godbrother.  Ray Lee set -- I'm sorry, I'm getting too excited

2    to keep up with my slides.  Ray Lee set Tony Kirkland's mother

3    up with a $50,000 car and more than $22,000 in cash in a bank

4    account.  That is a nice nest egg.

5          Ray Lee has said so many things about this subject.

6    Two weeks ago in trial preparation with Mr. Baker and

7    Officer Schafer he said he got supposed drug user contacts

8    himself out of Erika's phone and gave them to Mr. Kirkland.

9    Then here on the stand he said he introduced the two of them

10   together and had them exchange the contacts themselves.

11         Now, Tony says he got an actual phone, which is a

12   problem because, of course, we don't have a phone anywhere.

13   There's various stories.  Ray says he paid Erika in heroin.

14   Tony says, "Oh, Ray paid her in cash."  Tony can't get his

15   timeline right.  It happened in the summer.  When, of course,

16   she didn't move until the end of 2014.  And we know that

17   Tony Kirkland had a private lawyer here who observed the

18   testimony of Ray Lee the day before, then met with

19   Mr. Kirkland, and the two of them have had unlimited access to

20   each other driving in the van to and from the courthouse, at

21   the Newaygo County Jail.  And the first time we ever heard

22   about Mr. Kirkland gave some contacts back to Erika when she

23   returned back was up here on the stand.

24         Now the government has nothing but vague stories

25   about this contact list or phone records.  And Tony Kirkland is

1    a long-time drug user and alcohol abuser.  He's driving around

2    in his Escalade, in his truck.  He didn't need any contacts.

3    He's been doing this for years.  He first admitted to the

4    government he was quickly selling a kilogram and a half of

5    cocaine a year and 2.6 kilograms of heroin a year.  And he said

6    he was selling that long before Erika Atkinson ever met

7    Ray Lee.  So it's only up here that he adjusts his timeline and

8    says, "Oh, well, after I got those contacts, that's when I was

9    doing so great.  Oh, by the way, I had a prior supplier of

10    heroin and cocaine and I can't remember the name of that

11    person.  That person slipped my mind."  It's simply not

12    believable.  You heard on the phone call Ray Lee bossing Tony

13    around, tutoring him on how to take advantage of fiends and

14    addicts and bump up his prices.

15          Ray Lee is a master manipulator with unlimited access

16    to Tony Kirkland at the jail.  The only reliable evidence of

17    anything -- oh, and we herd Mr. Kirkland for the first time say

18    "I helped her move from Thomas Street."  But we heard Ray Lee's

19    testimony this is the house on Watkins where Erika Atkinson

20    lived while they were dating.  There's been no other testimony,

21    no other mention of this move by Tony Kirkland.  The only

22    reliable evidence of anything is these two meetings in July and

23    August of 2017.

24          Ray Lee said he did not front her any drugs.  He

25    didn't even trust her enough to do that.  There's not an

agreement to cooperate to do anything or work together at all

between the two of them.  Buying what the government claims is

a nonuser quantity, even if you believe that's what happened in

these two meetings, is not an agreement to cooperate or a

criminal partnership.  It's a couple of sales.  She's not his

criminal partner.  If you believe him that he fronted other

people and he didn't front her, there is even less of a level

of trust between the two of them.  These sales by themselves,

which is the only independent evidence they have if you believe

that's what happened, is not enough to prove a conspiracy.  But

there's really, really not enough to prove a thousand-gram

quantity of heroin.  The only way you get there is Ray Lee's

word for it.  And he's already misled the government twice on

quantities and types of drugs, and that's for the two

phone calls we have some independent evidence for.

There's no other text messages, no other phone

records, nothing else, no other communications from this

four-month wiretap period that would support anything.

The government wants you to fill in the gaps of

what's missing in its case, and it says we couldn't collect

this other evidence because we were too busy collecting

evidence against Ray Lee and Yusef Phillips.  And I agree that

was a great use of their resources.  Those two shouldn't ever

be out again.  But even if you think my client must be guilty

of something, the government has not put on enough evidence to

1    prove these charges here beyond a reasonable doubt.  And for

2    that reason, I would ask you to return a verdict of not guilty

3    on both charges.  Thank you very much.

4              THE COURT:  All right.  Thank you, Ms. Howard.

5              And we'll go to Mr. Frawley.

6              MR. FRAWLEY:  Thank you.  Good afternoon everyone.

7    You know, I love being here.  I love being in this room with

8    all these people, you in particular, because you constitute the

9    jury.  The jury system is the fundamental thing that makes our

10   country better than other countries from a legal standpoint and

11   criminal justice standpoint.  You know, as you walk in this

12   building there's a thing on the door that -- actually it's part

13   of a quote but a little larger quote, and that larger quote

14   says "My fellow Americans, our long national nightmare is over.

15   Our Constitution works.  Our great republic is a government of

16   laws and not of men.  Here the people rule."  And it goes on.

17   But that's Gerald Ford, the 38th president.

18             Fine notion.  This is where great notions are tested.

19   This is where individuals, any of us, we all have the right to

20   a jury trial.  It goes back and it's been tested over time.  I

21   think it starts in Article III Section 2 of the Constitution,

22   and then it gets further refined by the Bill of Rights, by the

23   Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments.  We

24   believe in it.  It is our public policy.

25             What does that public policy stand for?  It stands

1   for the presumption of innocence.  That's where we start.

2   That's where you begin when you go back in that jury room and

3   you start to examine the evidence.  It starts with the

4   presumption of innocence.  And it doesn't change unless and

5   until the government proves beyond a reasonable doubt that in

6   my case Max Avery is guilty.  So right this minute he's

7   presumed innocent.  I don't have to do anything.  It's all on

8   these two gentlemen right here.  In their very able hands.  You

9   can tell.  You can see how organized they are.  You can see

10  they know what they are doing.  And they have resources.  They

11  have the FBI, the DEA.  They had what, 17 different criminal

12  agencies, investigatory agencies working.  And yet they haven't

13  proved the case beyond a reasonable doubt against Max Avery.

14         There was no search of Max Avery's house, car.  We

15  don't even know where Max Avery lived other than the vague

16  notion of Indianapolis, Indiana, from the evidence that they

17  have presented.  We don't know -- we do know that on

18  September 3rd there's a video and he's out in that parking lot.

19  I'm not going to suggest to you something absurd and say that's

20  not him, okay?  There's -- you know, that's self-evident.  What

21  isn't self-evident are the phone taps.  That he's the person on

22  that -- on that line.  It was odd, it was eerie almost that

23  just before they introduced this exhibit, this 7F where they

24  have got Max Avery's picture on the top and then they have got

25  these lines drawn, there's only one number ascribed to

1    Max Avery being (317) 938-8218, it was moments before that

2    Mr. Baker read the stipulation into the record.  It's agreed

3    that that's not -- Max Avery is not the subscriber to that

4    number, okay?  So then who has got the burden of proof here?

5    Right there.  What do they do?  What evidence do they present

6    that they tried to track this down and figure out who it was?

7    Same thing.  Mario Martinez is the subscriber from Kentucky.

8    What do they do?  What do they do to check out Mario Martinez?

9    Did any of the investigators testify about what they did to

10   find out if it was maybe Mario Martinez?  Maybe listen to his

11   voice?  That would have been nice.  They didn't do that.

12           What did they rely on?  They relied upon the fact

13   that Yusef Phillips -- a piece of work there -- Yusef Phillips

14   tells them that that number is Max Avery's.  And then he tells

15   Agent Giudice.  Agent Giudice says she listened to another tape

16   and compared it, and, you know, "Oh, yeah, that's Max."  But

17   those are the only two that testified to it.  And there's no

18   objective evidence.  That's just subjective.  And from people

19   with an agenda.

20           And what is the agenda?  Let's look at

21   Yusef Phillips.  Isn't it hard to accept that Yusef Phillips is

22   now on his third-round drug conviction, the guidelines said he

23   should get the rest of his life in prison, he gets 300 months

24   consisting of 240 for the drug charges and then another 60 for

25   a gun charge?  A gun charge he says he wasn't guilty of.  He

1    said that on the stand under oath there.  He said it under oath

2    to the judge when he was sentenced.  And then he comes up here

3    and says, "Uh-uh, that was my lawyer."

4           Now talk about playing every angle.  Look at

5    Defense Exhibit Number 2.  That's the Plea Agreement that

6    Yusef Phillips signed with Mr. Baker and his attorney.  He's

7    now claiming that his attorney made him do it and that he

8    didn't have anything to do with that gun.  Well, one of the

9    things in that Plea Agreement says he gives up certain rights,

10   appellate rights.  But there's an exception.  One of those

11   exceptions is ineffective assistance of counsel.  This guy

12   plays every angle.  He plays every angle.  He is a master

13   manipulator.  His life is characterized by deception,

14   dishonesty.  That's what he's all about.

15          What kind of man is he?  They cannot prove their case

16   without him.  They cannot do it.  If you get in bed with a dog,

17   you've got to worry about waking up with fleas, and that's

18   exactly what I suggest they did.  They are overreaching on

19   trying to plead -- to convict Max Avery.

20          They don't have a case.  They didn't search his

21   house.  They didn't search his car.  They don't have any drugs.

22   Not any.  Not any.  They don't have a lab technician like some

23   of these instances because there are no drugs to test.  None of

24   this pile that they keep parading out here and has been out

25   here for the whole darn trial, none of that has anything to do

with Max Avery.

        And then they try to tell you that because
Yusef Phillips says he would give him 150 grams I think it was
a month that you should convict him.  He should get another
time cut for substantial assistance to the government if he
convicts Max Avery.  That's how he gets more time off.  The
third time around.  I always thought three times and you're
out.  Actually, this will actually be six because he got 5Ked.
The ones that happen when you're being sentenced.  And then he
got Rule 35s.  That's two of them.  And that Rule 35, don't
forget, that's the instance where they can come back in and if
you give them substantial assistance in the prosecution of the
crime or crimes, then they can move -- now, it's still up to
the judge, no question about that -- but they can move to
reduce your sentence.  And it even includes reducing below a
mandatory minimum such as the five-year drug charge -- or gun
charge that he had.  He's got an enormous amount to gain.
Everything to gain.  His very freedom.  I'd suggest that's
important to him.  I suggest -- heck, he admitted it.  I was
questioning him on the stand.  I said, "You're right now
cooperating with the government trying to get a Rule 35, aren't
you?"  And he says, "Yes."  Now, why in the world would anybody
believe a thing that man said?

        Let's try to look at some of the other things about
Yusef.  Yusef is willing to testify against his brother Ray.

Yusef is willing to testify against the woman he was intimate with.  Yusef sets up a godson or pseudo nephew, whatever you want to call him, Etrevion Murphy.  He's willing to testify against him.  And everybody else in sight.  Okay?  When you have pictures of people going to drug houses and stash houses, it's Yusef and it's Ray.  In a few instances other people.  But you never see Max Avery in any of those places.  You never see Max Avery anywhere but in the government's exhibit that has that September 3rd -- or no -- September 1st, 2017, video.

Now, did it seem a little odd to you that Mr. Baker right here stopped playing that?  Did that seem odd?  It seemed odd to me.  You never saw that until later they did it in pieces.  The beginning and the end.  And he argues that that shows that he had picked up some heroin from Yusef Phillips after he sat in the car with Yusef Phillips for 40 minutes.  You do not see in that film any evidence of anything being handed to him.  You do not see any evidence of -- oh, here is a good one.  They did this a few times.  They followed by surveillance either Ray Lee or Yusef Phillips, in this case it would have to be Yusef, from the drug house.  They are under surveillance that whole time.  That day they were -- heck, they were darn near ready to be done with the case.  But when Officer -- or Agent Giudice was on the stand and I said, "Well, what happened on the 3rd when you executed these search warrants and arrest warrants, what was the deal with Max?"  And

1    she said, "Well, we didn't have any probable cause to get a

2    search warrant or an arrest warrant against Max."  And then I

3    think it was one of the other officers was talking about

4    gathering more in November to execute some more warrants in the

5    first week of November and they didn't have any probable cause

6    then.  What surprisingly occurred prior to that, okay?  After

7    Yusef proffered twice, September and October.  What happened?

8    He makes up a story.  He gives them a number.  The number

9    doesn't check out.  The phone number doesn't check out at all.

10   We don't even know whose car that was out there.  We don't know

11   what was in the back of that car.  There was no evidence

12   whatsoever.

13          You know in that one case they had brought that

14   camera right in on the shirt and they said, "Look, there's

15   something underneath there."  They couldn't do that with Max.

16   There wasn't any package that can be identified as having drugs

17   in it.  There aren't any drugs.  There's no analysis of drugs.

18   There's no GPS on Max.

19          They were -- they were surveying -- surveilling that

20   area for a long time before that.  We know they were doing it

21   in July.  We know they were doing it in August.  There's one

22   day Max is there and it's on video and they have like a hundred

23   cameras to choose from, a hundred different angles to gather

24   evidence in terms of, you know, "We can see it, look at that,

25   he's handing him money or he's handing him drugs."  It's not

1    there.  They couldn't get it.  They couldn't get it with that

2    many cameras.  They couldn't get it because there was nothing

3    to get.  And they sure haven't proved it beyond a reasonable

4    doubt.  That's for darn sure.

5         Even if you think that the voice is Max Avery, which

6    I contend you can't, that's a conclusion you really can't come

7    to if you think about it hard.  Even if you do, the words in

8    that thing don't tell you anything.  It's basically gibberish.

9    And their expert, he didn't lend any light to it.  Mr. Burns.

10   The only thing that I took from Burns was that, you know, drug

11   dealers are deceitful, distrustful, dishonest, are good at

12   tricking people, are good at hiding the truth.  You know, you

13   wonder why perhaps, why did he pick out Max?  Well, you

14   remember when they were questioning him about the guy getting

15   shot, Mike Stevens, and they were asking Yusef Phillips?

16   Agent Giudice said, "Well, we asked him, you know, and he said

17   he didn't do it."  And it got a chuckle from a few people.

18        But they also brought up a Troy Carter who may have

19   been the subject of another hit.  And when I asked Yusef, "Was

20   Mike Stevens and Troy Carter, were they friends of

21   Max Avery's?"  He said, "Yeah.  Yeah."

22        Now, you've got one number, you've got -- you don't

23   even know what it is, but it's in a phone that they got.

24   That's another thing.  Did you believe him when he said there

25   was another phone he had that they didn't get and didn't ask

him about?  Come on.  Come on.  These people don't forget to ask questions.  They don't forget to track stuff down.  The reason they don't have this evidence is it wasn't there to get.

Wykena Bradford was mentioned as someone who delivered money to Yusef.  Wykena Bradford from I believe it was Indianapolis.  Where is she?  Who talked to Wykena Bradford?  What did she have to say?  Did anybody track that down?  Does she even exist?  We don't know.  Why don't we know?  Because they haven't given us that evidence.  Who has got the burden of proof?

You know, everybody before me has talked about that a little bit.  I'd like to try to give you a little something in terms of helping you in analyzing what the burden of proof could mean.  I'm going to use a little analogy.  Think about a pool table.  You've got 15 balls on a pool table.  You've got seven stripes, seven solids, and an 8 ball.  Now just imagine each one of those balls has got a label on it "reasonable doubt."  Well, if you want to prove a case beyond a reasonable doubt, you've got to run the table.  You've got to get them all off.  Get them all off the table.  You've got to eliminate the reasonable doubt.  Have they done that?  Do you think they have done that?  They haven't done that.

Etrevion Murphy, when he testified, I didn't know what to make of that really, frankly.  It's kind of odd.  But he did say that Yusef Phillips had told him that he wanted

Max Avery to go to trial so he could get a time cut.  That's coming from Yusef Phillips otherwise known as Unc in the letter as described.

You know, the whole situation here just lacks corroboration of any value.  Because how can you value Yusef Phillips' testimony?  How can you place any value on what he says?  Is there any evidence from anyone about -- that would help you on the question of whether or not Max Avery knowingly joined a conspiracy?  It's not there.  It's not there.  They don't have that.  They don't have any drugs.  All they have got is Yusef Phillips.

I mean, does anybody want to be a part of helping Yusef Phillips get a time cut?  They have left too many balls on the table, ladies and gentlemen.  And when they do that, that means they haven't proven their case beyond a reasonable doubt.  And when they haven't proven their case beyond a reasonable doubt, the only verdict is not guilty.  And that's on both counts, okay?  That's on 1 and 12.  Thank you very much for your attention.

THE COURT:  Thank you, Mr. Frawley.

We'll go to Mr. Turpel.

MR. TURPEL:  Ladies and gentlemen, the government has alleged that Andrea Thompson, a fellow citizen, has committed a crime commonly known as conspiracy to distribute controlled substances.  The government has to prove that case beyond a

1    reasonable doubt. In other words, they have to present

2    evidence that you believe is sufficient enough and so

3    convincing that you would not hesitate to rely and act on it in

4    making the most important decisions in your own lives.

5         The evidence has to show you that Ms. Thompson

6    entered into an agreement, a conspiracy, knowing what the

7    purpose of that conspiracy was and intended to help advance or

8    achieve its goals. The judge has given you instructions that

9    mere presence is not enough although a slight involvement is

10    enough. But she has to have knowingly and voluntarily entered

11    into it knowing what its goals were and intending to advance

12    those goals. And I'll put it to you, they have not proved that

13    beyond a reasonable doubt.

14         In the government's opening and in their closing they

15    use Power Point presentations. As you're aware, these are not

16    evidence. These are to assist them and assist you in grasping

17    what their theories of the case are and to be persuasive with

18    you.

19         One of the slides in the opening listed all eight of

20    the defendants and the government's position as to what their

21    position in this grand conspiracy was. My client,

22    Andrea Thompson, was listed as a courier and Kalamazoo heroin

23    dealer.

24         Several slides follow. One of them a photograph of

25    Ms. Thompson and Mr. Yusef Phillips exiting 3818 Camelot, the

supposed stash house and love nest.  There's another photograph that shows the directions and actual wire of funds to -- allegedly to Mr. Castro.  There's also a photo of a portion of the leases for Camelot listing Andrea Thompson.  There are also three photos that indicate what the government believes the evidence against Ms. Thompson might be.  They talk about nine phone and text conversations setting up one distribution, video surveillance, wires money to Castro, and lease on the stash house.

There's been testimony that there was a relationship, a physical relationship between Andrea Thompson and Mr. Yusef Phillips.  There's talk of nine phone and text conversations.  You've heard and seen some texts of what they are and what they purportedly represent.  You have to interpret those.

Exhibit 7G shows Ms. Andrea Thompson with her one phone calling Mr. Yusef Phillips or having contacts, some 370-some contacts between her and Mr. Phillips on three of his phones.  There's also 11 contacts with Mr. Lee.

We have nine phone calls that are allegedly incriminating.  We know there was a personal relationship between Phillips and Ms. Thompson.  Most of their conversations had to do with personal things.  We don't have hundreds about drugs or interpreted as about drugs.  Even the ones allegedly about drugs also make reference to her job, to her mom, to

other things.  And I think in one of the exhibits hers was the
only conversations where the minimization that we heard about
from one of the witnesses actually comes up.  Most of the
conversations, most of what Ms. Thompson's connection with
Mr. Phillips was had to do with their personal relationship.

You've heard and remember that the romantic
relationship is the key to Ms. Thompson's involvement with
Yusef Phillips.  It's alleged that she was a courier.  In the
presentation from the government in the opening, part of the
evidence is they have three individuals' photos there with
Ms. Thompson:  Mr. Phillips, Mr. Lee, Ms. Meridy.  Courier.
Mr. Yusef Phillips testified one or two times, I believe, that
Ms. Thompson went to Chicago to meet Big or Heavy.  This is
before Castro allegedly is involved in anything.  And we heard
that from Mr. Lee.

Upon cross-examination my recollection is Mr. Lee
indicated all that information about Ms. Thompson being a
courier came from Yusef Phillips.  It sounded like, my
recollection, Mr. Lee, there was really nothing from Mr. Lee
really incriminating Ms. Thompson.  He didn't deal with her.
What deals there were he was told by his brother.  Two -- one
or two trips to Chicago.  Once again, it's Yusef Phillips
testifying.

Ms. Meridy, what's her involvement with Ms. Thompson?
My recollection is outside of what she may have inferred from

1    being told by Mr. Phillips -- and we know his credibility --

2    she met with Ms. Thompson perhaps two times, both having to do

3    with the lease for Camelot.  Once signing onto it and then a

4    year later taking it over.  That's my recollection of the

5    testimony.

6           Mr. Lee, I believe, did not discuss drugs.  We have

7    no testimony from Ms. Meridy.  I don't think any of them

8    discussed drugs, testified that they gave drugs to

9    Ms. Thompson.  It's all Mr. Yusef Phillips.  There's no

10   personal knowledge from Lee or Meridy, who are having their

11   photos there as if they are strong witnesses against

12   Ms. Thompson.  They are not.

13          The only evidence as to "courier" would be

14   Yusef Phillips.  And remember they had a physical relationship,

15   but Yusef Phillips, my recollection is, initially for some

16   period that we don't know did not even let Ms. Thompson know

17   what his real name was.

18          Heroin dealer.  As with many of the other defendants

19   here, we have no undercover buys from Ms. Thompson.  We have no

20   drugs from Ms. Thompson.  It sounds like her place was not

21   raided.  She has no car that has secret compartments.  She has

22   one phone.  We hear about drug dealers.  Some acknowledged drug

23   dealers.  They have admitted to it.  Mr. Lee, Mr. Phillips,

24   perhaps to some extent Mr. Kirkland.  They don't tell people

25   their names.  They have multiple phones and change them.  They

1    have stash houses.  They have secret compartments.  They have

2    lots of money.  Often stored somewhere because they can't

3    readily dispose of it, put it in banks, et cetera.

4            They use women, I think both Lee and Phillips

5    testified to that, because they are less suspicious.  They can

6    get away with more.  No one said Ms. Thompson delivered.

7    There's no knowledge of evidence from her house, cars.

8            The stash house.  We know that that initially was

9    rented by her, paid for by Mr. Phillips.  He didn't want to use

10   his name.  She never used some fake name or fake ID.  I think

11   we have Exhibit 175 which has numerous pages, initials on many

12   of those pages.  It looks like "AT."  You'll have to decide

13   that.  On signature pages.  It looks like "A. Thompson."  Not a

14   squiggle.  A very legible signature.  She's not hiding

15   anything.  She's entering into these leases for this place.

16   How many times has she been there?  We don't know.  Spent the

17   night?  A few times.  We've got one still of her coming out.

18   There's a little kiss in one still or one video.  How often was

19   she there?  We've heard testimony she worked and lived in

20   Kalamazoo, Michigan, some 45 miles or whatever from there.

21   There's not extensive exhibits showing her being there.

22           We've heard how Phillips hid things in there.  If I

23   was -- I think the way I put it, if I was a maintenance man and

24   went in there, would I see anything?  No.  Does it mean she was

25   aware of what was in there?  We don't really have testimony

about that.  This is all inference.  The lease was in her name.

Bold to the world.

The Exhibits 141, 142, 143.  141 being I think the

directions on where to send this money.  142 and 143 are the

money wires.  Wires that total I think just under $4,000.  They

are sent to a Mr. Castro at the Betty Ford.  Hazelton,

Betty Ford Rehabilitation Center.  There's no evidence drugs

were being dealt out of the Betty Ford Rehabilitation Center.

There's no evidence really that Ms. Thompson knew that she was

sending it for that purpose.  There's no evidence she knew

Mr. Castro.

Once again, she signs.  It looks like the same

signature on 141, 142, and 143.  Boldly signing it.  Sending

money.  Not 200,000, not 300,000, but just under $4,000, to a

rehab center.  Where is the proof that this was for drugs, she

knew it was for drugs, she was knowingly advancing the purposes

of the conspiracy?  It's not there.  Not beyond a reasonable

doubt.

She's charged in this conspiracy.  As indicated by

the Court, the government must prove certain things beyond a

reasonable doubt.  As I've already said, they have to prove

that she knew what was going on, that she participated in that.

We've got a lot of -- we have some testimony that she

had money problems.  She worked.  She lived in Kalamazoo.  From

some of those tapes, if you're to believe them, she didn't seem

1    to know how to sell drugs.  She needed some money to pay bills.

2    She has a boyfriend who maybe she knows he sells drugs.  He

3    gives her some drugs.  I think he admitted to that.  Tried to

4    help her out.  Is that being part of the conspiracy?  Is that

5    an agreement to further the conspiracy?  You have to decide on

6    those things.

7         I won't go into great detail as many of my colleagues

8    have already covered the ground of how Yusef Phillips, a man

9    who tried to get others to lie or directed them to, "Hey, you

10   can get a cut by doing this," et cetera, et cetera.  I think

11   his credibility is very low.

12        The evidence against Ms. Thompson is more inference

13   than anything.  Don't let all those drugs there, the pictures

14   of the money, the guns, things that really aren't connected to

15   her, cloud your vision as to what her role or lack of role in

16   this matter was.  She essentially is somebody, I put it to you,

17   that was duped and used by somebody she cared for:

18   Yusef Phillips.

19        She comes into this court, as you've been told by the

20   judge, with the presumption of innocence that attaches to all

21   of us.  It's like a weight that goes on that scale of justice.

22   We talked about that in my opening.  That weight tips the

23   scales in favor of a defendant.

24        You heard the judge talk about Magna Carta.  How in

25   the old days, real old days, 800-some years ago or prior to

that, the government might just charge somebody and put them

away or make them disappear.  But with Magna Carta the jury

system, it evolves, we have our rules.  Mr. Frawley talked

about that.  The government has to come with pieces of evidence

and put it on the other side of that scale to tip it to prove

to you beyond a reasonable doubt to the point where you would

not hesitate making an important decision.

What evidence do they have that really weighs that

much against Ms. Thompson?  I put it to you what evidence they

have -- and there's evidence -- we agree that she lived in

Kalamazoo.  Worked in Kalamazoo.  But did come to Camelot on

occasion to make love to Mr. Yusef Phillips.  That she --

there's signatures of hers on the lease.  There's signatures of

hers on some wire grams.  But where is the heavy weight that's

needed to tip those scales to prove the case beyond reasonable

doubt?  I put it to you that that doesn't exist and it's not

here, and that essentially what we have, once again, is a

situation where you have a woman, Ms. Thompson, who loved

Yusef Phillips but was used by her [sic].  Helped out a little

bit.  "Here, you can sell some drugs to cover your bills."  But

she was duped.  She was used.  And like many of these other

defendants essentially thrown under the bus by this guy.

So based on the evidence here, you don't have to

believe that she's pure as the driven snow, but she got into

something, a relationship, that she should not have gotten into

1    and she stuck with it.  You'll see that even at the end, I

2    think Exhibit 124 has these little love bears in there.  She

3    was still involved with this guy.  But that doesn't mean that

4    proximity amounts to being part of the conspiracy.  I put it to

5    you that there's not enough evidence.  There's some evidence,

6    but it doesn't tip those scales sufficiently to prove her

7    guilty beyond a reasonable doubt.  Thank you.

8            THE COURT:  All right.  Thank you, Mr. Turpel.

9            We'll take a break now for 15 minutes, and then we'll

10   come back and finish with the last defense closing and rebuttal

11   from the government.  So get yourselves up for a stretch and

12   we'll be back in 15 minutes.

13       (Jury exited the courtroom at 3:25 p.m.)

14           THE COURT:  Ms. Chartier, did you have something you

15   wanted to address?

16           MS. CHARTIER:  I did.  Just in my closing.

17           THE COURT:  And get to a microphone, would you?

18           MS. CHARTIER:  Sure.  During my closing one of the

19   jurors was nodding off.  And I might not be the most

20   captivating orator on the planet, but I did notice him nod off

21   during another closing as well.  Although he did wake up really

22   quickly, but he would nod off as well.  I did just want to make

23   a record of that.

24           THE COURT:  Do you want him off the jury?

25           MS. CHARTIER:  For Mr. Tatum's benefit, yes, I

1    believe he should be swapped out with an alternate.

2              *THE COURT:*  Okay.  Which one are you talking about?

3              *MS. CHARTIER:*  Juror Number 5.

4              *THE COURT:*  In the back row?

5              *MS. CHARTIER:*  Yes, sir.

6              *THE COURT:*  Mr. Rogers?  Okay.  I'm happy to hear

7    what other people think, but my own observation is that both

8    the juror in the second chair close to me and Mr. Rogers had

9    their eyes closed from time to time.  I think that has happened

10   elsewhere during the trial.  But at least in all the occasions

11   that I've seen it's been very brief.  And so I don't think

12   anybody has missed any kind of large swatch.  And it wasn't

13   just in your closing, as you indicated.  I think Mr. Rogers

14   started out that way with the government's closing today.  And

15   if I recall correctly, he was or may still be a nighttime truck

16   driver.  So he might be having some wakeup moments.

17             But I'm happy to hear what other people think.  We

18   have two alternates who are still here.  And if anybody else

19   wants to join or oppose, I'm open to hearing the position now.

20             What's the government's position?  I guess the

21   request is for Juror Rogers to be excused and replaced with

22   one of the -- who would be the first alternate.

23             Mr. Baker.

24             *MR. BAKER:*  Your Honor, the government would be

25   opposed.  Jurors nod a little bit during trials.  It's

1  something that happens.  I think that Mr. Rogers has been

2  paying attention.

3          I've noticed exactly what the Court described.  I

4  don't think Ms. Chartier is wrong about what she's seeing.  But

5  I don't think there is a lock of information that's getting to

6  the jury here, and if we had to keep all 14's attention all the

7  time, that would not be a demarcation of what we could have for

8  a successful juror.  So I don't think that there's been

9  anything in terms of demonstration or what's been made on the

10  record that he should be taken off.

11          *THE COURT:*  All right.  Mr. Lombard.

12          *MR. LOMBARD:*  We'd oppose the request as well,

13  Your Honor.

14          *THE COURT:*  All right.  Mr. Phelan.

15          *MR. PHELAN:*  I remember a judge telling me at one

16  point in time "Be careful what you ask for.  You might get it."

17  I'm going to stay neutral.

18          *THE COURT:*  Mr. O'Keefe.

19          *MR. O'KEEFE:*  Your Honor, I did notice Juror Number 5

20  nodding off quite a lot.  It wasn't just during Ms. Chartier's

21  closing but other counsels' closings.  He appeared to perk up

22  after the break.  And when I addressed the jury, he seemed to

23  be awake the whole time.  But I believe when Ms. Chartier was

24  finishing up her closing, he may have bounced his head off the

25  wall.  I would concur with her objection.  He was very, very

1  sleepy.

2          THE COURT:  All right.  Ms. Howard.

3          MS. HOWARD:  I would also concur with the objection

4  by Ms. Chartier.  I think it's above an unacceptable level,

5  so . . .

6          MR. FRAWLEY:  I concur as well.  That's all I need to

7  say.

8          THE COURT:  All right.  That's Mr. Frawley.

9          Mr. Turpel?

10          MR. TURPEL:  Your Honor, I will concur.  He has been

11  nodding off even during jury selection.

12          THE COURT:  Mr. Hills.

13          MR. HILLS:  I haven't noticed it that much, but if

14  he's nodding off and sleeping that much, I would concur with

15  Ms. Chartier.

16          THE COURT:  Well, I'm going to reject the motion for

17  now, because at least in my observation what I saw was not

18  anything more than occasional.  I didn't see the head bang if

19  that happened.  I have seen other jurors from time to time,

20  most notably Mr. Wood in the front row, do the same kind of

21  thing, but the eyes rarely stay closed for any length of time,

22  perk up quickly.  And that's what I thought was going on with

23  Mr. Rogers today too.

24          So I think if we made, you know, closing the eyes or

25  even a jaw drop or a head bang the standard, we'd probably

never finish a jury trial.  Because as scintillating as you all

have been -- and honestly, you have been good, all of you

have -- it's tough to sit there all day.  And I'll tell a

story, because Dutch guys like stories too, not just Irish.  If

I already told you this during this trial, just say "You

already told me and I need to go to the bathroom."

But my dad is 98.  He was born in 1920.  A son of a

minister in the Christian Reform Church.  And I used to

complain as a kid about going to church twice, you know.  At

night especially when they'd dim the lights, at least in the

church I went to.  And I thought, you know, it was a great

invitation to sleep, which I did.  But -- and so did some other

people.  And we're dimming the lights, we're turning the lights

up, we're doing all of that.  His response to me was, "You

don't know how good you have it.  I had to go morning, night,

and in the afternoon to a Dutch service."  And then I thought

as we were listening all afternoon, I think if I talk to him

later this week, I go visit him usually on the weekends, he'd

have to admit that what the jury is doing today is worse than

anything he did as a kid.  Not because you're bad, you're all

good, but just because sitting through speeches for an entire

day is exhausting work.  And that's, I think, one reason we

have a group process with the jury.

If somebody is really sleeping, sawing wood, missing

out big chunks, I excuse them.  I don't think this one rises to

1    that level.  But I appreciate everybody's observations.

2           Let's go as fast as we can on the break.  We've taken

3    a little bit of time, but I know it takes time to get people

4    back and forth.  So no more than 15 minutes.  Hopefully we can

5    do it in a little less.

6           THE CLERK:  Court is in recess.

7        (Recess taken at 3:31 p.m.)

8        (Jury entered the courtroom at 3:45 p.m.)

9           THE COURT:  All right.  We're here for the last two

10   closings.  The last one of the defense and the final rebuttal

11   of the government.  And we'll turn it over to Mr. Hills

12   whenever you're ready.

13          MR. HILLS:  Thank you.  We're getting closer.  I'm

14   number 9 on the hit parade today.  I can't imagine what you're

15   going through.  So I'll get right to it.

16          I represent Aaron Cox.  He is charged in Counts 1 and

17   14 in this Indictment, the Second Superseding Indictment.

18   Count 1 is the conspiracy count.  Count 2 is the possession

19   with intent to distribute count.  Now, when I get to it, I'm

20   going to go in reverse order.  Like I think Ms. Howard did,

21   went in reverse order.  And I'm going to talk about Count 14

22   first and then I'm going to come back to Count 1.

23          Now, as a criminal defense attorney, I would be

24   remiss if I didn't talk about what I consider the cornerstones

25   of our criminal justice system.  You've heard it seven times

1   already, so I'm going to go really fast through this.

2           The cornerstones.  Presumption of innocence.  The

3   burden is always on the government.  And they have to prove

4   their case beyond a reasonable doubt.  There, I said it.  I had

5   to say it.  You've heard it umpteen times, so I'm not going to

6   dwell on it.  The judge has already instructed you on it.

7           All right.  Count 14.  That's the possession with

8   intent to distribute cocaine count.  This is from

9   September 2nd, 2017.  On this particular occasion what do we

10  have?  We have the Woodland Mall video.  We've got that.  And

11  we've got telephone calls.  Several of them.  On September 1st

12  and September 2nd.  That's it.  A series of telephone calls.

13  And you've got suspicion, right?  That's what you've got.

14  We've got some suspicion.

15          So what do you do to verify that?  Well, what else do

16  they have on that day, September 2nd, 2017?  They have got

17  surveillance.  And they have got a team in place on that

18  particular day.  I tried to figure out who was there.  I asked

19  that question multiple times.  I never got an answer to it.  I

20  can't tell you that, and the government can't tell you that at

21  this particular time or any time.  You're never going to hear

22  it.  We don't know who was there.  I think I asked

23  Chad Preston, or he was one of the officers that I asked, "Were

24  you there?"  "I might have been."  "Were you the one that

25  called?"  "I could have been.  I might have been.  I don't

1   know."  We don't know.

2          I asked Special Agent Guidice.  She confirmed that

3   she had a team in place.  And we know that because there was a

4   call.  They were up on the wire as they say.  So they knew that

5   Ray Lee was going to go to the Woodland Mall, so they get

6   ready.  They have done this over and over and over and over

7   again repeatedly throughout the summer of 2017.  And so they

8   have a team there.

9          You heard testimony about a three-man team that they

10  use and that they followed Ray Lee all over the place.  All

11  right?  So we know that they had a team in place.  We know that

12  they had the plate.  All right?  Up there I think I put up a

13  picture -- you can't really see it -- but they zoom in on the

14  plate.  By this time in history, September 2nd, 2017, the

15  Woodland Mall security people are trained in that, to zero in

16  on the plate.  So they had the plate.  And up there I also put

17  up who the plate goes to.  The plate goes to Aaron Cox.  It

18  gives his address, 3061 Plainfield Ave.

19         So they have got these phone calls on the 1st and

20  then most of them on the 2nd.  They have got a meeting at the

21  Woodland Mall.  And they have got a team there that has the

22  license plate.  All right?  So they have got this whole thing

23  going on.  They have got this whole investigation going on.

24  And at this particular point in time they have got 20 search

25  warrants ready to go.  They have got 17 arrest warrants ready

1   to go.  And they have got a team in place at the Woodland Mall

2   and they have got a plate.  So what do they do?  They have got

3   suspicion.  What do they do to verify the suspicion?

4          I'm here to represent Aaron Cox, and Aaron Cox is

5   charged in Count 14, so I want to know what they did to verify

6   their suspicion that this was a drug transaction.  Well, what

7   could they have done?  All right?  I asked one of the officers,

8   I think it was Mesman, about traffic stops.  You can stop a car

9   basically for anything.  There are so many traffic laws that

10  you can stop a car.  And I think I asked one of the other -- a

11  K-9 handler that did some searching, I asked him, and he

12  verified that too.  Can you stop?  Yes, for a traffic law

13  violation.  You don't need probable cause.  You don't need a

14  search warrant.  You can stop.  So you do a traffic stop.  All

15  right?  And if you've got all of this staged, we had three

16  officers testify that were K-9 handlers.  You call in a dog.

17  You have it ready to go.  They had a surveillance team there,

18  coordinate a stop.  Bring your dog in, right?  Do a search.

19  You don't need a search warrant.  It's what's called -- I think

20  they called it a free-air sniff.  Free-air search.  Bring the

21  dog, go around the vehicle.  If he hits, okay, you verify your

22  suspicion.  If he doesn't, he doesn't.  If you get in, you get

23  consent to search, you can search.  You verify your suspicion.

24         All right.  They didn't want to blow the case right

25  there is what they want to say.  All right.  That doesn't have

1    anything to do with Aaron Cox.  That's on them.  That's on the

2    government.  If they didn't want to do this, they didn't want

3    to verify their suspicion, that's on the government.  They

4    decided not to do it.

5         What else could they have done?  The trash pulls.

6    This is an officer who I found on the internet so you could see

7    pulling the trash.  I'm sure that they didn't do it exactly

8    this way.  I'm sure that they were slicker about it.  But they

9    could have done that.  We've had -- I mean, they were -- the

10   trash haulers on the regular crew for Ray Lee, they could have

11   done it.  They chose not to.  And they could have potentially

12   confirmed their suspicion that Mr. Cox was involved with drug

13   dealing.

14        You had -- and I wanted to make sure I got this out,

15   and I got it out of Detective -- Special Agent Burns that on

16   down the line, I think it makes sense and everybody would

17   realize this, but I wanted to make sure we had it on --

18   testimony on it -- that not just people like Ray Lee and

19   Yusef Phillips have remnants, have kilo wrappers and cutting

20   agents and gloves and all of that kind of stuff.  But if

21   somebody, according to Ray Lee, is delivering to Aaron Cox kilo

22   quantities of cocaine, they are going to also have those types

23   of things in the garbage.  So verify your suspicion.  They

24   didn't.

25        Okay.  They are going to go and they are going to do

their search warrants, okay?  Do a search warrant.  Right?  You
heard testimony from several of the officers about getting and
obtaining a search warrant.  You do it -- you get an affidavit,
you send it, and you receive it.  You get your search warrant.
They had 20 already.  If there's enough suspicion here that
we're going to put this man on trial, get a warrant.  Serve the
warrant.  You're doing 20 already.  I think
Special Agent Guidice indicated they had 200 to 300 officers
ready to go, ready to search.  They had 20.  One more.  Verify
your suspicion.  They could have done it.  They didn't.

So at the end of the day with this particular
incident we don't have paraphernalia, gloves, scales, cut,
money, drugs.  No suspicious activity around his home.  No
witnesses saying that he sold drugs.  Nothing like that.

And when we talk about Count 14, possession with
intent to distribute cocaine, they are going to ask you --
there's going to be a verdict form that talks about a weight,
and that weight is above or below 500 grams.  All right?  It's
half a kilo.  And if you believe -- and I'll get to more of
Ray Lee, the Ray Lee show a little bit later on, but if you
believe Ray Lee, I think it's his third statement to the
officers, where he indicates, "Oh, a half a kilo."  All right?
"I delivered him a, a half a kilo."  All right?  So we take his
word for it.  Because on this count we have no drugs.  We have
nothing.  Nothing to weigh, nothing to look at, nothing to

test.  And that's why I think the lab guy was important here.
Because I asked him a silly question.  The question is -- say
this is a kilo, right?  You get a box or a Saran wrap, tape,
whatever, and it looks like a kilo of drugs, right?  You get
that in the lab and you look at it and you pick it up and say,
"Okay, yep, this is heroin.  This weighs a thousand grams.
It's a kilo."  There you go.  Do you ever come in and testify
to that?  No.  Why?  Well, he's a scientist.  He's going to
test it.  I think he tested on three machines he put this thing
through to test what they were.

Agent Giudice got it wrong.  She thought what they
seized in the truck was all cocaine.  No, she's wrong.  That's
why they send it to the lab to test it, right?  And to weigh
it.  He had a -- he used his scale.  He indicated that his
scale is calibrated.  Calibrated I think he said internally
every day.  Every month it's calibrated with certified weights.
Every year it's calibrated with separate certified weights,
right?  And so none of the drugs that were seized -- we have
these boxes over here full of drugs -- none of them relate to
Aaron Cox.  None of them.

But I thought I'd pull one of the labs specifically
in Exhibit 168A, and I took a close look at that, and that
particular package weighed 503.4 grams with the packaging.  All
right?  Here is your half a kilo, right?  And then they take
it -- the Dr. Augustine took it out and it weighs 460.

1    Significantly shy of half a kilo, right?  So this is kind of a

2    glimpse of how this is done, right?

3              You heard lots of testimony that you get the drugs,

4    you pull it out of the package, you cut it up, you get more

5    mass to it, more weight to it, and then you sell it and you

6    make more money.  On the other end, they short -- they give you

7    short on the weight.  Here it's packaged, it weighs over

8    500 grams, so it's short on the weight when you open it up and

9    the actual cocaine or heroin or whatever it is, it's short.  So

10   you're going to be called upon to find beyond a reasonable

11   doubt that there's over 500 grams of cocaine, which you don't

12   have, has never been weighed, has never been seen.  That's even

13   if you get past the possession with intent to deliver where

14   they don't have cocaine, they don't have anything except for

15   Ray Lee.

16             So they don't have any verification of their

17   suspicion except for Ray Lee.  And we've heard a lot about

18   Ray Lee.  That's Count 14.

19             Count 1 then is the conspiracy.  All right?  Now, the

20   conspiracy -- Mr. Cox is charged in the overall conspiracy from

21   2013 to 2017 of receiving and dealing cocaine.  Now I want to

22   go back, and Agent Giudice indicated on her direct exam that my

23   client was indicted in November of 2017.  And he was.  But he

24   was not indicted on the entire conspiracy.  He was indicted on

25   November 8th, 2017, in a stand-alone indictment.  I put up

1   there -- I probably shouldn't have put PWID, but that's short

2   for possession with intent to distribute.  And I put 500 grams

3   or more because that's what you're going to be asked to decide.

4   So originally he was charged with PWID, possession with intent.

5   Now that's Count 14 on this whole big Second Superseding

6   Indictment.

7           And on November 8th -- this is important -- on

8   November 8th, 2017, they had the phone calls.  They had -- they

9   had them in realtime.  Right then on September 2nd, 2017, they

10  had the phone calls.  They were listening to them.  They were

11  recording them.  They were transmitting it to their agents to

12  go out to the Woodland Mall.  They had all of that.

13          They had the Woodland Mall video.  They had that in

14  realtime also.  So you can tell somebody is on the joy stick

15  dialing it in, zooming it in, zooming it out.

16          They had a Camelot video.  I put that in quotes

17  because they actually did not have a Camelot video.  You see in

18  a lot of the Camelot videos going in, going out.  Ray Lee going

19  in, coming out with something.  You won't see that in regard to

20  Aaron Cox and Ray Lee on this particular day.  There isn't one.

21  I put it in quotes because they thought they had it.  That's

22  what they thought they had.  That's what Officer Schafer, the

23  co-case agent on this case, testified.  That's what he put in

24  his report, that they had the electronic surveillance at

25  Camelot on that particular day, but they didn't.  And they

1   don't.  And he says because the thing went out of batteries or

2   whatever reason it is they don't have it.  All right?

3          Now, they say, okay, we've got this GPS.  And I'm

4   sure that Mr. Baker is going to put that up, right?  So we've

5   got GPS instead of the Woodland -- or instead of the Camelot

6   video.  And they have the map.  All right?  And on that map

7   you'll notice that there are no -- there are no addresses on

8   that particular map of the houses or apartments or whatever it

9   is.  But you'll also note on that map that they have a bunch of

10  stop signs.  I think four stop signs on that particular map.

11  And they don't have any times for any of those.  When the

12  vehicle may or may not have been stopped.

13         And also in Camelot you've got 3818, which is the

14  stash house, but he's also got his sister and his nephew living

15  at 3780 Camelot.  And that's why this video is so important,

16  right, to their case?  You see him coming in and coming out.

17  Because, all right, he's going into 3818, the stash house.

18  He's not going in over here to 37 -- what is it --

19  3780 Camelot, which is his sister's house, sister's apartment,

20  with the nephew.  All right?

21         Regardless, they -- so I put it up there.  They

22  thought they had it.  They assumed they had it.  All right?

23  Just like they assumed that there was a drug transaction at

24  Woodland Mall.  They assumed it.  They didn't verify it.  He

25  assumed that he had this video.  Come to find out, as we're

1     prepping for trial, he didn't have it.  They had his plate.

2     That's Aaron Cox's plate.  They had his plate.  They had his

3     address.

4             They had Ray Lee, right?  On November 8th, 2017, when

5     they do the stand-alone indictment on Aaron Cox, they had

6     Ray Lee.  He had testified at that time.  Ray Lee came in on

7     the 3rd and talked to them, and I'll get to his statements.  He

8     came in on the 25th, talked to them of September, he came in on

9     October 12th and talked to them.  And specifically on

10    November 7th, 2017, he testified in front of the grand jury at

11    10 something in the morning.  Alexis Guidice testified that

12    same day on November 7th at one something in the afternoon.

13    Alexis Guidice testified on November 8th, 2017, for the

14    indictment.  Specifically a stand-alone indictment.  And what

15    did she say?  They didn't put him in the conspiracy.  Because

16    they don't have any corroboration.  No corroboration for

17    Ray Lee.

18            After all these other defense attorneys have told you

19    and you sat through this trial, you listened to Ray Lee and

20    Yusef Phillips, you know that they don't have any credibility.

21    You know that you need some support, you need some

22    corroboration.  It's instinctive, it's intuitive.  You know

23    that.  But -- and I think Alexis Guidice knew that too, right?

24    But she also knew that the Court, that the law, the judge is

25    going to instruct you not to convict on unsupported testimony

1    unless you believe it beyond a reasonable doubt.  He's already

2    read that instruction to you.  There's more to it than that,

3    but this is the basic gist of it.  It's a cautionary

4    instruction.  Somebody like Ray Lee, put Ray Lee's name right

5    in that instruction.  Do not convict on unsupported testimony

6    of Ray Lee unless you believe him beyond a reasonable doubt.

7    And that's why he wasn't put in this grand conspiracy, because

8    they didn't have any corroboration.  Not then and not now.

9            So in April of 2018 -- this is not the stand-alone

10    now -- now he's put into what we're here for, the Second

11    Superseding Indictment.  The conspiracy.  But there's nothing

12    new.

13            How -- what did they have?  And I asked

14    Alexis Guidice this.  She testified as to what Ray Lee

15    testified on November 7th.  So she comes in to get him into the

16    Indictment just rehashing Ray Lee's testimony.  Nothing new.

17    Ray Lee didn't come in to testify.  There's nothing new.  Zero.

18            This is -- you've heard that you can indict a baloney

19    sandwich?  That's how it's done.  Right over here is your

20    living, breathing baloney sandwich.  He was indicted on nothing

21    new.

22            And it reminds me actually of Swain.  So he's

23    charged, he's indicted, he's coming around, coming around the

24    corner, coming up on trial and then, bam, wham, charged in the

25    conspiracy.  The greater conspiracy, right?

1          And Derrick Swain -- why does it remind me of

2    Derrick Swain?  Derrick Swain doesn't have anything to do with

3    Aaron Cox.  None of the other six cooperators do.  But

4    Derrick Swain came in, and he's "What if I lied in my proffer?

5    What if I lied in my proffer?" as Ms. Chartier was talking

6    about.  And he gets up on there and he has a choice, right?  Go

7    along with the proffer as he's proffered with the government or

8    there are consequences.  It reminds me of that.

9          So we have Yusef Phillips and we have Ray Lee.  They

10   kind of come as a pair, I think.  Yusef Phillips I consider the

11   trainer.  And we've seen that throughout, right?

12   Yusef Phillips has a history.  He's well-versed in how this

13   works, how this game is played.  You could tell, you know, how

14   the Yusef Phillips and Ray Lee drug-dealing operation went.

15   Clearly Mr. Phillips was in charge of the situation.  I don't

16   think there's any dispute about that.

17         But Yusef Phillips back in the nineties was indicted

18   and he -- that's where he learned about proffers.  He

19   proffered.  He went to the grand jury.  He testified in trial.

20   He got himself a 5K.  That's your reduction that we've already

21   seen.  That they get the reduction before.  Before sentence or

22   at sentence.  And then the Rule 35.  He got one of those.

23   That's a rare event.  Rule 35 is after.  That's what comes

24   after when you all go home.  That's what they are really

25   seeking now.

1        And Phillips is the master.  He's the trainer.

2   Right?  He's the trainer.  And we know they are communicating,

3   and other attorneys have gone through that, and so I won't

4   rehash all that.  But one of the things I don't think anybody

5   brought up yet, which I thought was amazing, that after

6   Yusef Phillips comes down here and does his thing, right,

7   testifies, then the next day -- was it the next day or the day

8   after?  Whenever Ray Lee came down to testify -- they are both

9   in Newaygo, we know that, how they ride down here on buses and

10  they go back on buses, and they stay here in some holding cell

11  I'm sure.  Well, they brought Yusef Phillips back down, the

12  trainer, to ride with his brother, to make sure he's doing what

13  he's supposed to be doing.  And on the way back, I think it was

14  Tony Kirkland that said, "Yeah, they were sitting together and

15  Ray Lee said, 'Yeah, I did what I was supposed to do,'" among

16  other things.  So they are together in this.  You can't

17  separate them.

18       And I almost forgot, somebody indicated their

19  sentencings were on the same day, so they are going to ride

20  down together for their sentencing.

21       Their Plea Agreement, I guess I put that up there,

22  there was also testimony about that.  They also signed their

23  Plea Agreements on the same day.  Right?  Do you see a pattern

24  happening with the trainer and his little -- not little

25  brother, I guess it's his big brother.

1          Cooperators.  Right?  None of them say anything about

2     Mr. Cox, save Ray Lee.  Not Phillips.  Not Meridy.  Not Swain.

3     Not Cervantes.  Murphy.  Not Murphy, but I want to talk about

4     Murphy for a minute.

5          Murphy is interesting to me because I think you get a

6     glimpse at what the defense has been saying in cross-examining

7     these cooperators.  What this game is.  What Yusef Phillips

8     knows so well.  Yusef Phillips trained Murphy.  Yusef Phillips

9     trained him in the drug trade, was grooming him I think may be

10    the term.  And also grooming him in how to cooperate.  What to

11    do.  The game is to get as many people as you can to testify

12    about and hopefully they go to trial.  Right?  That's how it

13    works.  You cooperate, and if they go to trial, you testify,

14    you get your Rule 35.  That's how it works.  Right?  And then

15    we heard it from Mr. Murphy on the stand that that's how it

16    works and that Yusef Phillips is the trainer and was training

17    him.

18          And Kirkland -- Murphy had nothing to do with --

19    Kirkland is interesting to me.  Kirkland, nothing about

20    Aaron Cox.  Right?  Says nothing about him.  But he's

21    interesting to me, and I think Ms. Howard is the one that

22    pointed out all his inconsistencies in how he was testifying.

23    From when he was with the agents in his proffers and all this.

24    But -- and he says, "Well, my calculations got better."  Right?

25    His calculations got better over time.  Until he's up here.

He's with -- originally he's here, he has his proffers, he meets with the agents, he does his thing, he gets on the stand, and now his calculations are better. Even though I think he testified that he's -- he uses heroin and cocaine and alcohol and whatever else, right? But his calculations are getting better with time. Regardless, none of them say anything about Aaron Cox.

I started out with the evolution of Ray Lee, and I figured it would get better with trial, and I was right. So Ray Lee starts out September 3rd, 2017. And he's arrested and called into the room to wherever he's being interviewed at, I think Grand Rapids Police Department, by a couple of officers. And two things that are interesting about this, I believe. You see Ray Lee give some very brief information. Doesn't give a whole lot. But what he does give is a lie. You know, right out the gate he gives the 3780 Camelot address, which is his sister and his nephew, throws them under the bus too. Right? You want to go search someplace, my home is at 3780 Camelot. Go search, you know, their house. Right? So we get to see the kind of guy he is right out the gate. He could have elected to say nothing, but instead his instinct is to lie. Right?

Also important about this, he gets to know -- he gets to start to know the game, because the officers are laying out pictures. I need to know this and this and this and this. So he knows what they want.

1          September 25th, 2017.  This is his first proffer.
2     Now he's got an immunity deal.  Now he can come in, now he can
3     tell the government everything about everything.  About
4     everybody.  Pictures, et cetera.  Right?  And the last guy that
5     he had supposedly dealt with was Aaron Cox for -- well, at this
6     time -- I think the next proffer it's a half a kilo, but in his
7     grand jury it's kilos and kilos, right?  So kilos and kilo guy,
8     and the last guy he dealt with, three and a half I
9     believe hours they are with him.  Not a mention.  Doesn't say
10    anything.
11         October 12th, 2017, they come and see him again.  And
12    this is important.  This is the first time that Ray Lee
13    mentions Aaron Cox.  And he mentions him, and I think I asked
14    one sentence, one or two sentences, a half a key.  Right?  A
15    half a key and a key for $35,000.  And Special Agent Guidice
16    said that always she has a photo lineup -- not a photo lineup
17    exactly, but it's a series of photos, and some of them are
18    suspects, some of them aren't, so it's fair.  But in this one
19    they say Aaron Cox.  Right?  And we don't know exactly what was
20    said.  We know that he had just one big photograph and then a
21    couple photographs of the brothers Goree.  But certainly no
22    spread, right, of photographs.  And we don't know exactly how
23    it was presented because they don't record those.  They record
24    everything else, but they don't record the proffer interviews
25    when these people like Ray Lee and Yusef Phillips are in there

1  testifying to the agents.  It's all set up, right?  In advance.

2  They don't have to scramble like at the Woodland Mall.  They

3  can bring their equipment and set it up and record it, but they

4  don't.  So we don't have that.  What we do have is one time a

5  half kilo.

6  November 7th, 2017, testifies in front of the

7  grand jury.  Ray Lee testifies in front of the grand jury at 10

8  something in the morning.  And testifies -- now he's moved from

9  a half key to kilos over from 2014 to 2017.  Every month a

10  kilo.  Or a half a key.  Every month.  Okay?

11  October of 2018, last week, or I don't know when it

12  was.  Last week or the week before that, whenever he came in to

13  testify.  That didn't make sense, right, because just out of

14  the blue you meet somebody and, "Okay, I'll start buying a

15  key."  So now he's got to testify, and he testified here after

16  riding down, right, with Yusef Phillips.  No, you've got to

17  start out slow.  That's how you start out.  So now we have his

18  testimony changing.

19  Now we start out in ounces for a while and we lead up

20  to kilos.  Right?  So that's how it would work.  But on the

21  government's closing they indicated to you that it was kilos

22  from -- kilos and half kilos from 2014 to 2017.  Well, that was

23  his grand jury testimony.  That wasn't what he told you.  I

24  think one of the other attorneys got into -- I think it was

25  Ms. Chartier that got into how much he was charging.  Okay.

He's testified here in front of you that he was charging 38,
39 thousand dollars for a kilo, but now he's giving it at cost
to Mr. Tatum.  Right?

And I just have to mention that on Mr. Tatum, all
right?  He's going to give him a kilo at cost and then he's
giving testers of heroin?  What sense does that make?  Right?

So then I ask him about Cox.  Yeah, so now he's
giving it to Cox for $35,000 because that's what he said
before.  And now he says for the first time ever, "Oh, that's
stepped on.  That's cut."  Okay.  So that's different.  Never
said anything about that before.

So this is how a witness is made and this is how
Mr. Lee evolved.  Like Kirkland said, "My calculations got
better."

So this conspiracy is unsupported.  Right?  It's
unsupported, but it's not unsupported for lack of trying.  This
investigation rivals any CSI or one of those shows that use all
these things.  They started back in 2012, I think, with the
Grand Rapids Police Department, they started getting
information on this drug-trafficking organization.  They had
confidential informants on the ground.  That's what this
represents.  I found these on the internet, the little
silhouettes with question marks in their heads.

We don't know who they are.  They are confidential
informants.  They are doing controlled buys.  They are

1   street-level knowledge.  And then we have all the agencies

2   involved in this thing.  And they all come and they all bring

3   their resources.  They all bring their intel.  We had from

4   several narc units that all have people on the ground,

5   street-level, and yet nothing.  No confidential informant.  No

6   controlled buy associated with Aaron Cox over the whole course

7   of this conspiracy.  And he's supposedly this big kilo dealer

8   individual.

9          Their surveillance.  I'm sure they were a little bit

10  slicker than this, you know, but they had had surveillance

11  going on for a long period of time.  Three-man teams.

12  Utilizing that as well as their GPS trackers to follow Ray Lee.

13  I think Ms. Guidice indicated they had multiple cars on GPS.

14  And nothing associated with Aaron Cox.  And I -- regarding this

15  car-tracker business.  I just asked -- you see the car tracker

16  in a few of their exhibits.  But I also asked them about just a

17  random few people.  I think it was Kim Foster, Mr. Marshall,

18  and one of Lee's girlfriends.  They tracked them, kept track of

19  it, they had them at the -- her -- Kim Foster's house,

20  Kayode Marshall's house, and his girlfriend's house multiple

21  times throughout the course of their investigation.  And again,

22  never is this tracker seen on Plainfield where my client lives.

23  It's never seen associated with my client.  It's a lack of

24  evidence.

25         The phone.  Significant phone information in this

1   particular case.  We've got trap and trace.  GPS ping.  The
2   wiretaps.  The only time that anything is captured with my
3   client is September 1st, one call on September 1st and
4   September 2nd, 2017.  That's it.  Going back on this entire
5   conspiracy, my -- Mr. Cox, my client, is never picked up on any
6   of their seven phones that they had wire on.
7           Toll information.  This is the -- all the phones,
8   phone calls, that they had thousands and thousands and
9   thousands.  And the government is going to get up and say,
10  "Well, Mr. Cox's phone just started on September 1.  That's why
11  they don't have them going back."
12          Well, they had Mr. Lee.  They had intel analysts,
13  phone analysts, Ms. Mesyn -- I hope I'm not getting your name
14  wrong, but I think that's how she pronounces her name -- to
15  scrub, as I call it, the phone records.  And they had witnesses
16  to help them.
17          Well, this number, this number, this number, I see on
18  some of their exhibits they had six cell phones for Mr. Lee.
19  And all the toll associated with that.  But yet nothing,
20  nothing with Mr. Cox.
21          And the Cellebrite.  They had 20 search warrants
22  executed on September 3rd, 2017.  We only heard about a handful
23  of them, right?  But out of all those, I think
24  Special Agent Guidice indicated they had a lot of phones out of
25  there, right?  So they are scrubbing all of these phones.  And

1   Cellebrite is a download of what's on the phone.  That's

2   phone calls, phone messages, the text messages, whatever is on

3   the phone.  Pictures.  Nothing.  Out of all of those search

4   warrants in this conspiracy, right, out of all of that, nothing

5   connects it to Aaron Cox.  Nothing.  It's the lack of evidence.

6   Reasonable doubt can be borne out of the evidence or the lack

7   of evidence.

8          Special Agent Guidice.  And I put it up here.  She

9   testified under oath on November 8th, 2017, that there was no

10  corroboration.  She's right.  She's right.  There's no

11  corroboration.  No physical surveillance going back from 2013

12  up to September of 2017.  Wire transfers, fake businesses.

13  Nothing on the tracking.  No phone.  I could go on and on and

14  on.  Right?  They have got nothing.

15         On September 2nd they didn't verify it.  They didn't

16  verify the possession with intent to deliver.  They have

17  nothing to weigh.  Nothing to show you.  Going back on the

18  conspiracy, they have got nothing new.  They have got nothing

19  throughout that whole thing except Ray Lee.  That's it.  Do not

20  convict on the unsupported testimony of Ray Lee.  Thank you.

21         *THE COURT:*  All right.  Thank you, Mr. Hills.

22         And we'll go to the government's rebuttal, which will

23  be the final argument of the day.

24         *MR. BAKER:*  Let's talk about support for the

25  witnesses we offered to you.  Each one of the witnesses that

1   was on the stand that we called and relied on in our closing

2   was supported by the phones.  You heard some argument today,

3   and you will hear argument from me, and I believe you'll hear

4   instruction from the judge, and you already have it, and you'll

5   have it back with you, that what you're supposed to evaluate is

6   the evidence you saw in court.  What you heard and saw and what

7   was testified to in court.

8          Each of defense counsel have wanted to spend a lot of

9   time about what didn't happen in court.  What didn't happen

10  over time.  What didn't happen in the investigation.  But what

11  you're called to do and what your job is to do and what you are

12  sworn to do is to evaluate what was present in front of you.

13         I suggest to you, ladies and gentlemen, that if

14  Justice Jackson and the Nuremberg prosecutors had had wiretaps,

15  they would talk differently about the witnesses they called.

16  Because what you had in this case was a wiretap on each one of

17  these defendants.

18         There are interceptions with regard to every one of

19  the defendants in this trial.  And you know that they are the

20  speakers on the phone calls not only because Ray Lee told you

21  and because Yusef Phillips told you and because

22  Salvador Cervantes told you and because Toranita Meridy told

23  you but because Special Agent Guidice told you.

24         There were suggestions from each one of these

25  defendants that it was a game.  That Yusef Phillips knew the

1    game and he taught as many people as he could.  Ladies and

2    gentlemen, this is not a game.  I've heard the drug-transaction

3    game described that way, but this is a court of law, and you

4    are sworn to make a decision beyond a reasonable doubt in the

5    course of the case.  And we are not conducting a game here.

6         I suggest to you that if you look at the evidence

7    piled on the two dollies in front of you, there is absolutely

8    no evidence that anyone, much less Yusef Phillips and Ray Lee,

9    outfoxed Special Agent Guidice or Task Force Officer Schafer or

10   the DEA or the government in this case.

11        Yusef Phillips has been sentenced to 25 years in

12   jail.  Ray Lee has been sentenced to 16 1/2 years in jail.

13   They are cooperating with the government pursuant to their

14   Plea Agreement.  If you have a problem with their cooperation,

15   blame the government.  And specifically you should blame me.

16   But they were called to testify.  So let's talk about the

17   support for their testimony.

18        The government didn't pick Yusef Phillips and Ray Lee

19   to be its kilogram customers for cocaine and heroin in

20   Grand Rapids.  Alex Castro picked them.

21        The government didn't pick Yusef Phillips as their

22   supplier.  Max Avery and Dante Howard and Andrea Thompson

23   picked Yusef Phillips.

24        The government didn't pick Ray Lee as its supplier.

25   Aaron Cox, Solon Tatum, Erika Atkinson, and Michael Nelson

1    picked him as their supplier.

2         The Court has instructed you that you're supposed to

3    treat the government's witnesses when they have cooperation

4    deals with caution, and you should.  You need to look for

5    corroboration for those witnesses.  You need to look at what

6    they have told you and hold it up.  As you weigh the evidence,

7    how can you believe what they are saying?  In the course of

8    this case, ladies and gentlemen, the reason you can believe

9    these witnesses is because of the phones.  It wasn't just them

10   saying that's who they are talking to.  And it's not just

11   Special Agent Guidice.  If you look at these phone calls and

12   you watch the surveillance, these defendants set up their own

13   meetings.  They talked about the things that are corroborated

14   by other witnesses that have testified and surveillance that

15   was seen.

16        Max Avery, just to give you an example, who

17   challenges whether or not he's the person on the phone, for his

18   phone number, the phone number that he uses, though it's

19   registered to a Mario Martinez, and if you look at the

20   registration for each one of the phones, and you've heard about

21   so many phone numbers in this case, but you'll see in the

22   stipulation none of them is registered to any of these

23   defendants because drug dealers do not register their drug

24   phones in their own names.  None of these people did.

25        But at 3:59 on September 1st, 2017, Yusef Phillips

sent a text to Max Avery, and that text said, "I'm here."  And
if you look at the video at 3:59 on September 1st, 2017, in the
parking lot of the Woodland Mall Max Avery gets into
Yusef Phillips' car.

And if you listen to the phone calls that we heard in
the course of this case and you align those phone calls with
the dates and times where the communications happened, they are
very much like the one that Dante Howard had with
Yusef Phillips on August 2nd when he sent a woman in a black
car to pick up that bag.  What's in the bag, ladies and
gentlemen?  A kilogram of cocaine.  And you know you can trust
the witness that testified about that because how in the name
of all that came in before you in this case could they have
orchestrated in retrospect the amount of information that they
would need to to make up information about each of these eight
defendants and coordinate it with each of their dropped phones
and all of the physical surveillance and all of the
surveillance of their stash houses?

Each of these defendants share something else in
common.  The drugs they received came directly from those stash
houses where the search warrants were performed on the day of
the takedown.  Everything you've heard and seen you have to
weigh together.  It doesn't make sense by itself any more than
any one of those phone calls sitting in a vacuum would make
sense by itself.  But the phone call, "I'll be there tomorrow."

1    "I'm coming."  And then the surveillance of Ray Lee or

2    Yusef Phillips going into the stash house before they go and

3    meet with each one of these defendants or their couriers as

4    they came together.  Another phone call, "I'm here."  If you

5    put them in sequence, they make sense.  If you put them in

6    sequence with all that was found in the stash house, it makes

7    sense.  That is what you were called to do.  To weigh the

8    evidence that was put before you in the course of this case.

9    All of the evidence.  And that is the support.  For each one of

10   these defendants there was correspondence of drugs going to or

11   from those stash houses in immediate proximity to the

12   deliveries to those defendants.  The phone calls show you.  How

13   would Yusef Phillips and Ray Lee -- Yusef Phillips who has been

14   shot and is in a hospital on September 3rd -- and

15   Salvador Cervantes coordinate this grand a story based upon

16   their drug phones they know they drop every 30 days?

17          If you look at Government Exhibit 7, which is the

18   chart of the target phones in the case that relate to what you

19   heard, the five separate phones that you heard in this case,

20   you'll see that we were not listening to Ray Lee's phones more

21   than 27 days total over three phones.  How would Ray Lee and

22   Yusef Phillips for those 27 days coordinate an orchestrated

23   story which frames up each of these eight defendants with

24   Salvador Cervantes who began speaking, as he testified to, to

25   law enforcement on the day of his arrest about where he got the

drugs.

Mr. Lombard suggested to you that Salvador Cervantes and Yusef Phillips, who did not even know each other's names when they were meeting and delivering these drugs over a period of years, decided during one of those big deliveries with Mr. Castro's drugs, 10 kilos or hundreds of thousands of dollars, "Hey, by the way, if we ever get caught, we're going to be looking at lots of time, because this is a lot of drugs. So let's come up with a good idea. And I've got a name. This is a great name. A guy I know. You probably have him on your phone. Do you have him on your phone too? Let's blame Alex Castro just in case the DEA ever busts in and arrests us."

Ladies and gentlemen, that's preposterous. And they could not have done it with regard to all the information you saw in the investigation that showed what they were up to. They could not thread the needle through all that investigation.

And I'll show you why they couldn't. You saw an example of someone who tried to do that in the course of this case. That was Solon Tatum. He got up on the witness stand and he testified, and he had to explain away five separate phone calls and three separate meetings in parking lots. So he gives you the T-clipper, right? That takes care of two meetings. And then his credit-reporting business. Well, you know that Solon Tatum lied to you. First because he lied on

the stand.  The first thing he said, the first time he was up
on the stand when he was asked about whether or not he had a
license, he said, "I didn't really get around to it."  But on
cross-examination he had to admit to you that his felony
conviction prevented him from getting around to it.  That was a
lie.

He told you he earned $110,000 in cash per year as a
barber, but he never paid taxes and he never registered his
business with the State of Michigan.  Other lies.

But beyond that, what he told you on its face was a
lie.  And you are called to use your common sense and your
experience in your lives as you assess the credibility of the
witnesses and the evidence in the case, and what Solon Tatum
told you was not credible.

He was driving across town to the Woodland Mall to
drop off clippers to Ray Lee who came into his barber shop?
When everybody else you heard from came to his barber shop for
the same reason?  He was getting a box of a Food Saver which
was actually a scanner which he was purchasing for $200?
Ray Lee has over $400,000 in cash not five miles away and he's
going to sell somebody a scanner like it's on Craig's List for
200 bucks?  And then he's going to go back to the same person
for credit counseling?  Ray Lee doesn't need credit counseling.
Ray Lee needs a job, right?  But he's got $400,000 in cash.  He
needs someplace to hide his money.  That's not credit

1    counseling, ladies and gentlemen.  Ray Lee is not the person to

2    drum up business for your credit-counseling business.  Those

3    ideas are preposterous.

4         What happened in each one of the videos that you

5    watched in the course of this case for each one of these

6    individuals after Ray Lee or Yusef Phillips went to the stash

7    house to come and see them is exactly what it looked like,

8    someone surreptitiously delivering a box or drugs to another

9    car which the defendants then hid in their own car and drove

10   off.  You saw cash exchanged in some cases.  You saw boxes in

11   others.  You saw Max Avery climb in the back of his Suburban to

12   hide 150 to a hundred grams of heroin for maybe two minutes

13   before he drove back to Indianapolis.

14        The evidence in this case when weighed together and

15   added together is clear.  Each one of these defendants is

16   guilty as charged, and each one of the witnesses that testified

17   about their activity was supported not only by each other but

18   by all the evidence that surrounded the case.  We ask you to

19   weigh all that evidence as a whole, to weigh each witness on

20   the basis of what they have told you, not whether or not you'd

21   listen to their advice on whether or not you'd get medical

22   treatment or buy a house but about the drug transaction they

23   were involved in.  They are the best witness for that

24   transaction because they were there.  And you know what they

25   are telling you about what happened is true because you

1   listened to it as it happened on their phone and you watched it

2   as it happened on the video and through the eyes of the law

3   enforcement officers there.  Each defendant is guilty of

4   conspiracy.  Those charged are guilty of possession with intent

5   to distribute on the days that you watched in the course of

6   this case.  We ask you for a verdict consistent with that

7   evidence.  Thank you.

8           *THE COURT:*  All right.  Well, thank you to counsel

9   all around.  And thank you, Members of the Jury.  You thought

10  the first two weeks were hard.  This is -- this is a tough day

11  to be sitting and listening to even excellent lawyers give

12  their closing arguments uninterrupted from whenever we started

13  this morning after my instructions.  I think that was about

14  10:00.  It's a long day.  I have about 10 more minutes of

15  instructions to give you, and I'm tired and I'm sure you're

16  more tired, so I'm going to ask you to come back tomorrow

17  morning, and this way if I leave you out now at 4:30, you can

18  still hopefully beat the traffic out of downtown.  You can get

19  rested up so that you're ready to go tomorrow morning with

20  deliberations after I give you about 10 minutes of instructions

21  and come back at it fresh.  And I think that's going to be a

22  better way to start.

23          It will also allow me to finish a hearing on a

24  completely unrelated case.  People have been waiting around

25  since about 3:00 today because when we were scheduling we

1    thought today would still be a day that you left at 3:00.  So

2    that, I think, is going to be easier than finishing the

3    instructions now and getting you set up.

4            The last thing is that the IT department of the court

5    will be setting up -- may have already done it -- but will be

6    setting up a monitor for you in the court -- or in the jury

7    room so that you, as you're deliberating, can pick and choose,

8    or listen to all of it if you want to, the intercepted phone

9    calls, the video, and look at, of course, all the paper

10   exhibits that were admitted.  So that will give everybody time

11   to set that up so that when you hit the ground on deliberations

12   tomorrow you'll be as fresh and as equipped as you can possibly

13   be.  So thank you for all of your attentions today.  We'll give

14   you a chance to get out of town now before the rush, and we'll

15   see you tomorrow at 8:30.  Thank you.

16           *(Jury exited the courtroom at 4:41 p.m.)*

17           *THE COURT:*  All right.  We'll be back tomorrow.

18   We'll have the jury officers sworn.  We'll have the alternates

19   put in a separate place so that they are available in case

20   there's questions from the regular jury.  My practice is to

21   bring them into the back so that they can hear the answers

22   along with the regular jury if that happens.  And then if they

23   need to sub in, they can do it with the same information set

24   that the regular jury has.

25           So please have your exhibit books or your

1  thumb drives, whatever else, ready to go.  You can give it to

2  Mr. Schmidt tonight or you can have it ready in the morning.

3  On one of the thumb drives, I'm not sure if it was the

4  government or the defense, when we tested it there was a

5  password.  So if you want the jury to see it, you better make

6  sure we have the password.

7        So the last thing for tomorrow, I don't know how that

8  room downstairs is working out for the defense group, the

9  sub-basement.

10       *MR. LOMBARD:*  I don't think anyone has used it,

11  actually.

12       *THE COURT:*  Well, then you don't know how it's

13  working.

14       My concern in terms of tomorrow is if the jury comes

15  back with a question, getting the whole group assembled is a

16  bit of a logistical challenge.  So please, at least when we get

17  started, maybe the defense group can check out that basement

18  room so that if they have a question in the first hour or so we

19  won't have to gather everybody up from wherever you're all

20  staying.  And the government, maybe you can stay in your

21  facilities at least for the first hour or so.

22       Once they get into it and it's clear that they are

23  going to go awhile, or it seems like it, people can wander a

24  little bit.  Just make sure we have a cell phone to get ahold

25  of everybody.  The closer the better.

1          I really didn't expect to enjoy myself, you know, but
2     I have to say this went about as well as I could have imagined
3     with nine sets of lawyers.  There was a ton of information.  I
4     thought everybody on both sides were really adept at focusing
5     on what mattered to their respective case.  And today was a
6     long day.  I mean, it really was.  But as I said before, I
7     don't think it was a long day because anybody was doing a lousy
8     job.  I think it was a long day despite the fact that you were
9     all doing a great job.
10          So I know at the end of this case, despite what you
11    read on the wall in England, no matter what happens the crown
12    wins, well, if the crown doesn't get their position sustained,
13    they are going to be disappointed.  And if the defense doesn't
14    get their position sustained, they are going to be
15    disappointed.  I know that's going to happen whenever the jury
16    comes back.  But I hope that, particularly from the client
17    perspectives at both tables, you realize that this group of
18    lawyers did just an outstanding job highlighting what needed to
19    be highlighted to give the jury insight into how you saw the
20    case.  And truly I enjoyed it.  I had a lot of fun.  I'm not
21    saying I'm ready to do it again next week, but this was really
22    a great gathering of excellent lawyers in my view, and you made
23    my job a lot easier as a result.  So thank you for all of that.
24          Are there things we need to cover today before we
25    finish, Mr. Baker?

1      *MR. BAKER:*  Your Honor, I raised this with defense

2   counsel before we turned back our thumb drive.  The VLC program

3   from Woodland Mall, I don't believe -- I don't know if the

4   court has an adaptable program, but in Windows Media for

5   occasional video sometimes they played upside down.  I raised

6   that with the Court and I raised it for defense counsel.  I

7   know the Court's normal practice is to play things in court.

8   If they ask about that, we could do that.  But there was no fix

9   for what we had if you didn't have the VLC program.

10      *THE COURT:*  All right.  Well, we'll test out if we

11   have the thumb drive and equipment what it looks like.  And I'm

12   not saying we won't come back into court.  Particularly if the

13   jury is having troubles with the equipment.  But I would like

14   to avoid it given the volume of material.  And I also think for

15   the jury's own deliberations, I think if they can privately

16   assess what matters to them, they would be better off.

17      *MR. BAKER:*  Agreed.

18      *THE COURT:*  Are there other things from any of the

19   defense counsel?

20      *MS. CHARTIER:*  No, Your Honor.

21      *THE COURT:*  All right.  Okay.  See you tomorrow at

22   8:30.

23      *MR. BAKER:*  Thank you, Your Honor.

24      *THE CLERK:*  Court is in recess.

25      *(Proceeding concluded at 4:45 p.m.)*

1          I certify that the foregoing is a correct transcript

2  from the record of proceedings in the above-entitled matter.

3          I further certify that the transcript fees and format

4  comply with those prescribed by the court and the Judicial

5  Conference of the United States.

6

7  Date:  May 1, 2019

8

9                    **/s/ Glenda Trexler**

10                   Glenda Trexler, CSR-1436, RPR, CRR

1                    *EXAMINATION INDEX*

2                                              *PAGE*

3    *GABRIEL HOLMES*

4        *DIRECT EXAMINATION BY MR. NYAMFUKUDZA:*    *2391*

5        *CROSS-EXAMINATION BY MR. BAKER:*           *2395*

6    *EDDIE LAIRD*

7        *DIRECT EXAMINATION BY MR. NYAMFUKUDZA:*    *2396*

8        *CROSS-EXAMINATION BY MR. BAKER:*           *2400*

9    *HARRY KNOWLING*

10       *DIRECT EXAMINATION BY MR. NYAMFUKUDZA:*    *2401*

11       *CROSS-EXAMINATION BY MR. BAKER:*           *2409*

12   *ALEXIS GUIDICE*

13       *DIRECT EXAMINATION BY MS. CHARTIER:*       *2410*

14       *CROSS-EXAMINATION BY MR. BAKER:*           *2412*

15       *REDIRECT EXAMINATION BY MS. CHARTIER:*     *2412*

16                    *        *        *        *        *

17                    *EXHIBIT INDEX*

18   *EXHIBIT*                              *OFFERED   ADMITTED*

19   *DFS 7A-7E Photographs of Gifted Hands    2404       2405*

20         *barber shop*

21

22

23

24

25